# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 24, 2017   Decided January 31, 2018

No. 15-1177

PHH CORPORATION, ET AL.,
PETITIONERS

v.

CONSUMER FINANCIAL PROTECTION BUREAU,
RESPONDENT

———

On Petition for Rehearing En Banc

———

*Theodore B. Olson* argued the cause for petitioners. With him on the briefs were *Helgi C. Walker*, *Lucas C. Townsend*, *Mitchel H. Kider*, *David M. Souders*, *Thomas M. Hefferon*, and *William M. Jay*.

*Andrew J. Pincus*, *Stephen C.N. Lilley*, *Matthew A. Waring*, *Kate Comerford Todd*, and *Steven P. Lehotsky* were on the brief for *amicus curiae* The Chamber of Commerce of the United States of America in support of petitioners.

*David K. Willingham*, *Michael D. Roth*, *Jeffrey M. Hammer*, and *Kelly L. Perigoe* were on the brief for *amici curiae* RD Legal Funding, LLC, et al. in support of petitioners.

*Joseph R. Palmore* and *Bryan J. Leitch* were on the brief for *amici curiae* American Bankers Association, et al. in support of petitioners and vacatur.

*David T. Case* and *Phillip L. Schulman* were on the brief for *amicus curiae* The National Association of Realtors® in support of petitioners and reversal of the June 4, 2015 order of the Director of the Consumer Financial Protection Bureau.

*Jay N. Varon* and *Jennifer M. Keas* were on the brief for *amici curiae* American Land Title Association, et al. in support of petitioners.

*Joshua D. Hawley*, Attorney General, Office of the Attorney General for the State of Missouri, and *D. John Sauer*, State Solicitor, were on the brief for *amici curiae* the States of Missouri, et al. in support of petitioners.

*Kirk D. Jensen*, *Joseph M. Kolar*, and *Alexander S. Leonhardt* were on the brief for *amicus curiae* The Consumer Mortgage Coalition in support of petitioner.

*Marc J. Gottridge*, *Allison M. Wuertz*, *Ilya Shapiro*, and *Thaya Brook Knight* were on the brief for *amicus curiae* The Cato Institute in support of petitioners.

*Brian Melendez* was on the brief for *amicus curiae* ACA International in support of petitioners.

*C. Boyden Gray*, *Adam R.F. Gustafson*, *James R. Conde*, Gregory *Jacob*, *Sam Kazman*, and *Hans Bader* were on the brief for *amici curiae* State National Bank of Big Spring, et al. in support of petitioners.

*Hashim M. Mooppan*, Attorney, U.S. Department of Justice, argued the cause as *amicus curiae* United States of America. On the brief were *Douglas N. Letter*, *Mark B. Stern*, *Daniel Tenny*, and *Tara S. Morrissey*, Attorneys. *Ian H. Gershengorn*, Attorney, entered an appearance.

*Lawrence DeMille-Wagman*, Senior Litigation Counsel, Consumer Financial Protection Bureau, argued the cause for respondent. With him on the brief was *John R. Coleman*, Deputy General Counsel.

*George Jepsen*, Attorney General, Office of the Attorney General for the State of Connecticut, and *John Langmaid*, Assistant Attorney General, were on the brief for The States of Connecticut, et al. in support of respondent.

*Thomas C. Goldstein*, *Eric Citron*, *Tejinder Singh*, and *Deepak Gupta* were on the brief for *amici curiae* Americans For Financial Reform, et al. in support of respondent.

*Elizabeth B. Wydra*, *Brianne J. Gorod*, and *Simon Lazarus* were on the brief for *amici curiae* Current and Former Members of Congress in support of respondent.

*Scott L. Nelson* and *Allison M. Zieve* were on the brief for *amici curiae* Public Citizen, Inc., et al. in support of respondent.

*Julie Nepveu* was on the brief for *amici curiae* AARP and AARP Foundation in support of respondent.

*Deepak Gupta* was on the brief for *amici curiae* Financial Regulation Scholars in support of respondent.

4

*Katharine M. Mapes*, *Jessica R. Bell*, and *Jeffrey M. Bayne* were on the brief for *amici curiae* Separation of Powers Scholars in support of Consumer Financial Protection Bureau.

Before: GARLAND[*], *Chief Judge*, HENDERSON, ROGERS, TATEL, BROWN[**], GRIFFITH, KAVANAUGH, SRINIVASAN, MILLETT, PILLARD, WILKINS, and KATSAS[*], *Circuit Judges* and RANDOLPH, *Senior Circuit Judge.*

Opinion for the Court filed by *Circuit Judge* PILLARD.

Concurring opinion filed by *Circuit Judge* TATEL, with whom *Circuit Judges* MILLETT and PILLARD join.

Concurring opinion filed by *Circuit Judge* WILKINS, with whom *Circuit Judge* ROGERS joins.

Opinion concurring in the judgment filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH, with whom *Senior Circuit Judge* RANDOLPH joins.

Dissenting opinion filed by *Senior Circuit Judge* RANDOLPH.

---

[*] Chief Judge Garland and Circuit Judge Katsas did not participate in this matter.

[**] Circuit Judge Brown was a member of the *en banc* court but retired before issuance of this opinion.

PILLARD, *Circuit Judge*:

We granted *en banc* review to consider whether the federal statute providing the Director of the Consumer Financial Protection Bureau (CFPB) with a five-year term in office, subject to removal by the President only for "inefficiency, neglect of duty, or malfeasance in office," 12 U.S.C. § 5491(c)(3), is consistent with Article II of the Constitution, which vests executive power "in a President of the United States of America" charged to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 1, cl. 1; *id.* § 3. Congress established the independent CFPB to curb fraud and promote transparency in consumer loans, home mortgages, personal credit cards, and retail banking. *See* 12 U.S.C. § 5481(12). The Supreme Court eighty years ago sustained the constitutionality of the independent Federal Trade Commission, a consumer-protection financial regulator with powers analogous to those of the CFPB. *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). In doing so, the Court approved the very means of independence Congress used here: protection of agency leadership from at-will removal by the President. The Court has since reaffirmed and built on that precedent, and Congress has embraced and relied on it in designing independent agencies. We follow that precedent here to hold that the parallel provision of the Dodd-Frank Wall Street Reform and Consumer Protection Act shielding the Director of the CFPB from removal without cause is consistent with Article II.

## Introduction

The 2008 financial crisis destabilized the economy and left millions of Americans economically devastated. Congress studied the causes of the recession to craft solutions; it determined that the financial services industry had pushed

consumers into unsustainable forms of debt and that federal regulators had failed to prevent mounting risks to the economy, in part because those regulators were overly responsive to the industry they purported to police. Congress saw a need for an agency to help restore public confidence in markets: a regulator attentive to individuals and families. So it established the Consumer Financial Protection Bureau.

Congress's solution was not so much to write new consumer protection laws, but to collect under one roof existing statutes and regulations and to give them a chance to work. Congress determined that, to prevent problems that had handicapped past regulators, the new agency needed a degree of independence. Congress gave the CFPB a single Director protected against removal by the President without cause. That design choice is challenged here as an unconstitutional impediment to the President's power.

To analyze the constitutionality of the CFPB's independence, we ask two questions:

*First*, is the means of independence permissible? The Supreme Court has long recognized that, as deployed to shield certain agencies, a degree of independence is fully consonant with the Constitution. The means of independence that Congress chose here is wholly ordinary: The Director may be fired only for "inefficiency, neglect of duty, or malfeasance in office," 12 U.S.C. § 5491(c)(3)—the very same language the Supreme Court approved for the Federal Trade Commission (FTC) back in 1935. *Humphrey's Executor*, 295 U.S. at 619, 629-32; *see* 15 U.S.C. § 41. The CFPB's for-cause removal requirement thus leaves the President no less removal authority than the provision sustained in *Humphrey's Executor*; neither PHH nor dissenters disagree. The mild constraint on removal of the CFPB Director contrasts with the cumbersome or

encroaching removal restrictions that the Supreme Court has invalidated as depriving the President of his Article II authority or otherwise upsetting the separation of powers. In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), the Court left in place ordinary for-cause protection at the Securities and Exchange Commission (SEC)—the same protection that shields the FTC, the CFPB, and other independent agencies—even as it invalidated an unusually restrictive second layer of for-cause protection of the SEC's Public Company Accounting Oversight Board (PCAOB) as an interference with Article II. In its only other decisions invalidating removal restrictions, the Supreme Court disapproved of means of independence not at issue here, specifically, Congress's assigning removal power to itself by requiring the advice and consent of the Senate in *Myers v. United States*, 272 U.S. 52 (1926), and a joint resolution of Congress in *Bowsher v. Synar*, 478 U.S. 714 (1986). The Supreme Court has never struck down a statute conferring the standard for-cause protection at issue here.

*Second*, does "the nature of the function that Congress vested in" the agency call for that means of independence? *Wiener v. United States*, 357 U.S. 349, 353 (1958); *see also Morrison v. Olson*, 487 U.S. 654, 687, 691 n.30 (1988). The CFPB is a financial regulator that applies a set of preexisting statutes to financial services marketed "primarily for personal, family, or household purposes." 12 U.S.C. § 5481(5)(A); *see also id.* §§ 5481(4), (6), (15). Congress has historically given a modicum of independence to financial regulators like the Federal Reserve, the FTC, and the Office of the Comptroller of the Currency. That independence shields the nation's economy from manipulation or self-dealing by political incumbents and enables such agencies to pursue the general public interest in the nation's longer-term economic stability and success, even where doing so might require action that is politically

unpopular in the short term. In *Humphrey's Executor*, the Supreme Court unanimously sustained the requirement of cause to remove members of the FTC, a consumer protection agency with a broad mandate to prevent unfair methods of competition in commerce. The FTC, "charged with the enforcement of no policy except the policy of the law," *Humphrey's Executor*, 295 U.S. at 624, could be independent consistent with the President's duty to take care that the law be faithfully executed. The CFPB's focus on the transparency and fairness of financial products geared toward individuals and families falls squarely within the types of functions granted independence in precedent and history. Neither PHH nor our dissenting colleagues have suggested otherwise.

The ultimate purpose of our constitutional inquiry is to determine whether the means of independence, as deployed at the agency in question, impedes the President's ability under Article II of the Constitution to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. It is beyond question that "there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role." *Morrison*, 487 U.S. at 690. Nobody would suggest that Congress could make the Secretary of Defense or Secretary of State, for example, removable only for cause. At the same time, the Court has consistently affirmed the constitutionality of statutes "conferring good-cause tenure on the principal officers of certain independent agencies." *Free Enterprise Fund*, 561 U.S. at 493.

The Supreme Court has distinguished those removal restrictions that are compatible with the President's constitutionally assigned role from those that run afoul of Article II in the line of removal-power cases running from *Myers*, 272 U.S. 52, through *Humphrey's Executor*, 295 U.S. 602, *Wiener*, 357 U.S. 349, *Bowsher*, 478 U.S. 714, *Morrison*,

487 U.S. 654, and *Free Enterprise Fund*, 561 U.S. 477. The Court has repeatedly held that "a 'good cause' removal standard" does not impermissibly burden the President's Article II powers, where "a degree of independence from the Executive . . . is necessary to the proper functioning of the agency or official." *Morrison*, 487 U.S. at 691 n.30, 686-96; *see Wiener*, 357 U.S. at 356; *Humphrey's Executor*, 295 U.S. at 631. Armed with the power to terminate such an "independent" official for cause, the President retains "ample authority to assure" that the official "is competently performing his or her statutory responsibilities." *Morrison*, 487 U.S. at 692.

Petitioners in this case, PHH Corporation, PHH Mortgage Corporation, PHH Home Loans, LLC, Atrium Insurance Corporation, and Atrium Reinsurance Corporation (collectively, PHH), would have us cabin the Court's acceptance of removal restrictions by casting *Humphrey's Executor* as a narrow exception to a general prohibition on *any* removal restriction—an exception it views as permitting the multi-member FTC but not the sole-headed CFPB. The distinction is constitutionally required, PHH contends, because "multi-member commissions contain their own internal checks to avoid arbitrary decisionmaking." Pet'rs' Br. 23.

PHH's challenge is not narrow. It claims that independent agencies with a single leader are constitutionally defective while purporting to spare multi-member ones. But the constitutional distinction PHH proposes between the CFPB's leadership structure and that of multi-member independent agencies is untenable. That distinction finds no footing in precedent, historical practice, constitutional principle, or the logic of presidential removal power. The relevance of "internal checks" as a substitute for at-will removal by the President is no part of the removal-power doctrine, which focuses on

executive control and accountability to the public, not the competing virtues of various internal agency design choices. Congress and the President have historically countenanced sole-headed financial regulatory bodies. And the Supreme Court has upheld Congress's assignment of even unmistakably executive responsibilities—criminal investigation and prosecution—to a sole officer protected from removal at the President's will. *Morrison*, 487 U.S. at 686-96.

Wide margins separate the validity of an independent CFPB from any unconstitutional effort to attenuate presidential control over core executive functions. The threat PHH's challenge poses to the established validity of other independent agencies, meanwhile, is very real. PHH seeks no mere course correction; its theory, uncabined by any principled distinction between this case and Supreme Court precedent sustaining independent agencies, leads much further afield. Ultimately, PHH makes no secret of its wholesale attack on independent agencies—whether collectively or individually led—that, if accepted, would broadly transform modern government.

Because we see no constitutional defect in Congress's choice to bestow on the CFPB Director protection against removal except for "inefficiency, neglect of duty, or malfeasance in office," we sustain it.

### Background

The 2008 financial crisis cost millions of Americans their jobs, savings, and homes. The federal commission that Congress and the President chartered to investigate the recession found that, by 2011, "[a]bout four million families have lost their homes to foreclosure and another four and a half million have slipped into the foreclosure process or are seriously behind on their mortgage payments." Financial Crisis Inquiry Commission, *The Financial Crisis Inquiry*

*Report*, at xv (2011). All told, "[n]early $11 trillion in household wealth has vanished, with retirement accounts and life savings swept away." *Id.* In Congress's view, the 2008 crash represented a failure of consumer protection. The housing bubble "was precipitated by the proliferation of poorly underwritten mortgages with abusive terms," issued "with little or no regard for a borrower's understanding of the terms of, or their ability to repay, the loans." S. Rep. No. 111-176, at 11-12 (2010). Federal bank regulators had given short shrift to consumer protection as they focused (unsuccessfully) on the "safety and soundness" of the financial system and, post-crisis, on the survival of the biggest financial firms. *Id.* at 10. Congress concluded that this "failure by the prudential regulators to give sufficient consideration to consumer protection . . . helped bring the financial system down." *Id.* at 166.

Congress responded to the crisis by including in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010), a new regulator: the Consumer Financial Protection Bureau. Congress gave the new agency a focused mandate to improve transparency and competitiveness in the market for consumer financial products, consolidating authorities to protect household finance that had been previously scattered among separate agencies in order to end the "fragmentation of the current system" and "thereby ensur[e] accountability." S. Rep. No. 111-176, at 11.

The CFPB administers eighteen preexisting, familiar consumer-protection laws previously overseen by the Federal Reserve and six other federal agencies, virtually all of which were also independent. These laws seek to curb fraud and deceit and to promote transparency and best practices in consumer loans, home mortgages, personal credit cards, and retail banking. *See* 12 U.S.C. § 5481(12). The CFPB is

charged "to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services" that "are fair, transparent, and competitive." *Id.* § 5511(a). Additionally, the CFPB has authority to prohibit any "unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." *Id.* § 5531(a).

To lead this new agency, Congress provided for a single Director to be appointed by the President and confirmed by the Senate. *Id.* §§ 5491(b)(1)-(2). Congress designed an agency with a single Director, rather than a multi-member body, to imbue the agency with the requisite initiative and decisiveness to do the job of monitoring and restraining abusive or excessively risky practices in the fast-changing world of consumer finance. *See, e.g.,* S. Rep. No. 111-176, at 11. A single Director would also help the new agency become operational promptly, as it might have taken many years to confirm a full quorum of a multi-member body. *See* 155 Cong. Rec. 30,826-27 (Dec. 9, 2009) (statement of Rep. Waxman) (noting that a single director "can take early leadership in establishing the agency and getting it off the ground").

The Director serves a five-year term, with the potential of a holdover period pending confirmation of a successor.[1] 12

---

[1] Congressional inaction or delayed confirmation would not necessarily extend the period of for-cause protection. Oral Arg. Tr. 48-49. *Cf. Swan v. Clinton*, 100 F.3d 973, 988 (D.C. Cir. 1996) ("[E]ven if the [National Credit Union Administration] statute were interpreted to grant removal protection to Board members during their appointed terms[,] . . . this protection does not extend to holdover members.").

U.S.C. §§ 5491(c)(1)-(2). The President may remove the Director "for inefficiency, neglect of duty, or malfeasance in office," *i.e.*, for cause. *Id.* § 5491(c)(3). By providing the Director with a fixed term and for-cause protection, Congress sought to promote stability and confidence in the country's financial system.

Congress also determined "that the assurance of adequate funding, independent of the Congressional appropriations process, is absolutely essential to the independent operations of any financial regulator." S. Rep. No. 111-176, at 163. Congress has provided similar independence to other financial regulators, like the Federal Reserve, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, the National Credit Union Administration, and the Federal Housing Finance Agency, which all have complete, uncapped budgetary autonomy. *See infra* Part I.C.2. Congress authorized the CFPB to draw from a statutorily capped pool of funds in the Federal Reserve System rather than to charge industry fees or seek annual appropriations from Congress as do some other regulators. The Federal Reserve is required to transfer "the amount determined by the Director [of the CFPB] to be reasonably necessary to carry out the authorities of the Bureau," up to twelve percent of the Federal Reserve's total operating expenses. 12 U.S.C. §§ 5497(a)(1)-(2). If the Bureau requires funds beyond that capped allotment, it must seek them through congressional appropriation. *Id.* § 5497(e).

The Real Estate Settlement Procedures Act of 1974 (RESPA) is one of the eighteen preexisting statutes the CFPB now administers. *See* 12 U.S.C. §§ 2601-2617. RESPA aims at, among other things, "the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain [real estate] settlement services." *Id.* § 2601(b)(2). To that end, RESPA's Section 8(a) prohibits giving or accepting "any fee,

kickback, or thing of value pursuant to any agreement or understanding" to refer business involving a "real estate settlement service." *Id.* § 2607(a). The term "thing of value" is "broadly defined" and includes "the opportunity to participate in a money-making program." 12 C.F.R. § 1024.14(d). Another provision of RESPA, Section 8(c)(2), states that "[n]othing in this section shall be construed as prohibiting . . . the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c).

In this case, the CFPB Director interpreted those provisions of RESPA as applied to PHH's mortgage insurance and reinsurance transactions. Mortgage insurance protects lenders in the event a borrower defaults on a mortgage loan. Mortgage lenders often require riskier borrowers to purchase such insurance as a condition of approving a loan. *See* Director's Decision at 3. In turn, insurers may obtain *re*insurance, transferring to the reinsurer some of their risk of loss in exchange for a portion of the borrower's monthly insurance premiums. Borrowers do not ordinarily shop for mortgage insurance, let alone reinsurance; rather, they are referred to insurers of the lender's choosing, to whom they then pay monthly premiums. *See id.* During the period at issue, the only mortgage reinsurers in the market were "captive"—that is, they existed to reinsure loans originated by the mortgage lenders that owned them. *See id.* at 13. In a captive reinsurance arrangement, a mortgage lender refers borrowers to a mortgage insurer, which then pays a kickback to the lender by using the lender's captive reinsurer.

On January 29, 2014, the CFPB filed a Notice of Charges against PHH, a large mortgage lender, and its captive reinsurer, Atrium. The CFPB alleged that "[t]he premiums ceded by

15

[mortgage insurers] to PHH through Atrium: (a) were not for services actually furnished or performed, or (b) grossly exceeded the value of any such services," and that the premiums were instead "made in consideration of PHH's continued referral of mortgage insurance business." Notice of Charges at 17-18.

The CFPB borrowed an administrative law judge (ALJ) from the Securities and Exchange Commission (SEC) to adjudicate the charges. The ALJ issued a Recommended Decision concluding that PHH and Atrium violated RESPA because they had not demonstrated that the reinsurance premiums Atrium collected from insurers were reasonably related to the value of its reinsurance services. The ALJ recommended that the Director order disgorgement of about $6.4 million. Director's Decision at 9.

On review of the ALJ's recommendation, the CFPB Director read RESPA to support a broader finding of misconduct and a substantially larger remedy. The Director held that a payment is "bona fide" and thus permitted under Section 8(c)(2) only if it is "solely for the service actually being provided on its own merits," and not "tied in any way to a referral of business." Director's Decision at 17. Thus, even if the reinsurance premiums had been reasonably related to the value of the reinsurance services that Atrium provided, PHH and Atrium could still be liable under the Director's reading of RESPA insofar as their tying arrangement funneled valuable business to Atrium that it would not have garnered through open competition. The Director also held that RESPA's three-year statute of limitations does not apply to the agency's administrative enforcement proceedings (only to "actions" in court) and that RESPA violations accrue not at the moment a loan closes with a tying arrangement in place, but each time monthly premiums are paid out pursuant to such a loan

agreement. *Id.* at 11, 22. Those interpretations raised the disgorgement amount to more than $109 million.

This court stayed the Director's order pending review. In October 2016, a three-judge panel vacated the Director's decision and remanded for further proceedings. 839 F.3d 1, 10 (D.C. Cir. 2016). A divided panel's majority held that providing for-cause protection to the sole director of an independent agency violates the Constitution's separation of powers. Severing the for-cause provision from the rest of the Dodd-Frank Act, the majority effectively turned the CFPB into an instrumentality of the President with a Director removable at will. *See id.* at 12-39.

The panel was unanimous, however, in overturning the Director's interpretation of RESPA. It held that Section 8 permits captive reinsurance arrangements so long as mortgage insurers pay no more than reasonable market value for reinsurance. *See* 839 F.3d at 41-44. And, even if the Director's contrary interpretation (that RESPA prohibits tying arrangements) were permissible, the panel held, it was an unlawfully retroactive reversal of the federal government's prior position. *See id.* at 44-49. Finally, according to the panel, a three-year statute of limitations applies to both administrative proceedings and civil actions enforcing RESPA. *See id.* at 50-55.

Judge Henderson joined the panel's opinion on the statutory questions but dissented from its constitutional holding on the ground that it was unnecessary in her view, and so inappropriate under the doctrine of avoidance, to reach the constitutional removal-power question. *Id.* at 56-60.

The *en banc* court vacated the panel decision in its entirety. Following oral argument, the full court, including Judge Henderson, unanimously concluded that we cannot avoid the

constitutional question. That is because the disposition of PHH's claims, reinstating the panel's statutory holding, results in a remand to the CFPB. Further action by the CFPB necessitates a decision on the constitutionality of the Director's for-cause removal protection. We accordingly decide only that constitutional question. The panel opinion, insofar as it related to the interpretation of RESPA and its application to PHH and Atrium in this case, is accordingly reinstated as the decision of the three-judge panel on those questions.

We also decline to reach the separate question whether the ALJ who initially considered this case was appointed consistently with the Appointments Clause. Our order granting review invited the parties to address the Appointments Clause implications for this case only "[i]f the *en banc* court" in *Lucia v. SEC*, 832 F.3d 277 (D.C. Cir. 2016), concluded that an SEC ALJ is an inferior officer rather than an employee. We did not so conclude. Instead, after argument in that case, the *en banc* court denied the petition for review. *Lucia v. SEC*, 868 F.3d 1021 (D.C. Cir. 2017), *cert. granted*, __ S. Ct. __, 2018 WL 386565 (Jan. 12, 2018).

Today, we hold that federal law providing the Director of the CFPB with a five-year term in office, subject to removal by the President only for "inefficiency, neglect of duty, or malfeasance in office," is consistent with the President's constitutional authority.

**Analysis**

PHH challenges the removal protection of the Consumer Financial Protection Bureau's Director, arguing that it unconstitutionally upsets the separation of powers. But the CFPB's structure respects the powers and limits of each branch of government. Congress's decision to establish an agency led by a Director removable only for cause is a valid exercise of its

Article I legislative power. The for-cause removal restriction fully comports with the President's Article II executive authority and duty to take care that the consumer financial protection laws within the CFPB's purview be faithfully executed. The panel's grant of PHH's due process claim illustrates how the exercise of legislative and executive powers to establish and empower the CFPB are backstopped by the Article III courts' obligation to protect individual liberty when government overreaches.

Our analysis focuses on whether Congress's choice to include a for-cause removal provision impedes the President's ability to fulfill his constitutional role. Two principal considerations inform our conclusion that it does not. First, the familiar for-cause protection at issue broadly allows the President to remove the Director for "inefficiency, neglect of duty, or malfeasance in office," leaving the President ample tools to ensure the faithful execution of the laws. Second, the functions of the CFPB and its Director are not core executive functions, such as those entrusted to a Secretary of State or other Cabinet officer who we assume must directly answer to the President's will. Rather, the CFPB is one of a number of federal financial regulators—including the Federal Trade Commission, the Federal Reserve, the Federal Deposit Insurance Corporation, and others—that have long been permissibly afforded a degree of independence. The CFPB matches what the Supreme Court's removal-power cases have consistently approved. Accepting PHH's claim to the contrary would put the historically established independence of financial regulators and numerous other independent agencies at risk.

None of the theories advanced by PHH supports its claim that the CFPB is different in kind from the other independent agencies and, in particular, traditional independent financial

regulators. The CFPB's authority is not of such character that removal protection of its Director necessarily interferes with the President's Article II duty or prerogative. The CFPB is neither distinctive nor novel in any respect that calls its constitutionality into question. Because none of PHH's challenges is grounded in constitutional precedent or principle, we uphold the agency's structure.

## I. Precedent and History Establish the Constitutionality of the CFPB

The Constitution makes no explicit provision for presidential removal of duly appointed officers, but the Supreme Court has long recognized that "the executive power include[s] a power to oversee executive officers through removal." *Free Enterprise Fund*, 561 U.S. at 492. The Court has found the removal power implied in aid of the executive power, which the Constitution vests "in a President of the United States of America" charged to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. The Court's decisions, from *Myers* to *Free Enterprise Fund*, also acknowledge the legitimacy, in appropriate circumstances, of an agency's independence from the President's removal of its leadership without cause. And history teaches that financial regulators are exemplars of appropriate and necessary independence. Congress's decision to afford removal protection to the CFPB Director puts the agency squarely within the bounds of that precedent and history, fully consonant with the Constitution.

## A. Precedent

The Court has consistently upheld ordinary for-cause removal restrictions like the one at issue here, while invalidating only provisions that either give Congress some

role in the removal decision or otherwise make it abnormally difficult for the President to oversee an executive officer.

In the first modern removal-power decision, *Myers v. United States*, the Court held that Congress could not condition presidential removal of certain postmasters on the Senate's advice and consent, explaining that the President has "the exclusive power of removing executive officers of the United States whom he has appointed by and with the advice and consent of the Senate." 272 U.S. at 106. Without interpreting the Take Care Clause as such, *see* Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Penn. L. Rev. 1835, 1840-41 (2016), the Court in *Myers* appeared to assume the Clause dictated illimitable removal power in the President. PHH deploys that conception of illimitable removal power against the CFPB.

But the Supreme Court since *Myers* has cabined that decision's apparent reach, recognizing the constitutionality of some measure of independence for agencies with certain kinds of functions. The Court in *Morrison*, *Wiener*, and *Humphrey's Executor* explicitly and repeatedly upheld for-cause removal restrictions in a range of contexts where the Constitution tolerates a degree of independence from presidential control. The Court's latest removal-power decision, *Free Enterprise Fund*, applied the same analysis developed in those cases to strike an especially onerous set of removal restraints. The Court held that those double-layered restrictions, taken together, interfered with the President's oversight of faithful execution of the securities laws, but it left in place the SEC Commissioners' ordinary for-cause protection—the same protection at issue here.

The Court's removal-power doctrine supports Congress's application of a modest removal restriction to the CFPB, a

financial regulator akin to the independent FTC in *Humphrey's Executor* and the independent SEC in *Free Enterprise Fund*, with a sole head like the office of independent counsel in *Morrison*.

It was only nine years after *Myers*, in *Humphrey's Executor*, that the Court unanimously upheld a provision of the Federal Trade Commission Act protecting FTC Commissioners from removal except for "inefficiency, neglect of duty, or malfeasance in office." 295 U.S. at 619, 632. *Humphrey's Executor* explained that *Myers* was limited; it required only that the President be able to remove purely executive officers without congressional involvement. *Id.* at 628. By contrast, where administrators of "quasi legislative or quasi judicial agencies" are concerned, the Constitution does not require that the President have "illimitable power" of removal. *Id.* at 629. The *Humphrey's Executor* Court drew guidance from the founding era, when James Madison (otherwise a strong proponent of the removal power) argued that an official who "partakes strongly of the judicial character . . . should not hold . . . office at the pleasure of the Executive branch of the Government." 5 *The Writings of James Madison* 413 (Hunt ed., 1904); *see Humphrey's Executor*, 295 U.S. at 631. Because Congress may require quasi-legislative and quasi-judicial administrators "to act in discharge of their duties independently of executive control," it may "forbid their removal except for cause" during a fixed term in office. *Id.* at 629.

A generation later, an again-unanimous Court in *Wiener v. United States*, 357 U.S. at 352-55, per Justice Frankfurter, explicitly reaffirmed *Humphrey's Executor* and held that neither the rationale supporting the President's removal power nor the history of that power dating back to the First Congress required that the President always enjoy unconstrained

authority to remove leadership of every kind of agency at his will. *Wiener* concerned the War Claims Commission, which had been set up to compensate certain personal injuries and property losses at the hands of the enemy in World War II. Both President Eisenhower (in *Wiener*) and President Roosevelt (in *Humphrey's Executor*) wanted the leaders of the respective agencies "to be their men," removable at will, but in each case Congress had opted for and the Court sustained a modicum of independence. *Id*. at 354.

In *Wiener*, Justice Frankfurter expressly took into account the "thick chapter" of "political and judicial history" of controversy over the President's removal power that the Court had canvassed at length in *Myers*. 357 U.S. at 351. The *Wiener* Court rejected President Eisenhower's broad, categorical understanding of *Myers* as largely drawn from its dictum and—in light of *Humphrey's Executor*—appropriately "short-lived." *Id*. at 352. Commenting that "the versatility of circumstances often mocks a natural desire for definitiveness," *id*., *Wiener* squarely denied that the President had a power of removal that Congress could not limit under any circumstance, "no matter the relation of the executive to the discharge of [the official's] duties and no matter what restrictions Congress may have imposed regarding the nature of their tenure." *Id*. Rather, with attention to the sort of agency involved, *Humphrey's Executor* had "narrowly confined the scope of the *Myers* decision" to purely executive officers, not members of quasi-judicial bodies. *Id*.

The *Wiener* Court identified "the most reliable factor" in deciding whether a removal restriction comported with the President's constitutional authority to be "the nature of the function that Congress vested" in the agency. *Id*. at 353; *see Humphrey's Executor*, 295 U.S. at 631 ("Whether the power of the President to remove an officer shall prevail[,] . . . precluding

a removal except for cause will depend upon the character of the office . . . ."). The Court distinguished core executive agents who must be fully responsive to the President's preferences from those whose tasks call for a degree of independence "from Executive interference." *Wiener*, 357 U.S. at 353. What mattered in *Wiener* was the "intrinsic judicial character of the task with which the [War Crimes] Commission was charged": Congress had directed the Commission to "'adjudicate according to law' the classes of claims defined in the statute" entirely on their merits, free of personal or partisan pressures. *Id.* at 355. That directive prevented the President from interfering at will with the leadership of the Commission. The legislation establishing the Commission made plain, even in the absence of an express for-cause removal provision, that "Congress did not wish to have hang over the Commission the Damocles' sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing." *Id.* at 356.

Though the Court in *Humphrey's Executor* and *Wiener* thus emphasized the "quasi-legislative" and "quasi-judicial" character of the relevant offices, more recently the Court in *Morrison v. Olson* downplayed those particular characterizations of independent agencies while continuing to narrowly read *Myers* as disapproving "an attempt by Congress itself to gain a role in the removal of executive officials other than its established powers of impeachment and conviction." 487 U.S. at 686. *Morrison* posed more directly the question whether a removal restriction "interfere[d] with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Id.* at 690. According to *Morrison*, the references in the earlier removal-power cases to the "character" of the relevant offices could best be understood as describing "the circumstances in which Congress might be

more inclined to find that a degree of independence from the Executive, such as that afforded by a 'good cause' removal standard, is necessary to the proper functioning of the agency or official" in fulfilling its duties. *Id.* at 691 n.30. The Court explained that its decision in *Humphrey's Executor* to sustain the independence that Congress thought appropriate for the FTC, with its "'quasi-legislative' or 'quasi-judicial'" character, reflected the Court's "judgment that it was not essential to the President's proper execution of his Article II powers that [the FTC] be headed up by individuals who were removable at will." *Morrison*, 487 U.S. at 690-91.

*Morrison* viewed as constitutionally relevant Congress's determination that the role and character of a special independent prosecutor called for some autonomy from the President. Echoing *Wiener*, the Court in *Morrison* again rejected as "dicta" the "implication" drawn from *Myers* that the President's removal power should in every circumstance be understood as "all-inclusive." *Id.* at 687. Instead, *Morrison* read *Humphrey's Executor* and its progeny to allow Congress to provide limited removal protection for some administrative bodies, whose leadership Congress "intended to perform their duties 'without executive leave and . . . free from executive control.'" *Id.* n.25 (alteration in original) (quoting *Humphrey's Executor*, 295 U.S. at 628). The *Morrison* Court evaluated the independent counsel's for-cause protection accordingly.

The independent counsel concededly performed functions that were traditionally "executive," but *Morrison* pinpointed "the real question" as "whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." *Id*. at 691. Analyzing "the functions of the officials in question . . . in that light," *id*., the Court found the removal protection to be constitutional, recognizing it as "essential, in the view of Congress, to

establish the necessary independence of the office." *Id.* at 693. To be sure, the office of independent counsel was potent: It was empowered to prosecute high-ranking federal officials for violations of federal criminal law. Nevertheless, its removal protection did not unconstitutionally impinge on executive power. The Court "simply [did] not see how the President's need to control the exercise of [the independent counsel's] discretion is so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President." *Id.* at 691-92. The Court noted that the President retained "ample authority" to review the independent counsel's performance and that, because the independent counsel was removable by the Attorney General for good cause, the President's removal power had not been "completely stripped." *Id.* at 692.

The Supreme Court has thus recognized that Congress may value and deploy a degree of independence on the part of certain executive officials. At least so long as Congress does not disturb the constitutional balance by arrogating to itself a role in removing the relevant executive officials, *see Bowsher*, 478 U.S. at 726; *Myers*, 272 U.S. at 161, the Constitution admits of modest removal constraints where "the character of the office" supports making it somewhat "free of executive or political control," *Morrison*, 487 U.S. at 687, 691 n.30. The Court has sustained Congress's determinations that removal restrictions were appropriate to protect the independence of heads of agencies devoted specifically to special prosecution in *Morrison*, claims adjudication in *Wiener*, and market competition and consumer protection in *Humphrey's Executor*. Without questioning that there are certain agencies that Congress cannot make even modestly independent of the President, the Court accepted the removal restriction in each of those three cases as appropriate protection against the "'coercive influence' of the [at-will] removal power" that

otherwise "would 'threaten the independence of the [agency].'" *Morrison*, 487 U.S. at 690, 688; *see Wiener*, 357 U.S. at 356; *Humphrey's Executor*, 295 U.S. at 629-30.

Invalidating a provision shifting removal power over the Comptroller General from the President to Congress, the Supreme Court in *Bowsher v. Synar* again insisted on a narrow reading of *Myers*—at odds with the reading PHH advances here. The Supreme Court treated *Myers* as holding only "that congressional participation in the removal of executive officers is unconstitutional." 478 U.S. at 725. To have an executive officer "answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws" in violation of the constitutional separation of powers. *Id.* at 726. Setting aside the removal scheme before it, the Court in *Bowsher* made clear that *Humphrey's Executor* and its progeny "involved an issue not presented either in the *Myers* case or in this case"—*i.e.*, the constitutional validity of a statute leaving the removal power under the President's control, but authorizing its exercise "only 'for inefficiency, neglect of duty, or malfeasance in office.'" *Id.* at 724-25 (quoting *Humphrey's Executor*, 295 U.S. at 628-29). *Bowsher* thus acknowledged the constitutionality of for-cause limitation on the removal power when the President retains the power to find cause. The culprit violating the separation of powers in *Bowsher* was Congress's aggrandizement of its own control over executive officers.

The Supreme Court's most recent removal-power decision, *Free Enterprise Fund*, invalidated a "highly unusual" removal restriction because it interfered with the President's ability to "remove an officer . . . even if the President determines that the officer is neglecting his duties or discharging them improperly." 561 U.S. at 484, 505. The problem was not congressional encroachment, but damage to

the President's ability to supervise executive officers: "'Even when a branch does not arrogate power to itself,' . . . it must not 'impair another in the performance of its constitutional duties.'" *Id*. at 500 (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)). "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." 561 U.S. at 484. *Free Enterprise Fund* distinguishes ordinary for-cause requirements from abnormally constraining restrictions that impair the President's constitutional oversight prerogative.

At issue in *Free Enterprise Fund* was an extreme variation on the traditional good-cause removal standard: a provision of the Sarbanes-Oxley Act that afforded members of the Public Company Accounting Oversight Board, an agency within the Securities and Exchange Commission, unusually strong protection from removal. *See* 561 U.S. at 486. As in *Morrison*, the Court focused its inquiry on whether the President retains "power to oversee executive officers through removal." *Id.* at 492. The challenged provisions shielded the PCAOB with "two layers of for-cause [protection from] removal—including at one level a sharply circumscribed definition of what constitutes 'good cause,' and rigorous procedures that must be followed prior to removal." *Id*. at 505. It provided that PCAOB members could be removed only by a formal order of the SEC, and only "for good cause shown." *Id.* at 486-87, 505. But this was no garden-variety cause standard: It required a pre-removal finding, "on the record" and "after notice and opportunity for a hearing," of a Board member's willful violation of the Sarbanes-Oxley Act itself, the PCAOB's own rules, or the securities laws, or willful abuse of Board member authority, or a lack of "reasonable justification or excuse" for failure to enforce compliance. *Id.* at 486; 15 U.S.C. § 7217(d)(3). On top of that, the SEC's Commissioners—tasked with removing such delinquent Board members—were

themselves protected from presidential removal except for inefficiency, neglect of duty, or malfeasance in office. *Free Enterprise Fund*, 561 U.S. at 487.

The scheme challenged in *Free Enterprise Fund* was defective because the Court found that it "withdraws from the President any decision on whether good cause exists" and thus "impair[s]" the President's "ability to execute the laws—by holding his subordinates accountable for their conduct." *Id.* at 495-96. The Court distinguished *Humphrey's Executor* and *Morrison* as involving "only one level of protected tenure separat[ing] the President from an officer exercising executive power." *Id.* at 495. When Congress provides agency heads with for-cause protection against removal by the President, the Court held, it must define "cause" in such a way as to leave the President leeway to sufficiently "oversee" these heads to prevent misconduct. *Id.* at 492-93. The problem with the PCAOB's protection, then, was that the President did not retain that oversight. Specifically, "multilevel" for-cause protection rendered the President unable to "remove an officer . . . even if the President determines that the officer is neglecting his duties or discharging them improperly." *Id.* at 484. The Court's solution to that problem was to retain one level of for-cause protection and remove the other. *Id*. at 514. Thus, the Board members who serve under the SEC Commissioners may be removed by the Commissioners without cause, but the SEC Commissioners' for-cause protection remains in place.

The traditional for-cause protection enjoyed by the SEC Commissioners—and the officials in *Morrison*, *Wiener*, and *Humphrey's Executor*—remains untouched by and constitutionally valid under *Free Enterprise Fund*. When an official is so protected, the President may not remove her or him for personal or partisan reasons, or for no reason at all. But, because such a cause requirement does not prevent

removal by reason of incompetence, neglect of duty, or malfeasance, it may apply without impairing the President's ability to assure the faithful execution of the law. *See Morrison*, 487 U.S. at 691-92; *Free Enterprise Fund*, 561 U.S. at 495-96.

*Free Enterprise Fund* did not, contrary to PHH's suggestion, narrow *Humphrey's Executor* or give *Myers* newly expansive force. *See* Pet'rs' Br. 21-22 & n.4. The Court's "modest" point was "not to take issue with for-cause limitations in general," but rather that the unprecedented restriction on the President's ability to remove a member of the PCAOB hobbled his power to oversee executive officers. 561 U.S. at 501. As the Supreme Court had already made clear, "the only issue actually decided in *Myers* was that 'the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress.'" *Morrison*, 487 U.S. at 687 n.24 (quoting *Humphrey's Executor*, 295 U.S. at 626); *see Wiener*, 357 U.S. at 351-52. *Free Enterprise Fund*, for its part, cites *Myers* only for general restatements of law, all of which are consistent with *Morrison*, *Wiener*, and *Humphrey's Executor*. The opinion emphasizes, for example, that "[s]ince 1789, the Constitution has been understood to empower the President to keep [executive] officers accountable—by removing them from office, if necessary," and quotes *Myers* for the accepted principle that "the President . . . must have some 'power of removing those for whom he can not continue to be responsible.'" *Free Enterprise Fund*, 561 U.S. at 483, 493 (quoting *Myers*, 272 U.S. at 117). At the same time, *Free Enterprise Fund* recognizes the functional values of those for-cause protections the Court has sustained as consistent with the President's Take Care duty: An FTC "'independent in character,' [and] 'free from political domination or control,'" in *Humphrey's Executor*; "the necessary independence of the

office" of the independent counsel in *Morrison*; and "the rectitude" of officers administering a fund to compensate for war losses in *Wiener*. *Free Enterprise Fund*, 561 U.S. at 502 (quoting *Humphrey's Executor*, 295 U.S. at 619; *Morrison*, 487 U.S. at 693; *Wiener*, 357 U.S. at 356).

Thus, the Court has upheld statutes that, like the challenged provision of the Dodd-Frank Act, "confer[] good-cause tenure on the principal officers of certain independent agencies." *Free Enterprise Fund*, 561 U.S. at 493. Decisions from *Humphrey's Executor* to *Free Enterprise Fund* have approved standard for-cause removal restrictions where Congress deems them necessary for the effectiveness of certain types of agencies, provided that the President remains able to remove the agency heads for acting inefficiently, without good faith, or for neglecting their duties. The "real question" to ask, in considering such a statute, "is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty," taking account of the "functions of the officials in question." *Morrison*, 487 U.S. at 691. The question for us, then, is whether the requirement that the President have cause before removing a Director of the CFPB unconstitutionally interferes with the President's Article II powers.

## B. History

"The subject [of the President's removal authority] was not discussed in the Constitutional Convention." *Myers*, 272 U.S. at 109-10 (1926). But there was a diversity of opinion on the subject at the founding, and early examples of heterogeneity in agency design bear that out. Financial regulation, in particular, has long been thought to be well served by a degree of independence.

Congressional alertness to the distinctive danger of political interference with financial affairs, dating to the founding era, began the longstanding tradition of affording some independence to the government's financial functions. *See* Amicus Br. of Separation of Powers Scholars 4-10. Whereas the secretaries of the two other original departments (War and Foreign Affairs) were broadly chartered to "perform and execute such duties as shall from time to time be enjoined on or intrusted to [them] by the President of the United States," Act of July 27, 1789, ch. 4, § 1, 1 Stat. 28, 29; Act of Aug. 7, 1789, ch. 7, § 1, 1 Stat. 49, 50, Congress specified the responsibilities of the Treasury Secretary and other officers in the Treasury Department in some detail, *see* Act of Sept. 2, 1789, ch. 12, §§ 2-6, 1 Stat. 65, 65-67. *See* Gerhard Casper, *An Essay in Separation of Powers: Some Early Versions and Practices*, 30 Wm. & Mary L. Rev. 211, 241 (1989) (noting that, under the statutes of 1789 establishing the three "great departments" of government, "[o]nly the departments of State and War were completely 'executive' in nature").

The Comptroller of the Treasury, notably, was charged with "direct[ing] prosecutions for all delinquencies of officers of the revenue; and for debts that are, or shall be due to the United States," *id.* at § 3, 1 Stat. at 66, and his decisions were deemed "final and conclusive," Act of Mar. 3, 1795, § 4, 1 Stat. 443, 443. He could be removed if found to "offend against any of the prohibitions of this act." 1 Stat. at 67. It is unclear whether the Comptroller was also thought to be removable by the President for other reasons, but James Madison, who was generally opposed to removal protections, said he believed "there may be strong reasons why an officer of this kind should not hold his office at the pleasure of the Executive branch of the Government." 1 Annals of Cong. 612 (1789). The nature of the Comptroller's office and independence eventually changed, but it is evident that the Comptroller was, from

inception, meant to exercise an unusual degree of independent judgment. *See* Lawrence Lessig, *Readings by Our Unitary Executive*, 15 Cardozo L. Rev. 175, 184 (1993) (explaining that the President had "no directory control over the Comptroller General" and that "the Framers and the early congresses treated this independence as flowing from the nature of the Comptroller's duties"); Charles Tiefer, *The Constitutionality of Independent Officers as Checks on Abuses of Executive Power*, 63 B.U. L. Rev. 59, 73-75 (1983) (explaining that the Comptroller was "clearly . . . expected to exercise independent judgment").

At the dawn of the modern-day federal banking system, Congress continued to afford some independence to financial regulators as it set up the Office of the Comptroller of the Currency. *See* Nat'l Bank Act of 1863, 12 Stat. 665, 665-66 (1863); Nat'l Bank Act of 1864, 13 Stat. 99 (1864). Since the office's inception, the Comptroller of the Currency has been removable only if the President sends the Senate "reasons" for removing him. 12 U.S.C. § 2. Whatever the type of reason it requires, the statute without question constrains the presidential removal power. The U.S. Code accordingly classifies the Comptroller of the Currency as an "independent regulatory agency" along with all the other removal-constrained independent agencies. 44 U.S.C. § 3502(5); *see also* 12 U.S.C. § 1(b)(1) (prohibiting the Treasury Secretary from interfering with the Comptroller); 2 Op. O.L.C. 129 (1978) (concluding that the Comptroller has independent litigation authority).

The independence of financial regulators remains a prominent pattern today. The Federal Reserve Board is led by governors who can be removed only for cause during their fourteen-year terms. 12 U.S.C. § 242. The reason is simple: The Federal Reserve must "provide for the sound, effective,

and uninterrupted operation of the banking system," and Congress found that a degree of independence was needed to "increase the ability of the banking system to promote stability." H.R. Rep. No. 74-742, at 1 (1935). By insulating the Board from presidential control and political pressures, Congress sought to ensure that the Federal Reserve would "reflect, not the opinion of a majority of special interests, but rather the well considered judgment of a body that takes into consideration all phases of national economic life." *Id.* at 6.

The Federal Trade Commission stands as another example of an independent financial regulator in the modern era—one expressly approved by the Supreme Court. When the FTC was created, the Senate Committee Report described the need for independence as ensuring "a continuous policy . . . free from the effect of . . . changing incumbency" in the White House. 51 Cong. Rec. 10,376 (1914). Congress reasoned that, as the country passed "through a depression," a new consumer protection agency with a degree of independence would "give reassurance rather than create doubt." *Id.*; *see also id.* ("The powers [of the FTC] must be large, but the exercise of the powers will not be against honest business, but will be persuasive and correctional . . . ."). In *Humphrey's Executor*, the Supreme Court expressly approved of Congress's choice to insulate this new consumer protection agency via a for-cause removal provision. 295 U.S. at 619, 632.

These examples typify other federal financial regulators, such as the Commodity Futures Trading Commission, the Federal Deposit Insurance Corporation, the Federal Housing Finance Authority, the National Credit Union Administration, and the Securities and Exchange Commission, which are considered independent whether or not for-cause removal protection is specified by statute. *See* Henry B. Hogue et al., Cong. Research Serv., R43391, *Independence of Federal*

*Financial Regulators: Structure, Funding, and Other Issues* 1, 15 (2017). This makes sense because Congress has consistently deemed "[i]nsulation from political concerns" to be "advantageous in cases where it is desirable for agencies to make decisions that are unpopular in the short run but beneficial in the long run," such as, for example, "the Fed's monetary policy decisions." *Id.* at 5 n.16. History and tradition, as well as precedent, show that Congress may appropriately give some limited independence to certain financial regulators.

## C. Application to the CFPB

The for-cause protection shielding the CFPB's sole Director is fully compatible with the President's constitutional authority.

Congress validly decided that the CFPB needed a measure of independence and chose a constitutionally acceptable means to protect it. First, the removal restriction here is wholly ordinary—the verbatim protection approved by the Supreme Court back in 1935 in *Humphrey's Executor* and reaffirmed ever since. The provision here neither adds layers of protection nor arrogates to Congress any role in removing an errant official. Second, the CFPB Director's autonomy is consistent with a longstanding tradition of independence for financial regulators, and squarely supported by established precedent. The CFPB's budgetary independence, too, is traditional among financial regulators, including in combination with typical removal constraints. PHH's constitutional challenge flies in the face of the Supreme Court's removal-power cases, and calls into question the structure of a host of independent agencies that make up the fabric of the administrative state.

There is nothing constitutionally suspect about the CFPB's leadership structure. *Morrison* and *Humphrey's Executor* stand in the way of any holding to the contrary. And there is no reason to assume an agency headed by an individual will be less responsive to presidential supervision than one headed by a group. It is surely more difficult to fire and replace several people than one. And, if anything, the Bureau's consolidation of regulatory authority that had been shared among many separate independent agencies allows the President more efficiently to oversee the faithful execution of consumer protection laws. Decisional responsibility is clear now that there is one, publicly identifiable face of the CFPB who stands to account—to the President, the Congress, and the people—for all its consumer protection actions. The fact that the Director stands alone atop the agency means he cannot avoid scrutiny through finger-pointing, buck-passing, or sheer anonymity. What is more, in choosing a replacement, the President is unhampered by partisan balance or *ex-officio* requirements; the successor replaces the agency's leadership wholesale. Nothing about the CFPB stands out to give us pause that it—distinct from other financial regulators or independent agencies more generally—is constitutionally defective.

## 1. For-Cause Removal

Applying the Court's precedents to this case, we begin by observing that the CFPB Director is protected by the very same standard, in the very same words—"inefficiency, neglect of duty, or malfeasance in office"—as the Supreme Court sustained in *Humphrey's Executor*. *Compare* 15 U.S.C. § 41, *with* 12 U.S.C. § 5491(c)(3). Again, the challenged statute imposes no additional layer of particularly onerous protection, per *Free Enterprise Fund*, nor indeed any other restriction on removal. And Congress has not given itself authority to participate in the President's removal decision, which was fatal

to the removal mechanisms in *Myers* and *Bowsher*. The CFPB's for-cause protection is therefore unlike any removal restriction that the Court has ever invalidated as impermissibly restricting executive authority. In every case reviewing a congressional decision to afford an agency ordinary for-cause protection, the Court has sustained Congress's decision, reflecting the settled role that independent agencies have historically played in our government's structure. *See Morrison*, 487 U.S. at 688; *Wiener*, 357 U.S. at 356; *Humphrey's Executor*, 295 U.S. at 629-30; *see also Free Enterprise Fund*, 561 U.S. at 509 (leaving in place "a single level of good-cause tenure" for SEC Commissioners); *id*. at 510 (suggesting that Congress might choose to make PCAOB members removable directly by the President "for good cause").

In analyzing where Congress may deploy such for-cause protection, the Supreme Court looks to "the character of the office" and the "proper functioning of the agency or official." *Morrison*, 487 U.S. at 687, 691 n.30; *see Wiener*, 357 U.S. at 353 (emphasizing the "nature of the function" of the agency); *Humphrey's Executor*, 295 U.S. at 631 (pointing to the "character of the office"). As seen through that lens, the CFPB's function is remarkably similar to that of the FTC, a consumer protection agency that has operated for more than a century with the identical for-cause protection, approved by a unanimous Supreme Court. *Compare* 12 U.S.C. §§ 5511-12, 5532, 5534, 5562-64, *with* Federal Trade Commission Act of 1914, 15 U.S.C. §§ 45-46; *see Free Enterprise Fund*, 561 U.S. 477; *Humphrey's Executor*, 295 U.S. 602.

Indeed, the independence of financial regulators—chronicled above, *see supra* Part I.B—is so well established by tradition and precedent that courts have assumed these agencies' heads have removal protection even in the absence

of clear statutory text so directing. *See Free Enterprise Fund*, 561 U.S. at 487 (treating SEC Commissioners as removable only for cause). It has long been "generally accepted that the President may remove a[n SEC] commissioner [only] for inefficiency, neglect of duty, or malfeasance in office." *SEC v. Bilzerian*, 750 F. Supp. 14, 16 (D.D.C. 1990) (citing *SEC v. Blinder, Robinson & Co., Inc.*, 855 F.2d 677, 681 (10th Cir. 1988), and H. Rep. No. 2070, 86th Cong., 2d Sess. 14 (1960)). And in *Swan v. Clinton*, for example, this court assumed that board members of the National Credit Union Association have removal protection because "people will likely have greater confidence in financial institutions if they believe that the regulation of these institutions is immune from political influence." 100 F.3d 973, 983 (D.C. Cir. 1996).

PHH's attempt to single out the CFPB from other financial regulators, including the FTC, is unpersuasive. PHH asserts that, when the Court decided *Humphrey's Executor*, the FTC "had no substantive rulemaking powers" and "could not order 'retrospective' remedies." Pet'rs' Reply Br. 6. But the FTC at that time did have broad powers to interpret and enforce the law. *See generally, e.g.*, *Federal Trade Comm'n v. Western Meat Co.*, 272 U.S. 554 (1926). Moreover, many independent agencies (including the FTC) now exercise rulemaking and remedial powers like those of the CFPB. *See Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 698 (D.C. Cir. 1973) (holding that the Federal Trade Commission Act conferred substantive rulemaking powers); Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, § 205(a), 88 Stat. 2183, 2200-01 (1975) (codified as amended at 15 U.S.C. § 45(m)(1)(A)) (authorizing FTC to "commence a civil action to recover a civil penalty in a district court of the United States").

Apart from the panel of this court whose decision we vacated, courts have uniformly understood *Humphrey's Executor* to support the constitutionality of for-cause removal protection for the current FTC and certain other agencies with rulemaking and enforcement powers. *See Morrison*, 487 U.S. at 692 & n.31 (noting that the FTC and other independent agencies "exercise civil enforcement powers"). Well before the Supreme Court in *Free Enterprise Fund* assumed the unchallenged constitutionality of SEC Commissioners' for-cause protection, for instance, the Tenth Circuit sustained it, observing that *Humphrey's Executor* "stands generally for the proposition that Congress may, without violating Article II, authorize an independent agency to bring civil law enforcement actions where the President's removal power was restricted." *Blinder, Robinson, & Co.*, 855 F.2d at 682. And, in *FEC v. NRA Political Victory Fund*, this court noted that *Humphrey's Executor* and *Morrison* confirmed the constitutionality of the Federal Election Commission, which is "patterned on the classic independent regulatory agency" and can both make rules and order retrospective remedies. 6 F.3d 821, 826 (D.C. Cir. 1993); *see also* 52 U.S.C. §§ 30107(a)(8), 30109 (setting out the FEC's enforcement power).

PHH asks us to cast aside the CFPB's pedigree in Supreme Court precedent upholding this very type of independence and its lineage in historical practice regarding financial regulators. PHH focuses instead on dicta in *Myers* that speak of executive removal power as seemingly "illimitable." *Humphrey's Executor*, 295 U.S. at 627-28. Within less than a decade, however, the Supreme Court unanimously rejected that dicta in *Humphrey's Executor*, 295 U.S. at 628-29, and unanimously did so again in *Wiener*, 357 U.S. at 351-52. In the ensuing decades, while it has cited *Myers*'s unexceptional holding prohibiting congressional involvement in removal of executive officials, the Court has continued to disavow the broad dicta on

which PHH principally relies. *See, e.g, Morrison*, 487 U.S. at 686-87; *see also Bowsher*, 478 U.S. at 724-25; *Free Enterprise Fund*, 561 U.S. at 483, 493, 502. Law and history put the CFPB, led by a Director shielded from removal without cause, on safe ground.

## 2. Budgetary Independence

Congress's commitment to independence for financial regulators is also reflected in the CFPB's budgetary set-up. PHH and some of its amici protest Congress's choice to allow the CFPB to claim funds from the Federal Reserve rather than through the congressional appropriations process. *See* Pet'rs' Br. 26-28; Amicus Br. of Chamber of Commerce 8-9. But Congress can, consistent with the Appropriations Clause, create governmental institutions reliant on fees, assessments, or investments rather than the ordinary appropriations process. *See Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004). Using that authority, Congress has consistently exempted financial regulators from appropriations: The Federal Reserve, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, the National Credit Union Administration, and the Federal Housing Finance Agency all have complete, uncapped budgetary autonomy. *See, e.g.*, 12 U.S.C. § 243 (Federal Reserve); *see also* Hogue, *Independence of Federal Financial Regulators*, at 26-27.

The way the CFPB is funded fits within the tradition of independent financial regulators. The Bureau draws a statutorily capped amount from the Federal Reserve, which formerly administered many of the consumer-protection laws now largely under the CFPB's purview. *See* Identification of Enforceable Rules and Orders, 76 Fed. Reg. 43,569-01, 43,570-71 (July 21, 2011). That feature aims to help the CFPB

to avoid agency capture that Congress believed had beset the agencies that previously administered the CFPB's statutes, in part because those agencies depended on industry fees. *See* Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 44-45 (2010); Oren Bar-Gill & Elizabeth Warren, *Making Credit Safer*, 157 U. Pa. L. Rev. 1, 93 (2008).

The CFPB's independent funding source has no constitutionally salient effect on the President's power. The Supreme Court has recently dismissed issues including "who controls the agency's budget requests and funding" as "bureaucratic minutiae"—questions of institutional design outside the ambit of the separation-of-powers inquiry. *Free Enterprise Fund*, 561 U.S. at 499-500. The fact that "the director need not ask the President for help negotiating appropriations from Congress," Pet'rs' Br. 27, is neither distinctive nor impermissible. Just as financial regulators ordinarily are independent of the congressional appropriations process, so, too, they typically are exempt from presidential budgetary oversight. *See, e.g.*, 12 U.S.C. § 250. That ensures the measure of permissible independence instituted by for-cause protection is not effectively eroded by virtue of budgetary dependence on the President. The requirement that the CFPB seek congressional approval for funding beyond the statutory cap makes it more constrained in this regard than other financial regulators.

PHH suggests that, even if budgetary independence and for-cause removal protection are not separately unconstitutional, their combination might be. *See* Pet'rs' Br. 28 (citing *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666, 673 (D.C. Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1225 (2015)). But that combination is not novel. *See, e.g.*, 12 U.S.C. § 243 (Federal Reserve's budgetary independence);

*id.* § 242 (Federal Reserve's for-cause removal protection); *id.* § 16 (Office of the Comptroller of the Currency's budgetary independence); *id.* § 2 (Office of the Comptroller of the Currency's removal protection). And, in any event, for two unproblematic structural features to become problematic in combination, they would have to affect the same constitutional concern and amplify each other in a constitutionally relevant way. Thus, as we have noted, "*Free Enterprise Fund* deemed invalid a regime blending two limitations on the President's removal power." *Ass'n of Am. R.Rs.*, 721 F.3d at 673. No similar amplification is present here. The CFPB's budgetary independence primarily affects Congress, which has the power of the purse; it does not intensify any effect on the President of the removal constraint.

The CFPB thus fits comfortably within precedent and tradition supporting the independence of the financial regulators that safeguard the economy. Whether it is considered alone or in combination with the independent funding provision, the requirement that the CFPB Director be removed only for cause does not unconstitutionally constrain the President.

### 3. Multi-Member vs. Single-Director

We are nevertheless urged that the constitutionality of for-cause removal turns on a single feature of the agency's design: whether it is led by an individual or a group. But this line of attack finds no home in constitutional law.

To begin with, that contention flies in the face of *Morrison*, which, contrary to PHH's suggestions, remains valid and binding precedent. *Morrison* upheld the constitutionality of for-cause removal protection for an individual agency head who exercised substantial executive authority. The fact that the independent counsel was a solo actor played no role in either

the Court's decision for an eight-member majority or Justice Scalia's dissent; neither saw that fact as a ground of distinction from the multi-member agencies sustained in *Humphrey's Executor* and *Wiener*.[2]

PHH's emphasis on the CFPB's leadership by a Director rather than a board defies historical practice as well. The Comptroller of the Currency, for example—an independent federal financial regulator with statutory removal protection dating back 150 years—is also headed by a single director,

---

[2]The independent counsel's inferior-officer status is not ground for distinguishing *Morrison* from this case. The Appointments Clause separately identifies the permissible appointing mechanisms for principal and inferior officers, U.S. Const. art. II, § 2, cl. 2, because of such officers' differing routes of accountability to the President: Principal officers are directly accountable, while inferior officers are indirectly accountable through the principal officer to whom they report. While that distinction is constitutionally relevant to the President's appointments power, it is not determinative of the removal-power question. That is because the removal inquiry asks not whether an official exercises significant governmental authority, but whether a measure of independence in the exercise of such power interferes with the President's constitutional duty and prerogative to oversee the executive branch and take care that the laws are faithfully executed. The degree of removal constraint effected by a single layer of for-cause protection is the same whether that protection shields a principal or inferior officer. In either case, the President—or a principal officer acting as the President's agent—may not fire the independent officer except for cause. Indeed, the objective of the independent counsel statute was to protect the counsel's independence, not only from the President's direct interference, but also from interference by the President's agent, the Attorney General. The question whether a removal restriction unconstitutionally constrains presidential power thus does not track whether the shielded official is a principal or inferior officer. Even the mildest degree of removal protection of certain subordinate officers—such as the Secretary of the Navy or the Chief of Staff to the Secretary of State—could pose a constitutional problem, whereas Supreme Court precedent treats ordinary for-cause protection of some principal officers, such as members of the Federal Trade Commission or the SEC, to be permissible.

insulated from removal.  *See* 12 U.S.C. § 2.  Other historical examples of sole-headed independent agencies similarly counter PHH's claim.  *See supra* Part I.B; H.R. Conf. Rep. No. 103-670, at 89-90 (1994) (explaining that sole administrator of Social Security Administration would enhance "management efficiency" and reduce "inappropriate influence").  Historical practice of independent agencies, including the earliest examples of independent financial regulators which operated under single heads, suffices to place the CFPB on solid footing.

Fundamentally, Congress's choice—whether an agency should be led by an individual or a group—is not constitutionally scripted and has not played any role in the Court's removal-power doctrine.  As discussed above, the cases focus on "whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty," *Morrison*, 487 U.S. at 691, or, put otherwise, whether the President's "ability to execute the laws—by holding his subordinates accountable for their conduct—is impaired," *Free Enterprise Fund*, 561 U.S. at 496.  Preserving lines of accountability within the executive branch ensures that the public can "determine on whom the blame or the punishment of a pernicious measure, or series of pernicious measures ought really to fall."  The Federalist No. 70, at 476 (Alexander Hamilton) (J. Cooke ed. 1961).  On this measure, the constitutionality of the CFPB's structure is unaffected by the fact that it is led by a single Director.

As a practical matter, considering the impact on presidential power, the line of accountability at the CFPB is at least as clear to the observing public as at multi-headed independent agencies, and the President's control over the CFPB Director is at least as direct.  PHH has not identified any reason to think that a single-director independent agency is any less responsive than one led by multiple commissioners or

board members.  If anything, the President's for-cause removal prerogative may allow more efficient control over a solo head than a multi-member directorate.  Consider the case of *Humphrey's Executor*.  There, President Roosevelt attempted to remove an FTC Commissioner based on policy disagreements.  Of course, the Supreme Court put a stop to the President's effort to sway the agency, upholding the Commissioner's removal protection.  295 U.S. at 625-26.  But had the Court not so held, perhaps that would not have been the last of the personnel changes at the FTC.  Removal of just one Commissioner by the President might not have had any substantial effect on the multi-member body's direction, which he so strongly disfavored.  The President might have had to remove multiple Commissioners in order to change the agency's course.

By contrast, the CFPB Director's line of accountability to the President is clear and direct.  Before Congress established the Bureau, multiple agencies—most of them independent—had jurisdiction over consumer financial protection, and that dispersion hampered executive ability to diagnose and respond to problems.  The creation of the CFPB, with the centralization of previously scattered powers under common leadership, enhanced public accountability and simplified the President's ability to communicate policy preferences and detect failings.  Now, if the President finds consumer protection enforcement to be lacking or unlawful, he knows exactly where to turn.  If the offending conduct is rooted in the Director's failure to carry out the prescribed work of the agency, the President can remove the Director for "inefficiency, neglect of duty, or malfeasance in office."  12 U.S.C. § 5491(c).  The President need only remove and replace a single officer in order to transform the entire CFPB and the execution of the consumer protection laws it enforces.  Thus, just as the Framers "consciously decid[ed] to vest Executive authority in one

person rather than several" so as to "focus, rather than to spread" responsibility and thereby "facilitat[e] accountability" to the people, *Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring), Congress's creation of an independent agency led by a single Director would appear to facilitate the agency's accountability to the President.

Eschewing the relevant doctrinal inquiry—whether an agency's independence impermissibly interferes with presidential power—PHH nonetheless seeks some other home in the precedent for its argument that a single-headed independent agency is unlawful. PHH places great stock in the Court's observation in *Humphrey's Executor* that the FTC is "called upon to exercise the trained judgment of a body of experts." Pet'rs' Br. 22-23 (quoting *Humphrey's Executor*, 295 U.S. at 624). It claims an absence of any such body here. In reality, Congress created a multi-member body of experts to check the CFPB Director: the Financial Stability Oversight Council (FSOC). *See* 12 U.S.C. § 5321. The Council brings together the nation's leading financial regulators, including the Secretary of the Treasury and the Chairman of the Federal Reserve, to constrain risk in the financial system. *Id.* § 5321(b). The FSOC may stay or veto any CFPB regulation that threatens the "safety and soundness" of the national economy. *Id.* § 5513.

As a legal matter, the passing reference to a "body" of experts in *Humphrey's Executor* arose in the course of the Court's statutory holding, not its constitutional analysis. Before reaching the constitutional question—whether FTC Commissioners may be given for-cause protection consistently with the separation of powers—the Court needed to discern whether the statute in question actually required for-cause removal. To do so, the Court asked whether the express statutory term allowing removal "by the President for

inefficiency, neglect of duty, or malfeasance in office" carried a negative implication barring the President from removing Commissioners for other reasons or for no reason at all. 295 U.S. at 619. The Court reasoned that the FTC's composition as a "body of experts" "made clear" that "the intention of Congress" was to limit removal to the enumerated causes. *Id.* at 623-24. Independence from presidential control, Congress believed, would facilitate the Commission's access to apolitical expertise and its exercise of neutral judgment. Even as to the statutory question, the Court emphasized the Commissioners' expertise more than their number: "The commission is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality. It is charged with the enforcement of no policy except the policy of the law." *Id.* at 624. PHH further suggests that the terms "quasi-legislative" and "quasi-judicial" in *Humphrey's Executor* implicitly emphasize collective leadership, because legislatures and appellate courts have more than one member. Oral Arg. Tr. at 40-42. But those terms refer to the functions and powers of the agency, not its singular or plural head. *See Humphrey's Executor*, 295 U.S. at 629. The fact that district judges sit alone, for example, makes them no less judicial.

As an alternative theory why an agency's leadership structure might be constitutionally relevant to presidential power, PHH points out that the CFPB Director's five-year term means that some future President might not get to appoint a CFPB Director, whereas Presidents typically have an opportunity to appoint at least some members of multi-member commissions, or to select a member to act as chair. Pet'rs' Br. 25. But the constitutionality of for-cause protection does not turn on whether the term is five years or four. None of the leaders of independent financial-regulatory agencies serves a term that perfectly coincides with that of the President, and many have longer terms than the CFPB Director. *See* Hogue,

*Independence of Federal Financial Regulators*, at 14 ("Five-year terms are the most common . . . but some positions have longer terms."); Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1137 (2000) (describing terms as "typically extend[ing] beyond the four-year presidential term"). As noted, the seven governors of the Federal Reserve Board are appointed to serve staggered fourteen-year terms unless removed for cause. *See* 12 U.S.C. § 242. Further examples abound. The members of the Consumer Product Safety Commission, the FTC, and the Merit Systems Protection Board have seven-year terms, 15 U.S.C. § 2053; 15 U.S.C. § 41; 5 U.S.C. § 1202, the Federal Deposit Insurance Corporation's five directors each has a six-year term, 12 U.S.C. § 1812, so, too, do the National Credit Union Administration's three members, 12 U.S.C. §§ 1752a(b), (c); and the National Transportation Safety Board's members serve five-year terms, 49 U.S.C. § 1111. The Social Security Commissioner appointed by President George W. Bush to a six-year term served into the second term of President Barack Obama.

Across independent agencies, there is also wide variation as to the means of appointment and term of various chairpersons. The members of the Federal Election Commission, for instance, serve six-year terms, and the Chair, rather than being presidentially appointed, rotates among the members annually. 52 U.S.C. §§ 30106(a)(2), (5). The International Trade Commission's Chair, which changes biannually, must alternate between political parties without regard to who is in the White House. 19 U.S.C. § 1330. And among agencies with chairs chosen by the President, not all may be replaced by the President for any reason at any time. The Chair of the Federal Reserve serves a fixed four-year term,

and the Federal Deposit Insurance Corporation's Chair serves a five-year term.  12 U.S.C. § 242; *id.* § 1812(b)(1).

We are not aware of any court that has viewed the existence, strength, or particular term of agency chairs or members to be relevant to the constitutionality of an independent agency.  The Constitution has never been read to guarantee that every President will be able to appoint all, or even a majority of, the leaders of every independent agency, or to name its chair.  And what practical effect the terms of any particular agency's members or chair might have on a President's agenda remains context-dependent and unclear. *See* Hogue, *Independence of Federal Financial Regulators*, at 8-9 & n.36 (explaining that the statutory or practical authority of such chairs varies widely); Senate Committee on Governmental Affairs, *Study on Federal Regulation*, S. Doc. No. 95-91, vol.5, at 35 (1977) ("[T]he President would have only a limited opportunity to affect the leadership of any given commission; most of the time, hold-overs from a prior administration could be expected to be part of the membership.").  PHH assumes that this factor always cuts one way.  In reality, the diversity of circumstance helps illustrate why PHH errs in treating commission structure as constitutionally decisive.

Notably, when the President does get to replace the CFPB Director, he is not restricted by *ex-officio* requirements to appoint incumbent officeholders, or by a partisan-balance mandate to select individuals who do not even belong to his political party.  *See, e.g.*, 15 U.S.C. § 78d(a) (not more than three of five SEC Commissioners shall be members of the same political party); 12 U.S.C. § 1812(a)(2) (not more than three of the five members of the FDIC's Board of Directors may be members of the same political party, and one must have State bank supervisory experience); 12 U.S.C. § 242 (the Chairman

and two Vice Chairmen of the Federal Reserve are designated from among its Board of Governors). At bottom, the ability to remove a Director when cause to do so arises and to appoint a replacement provides "ample authority to assure that the [Director] is competently performing his or her statutory responsibilities." *Morrison*, 487 U.S. at 692. After all, the terms "inefficiency, neglect of duty, or malfeasance in office" are "very broad." *Bowsher*, 478 U.S. at 729. Given these realities, a single level of for-cause protection for heads of certain appropriate agencies is constitutionally permissible despite the possibility that some future President will lack a regularly occurring vacancy to fill.

We find no reason in constitutional precedent, history, or principle to invalidate the CFPB's independence. The Supreme Court has sustained for-cause protection for the heads of certain administrative agencies—even if they perform a mix of regulatory, investigative, prosecutorial, and adjudicatory functions—as compatible with the President's essential duty to assure faithful execution of the law. The CFPB led by a single Director is as consistent with the President's constitutional authority as it would be if it were led by a group. Like other independent federal financial regulators designed to protect the public interest in the integrity and stability of markets from short-term political or special interests, the CFPB is without constitutional defect.

## II. Broader Theories of Unconstitutionality

PHH goes further than trying to problematize the CFPB's leadership structure with reference to the logic or language of the Supreme Court's removal-power cases; it offers several broader theories of unconstitutionality. None of PHH's novel objections to the Director's for-cause protection squares with the Constitution or precedent. And PHH's disputed factual

premises about the effects of agency design choices underscore that, while such considerations may be useful fodder for policy-making by Congress, they are not grounds for courts to reshape the constitutional removal power.

First, breaking with traditional separation-of-powers analysis and precedent, PHH and its amici assail the CFPB as somehow too powerful. *See* Pet'rs' Br. 24; Amicus Br. of Chamber of Commerce 8-11. But nothing about the focus or scope of the agency's mandate renders it constitutionally questionable; indeed, the Bureau's powers have long been housed in and enforced by agency officials protected from removal without cause. That fact underscores our fundamental point: The exercise of those powers by an independent official does not interfere with the President's constitutional role.

Second, the CFPB's sole directorship is not historically anomalous. And, in any event, congressional innovation in the CFPB's internal structure would not alone render the agency constitutionally invalid.

Third, PHH's notion that a multi-member structure would safeguard liberty, writ large, because it would check or slow or stop the CFPB from carrying out its duties is a non-sequitur from the perspective of precedent, which focuses on President's authority and the separation of powers.

Finally, our decision to sustain the challenged for-cause provision cannot reasonably be taken to invite Congress to make all federal agencies (or various combinations thereof) independent of the President. The President's plenary authority over his cabinet and most executive agencies is obvious and remains untouched by our decision. It is PHH's unmoored theory of liberty that threatens to lead down a dangerously slippery slope.

## A.  Scope of Agency Power

PHH argues that, because the CFPB Director wields "vast authority" over the American economy, he cannot be protected from the President.  Pet'rs' Br. 28.  Both the factual and the legal premises of that argument are unsupported.

To begin with the factual assertion, the CFPB's power and influence are not out of the ordinary for a financial regulator or, indeed, any type of independent administrative agency.  The Bureau enforces anti-fraud rules in the consumer finance context; it does not unilaterally exercise broad regulatory power over the financial system.  Its authority reaches only entities providing "consumer financial product[s] or service[s]," limited to those offered to individual consumers "primarily for personal, family, or household purposes."  *See* 12 U.S.C. § 5491(a); *id.* §§ 5481(4), (5), (6), (15).  It does not address, for example, business-to-business or institutional debt or investments.  In that respect, it contrasts with the 1935-era FTC—upheld by the Court in *Humphrey's Executor*, 295 U.S. at 620—that had authority, with limited exceptions, over commerce generally.

That the CFPB is headed by a single Director does not render the scope of its responsibilities anomalous or problematic.  Independence has long been associated with financial regulators with wide latitude to oversee and steady financial markets and the national economy.  *See supra* Part I.B.  Independent financial regulators have been headed either by one person, as with the Comptroller of the Treasury and the Comptroller of the Currency, or by a group, as with the Federal Reserve.  The CFPB's authority to ensure the fairness of family- and household-facing financial products does not somehow pose unprecedented dangers rendering every historical analogue inapt.

As for PHH's legal premise that the scope of the CFPB's regulatory authority is constitutionally relevant, *Humphrey's Executor* turned not on the breadth of the FTC's jurisdiction or on its social and economic impact, but on its character as a financial and commercial regulator. The Supreme Court described the FTC as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Humphrey's Executor*, 295 U.S. at 628. PHH relies on *Morrison*'s description of the independent counsel as having only "limited jurisdiction and tenure and lacking policymaking or significant administrative authority." 487 U.S. at 691. Those limitations were significant in *Morrison* because the independent counsel's criminal-law-enforcement functions were quintessentially "executive" in nature; the Court placed emphasis on features of the independent counsel that would clearly distinguish her from, for example, an independent Attorney General. *See id.* The Court spelled out the independent counsel's functions to make plain that they were not "so central to the functioning of the Executive Branch as to require as a matter of constitutional law that the counsel be terminable at will by the President." *Id.* at 691-92. But that is not to suggest that it is appropriate to tally up the number of laws an agency is charged with administering in order to determine whether it may be independent. *Cf.* Pet'rs' Reply Br. 2. Indeed, the independent counsel had all of federal criminal law at her disposal. Rather, the Court has analyzed the function of the office in question and where it stood in relation to particular types of governmental power, including those like criminal prosecution that are indisputably and solely executive.

In sum, under the requisite functional analysis, the CFPB's authority is more cabined than either the FTC's or the

independent counsel's, and the agency is part of a longstanding tradition, dating back to the founding of the Republic, of financial regulators with a modicum of independence from presidential will.

## B.  Novelty

PHH further argues that the CFPB's structure is constitutionally suspect because it is novel.  We reject both premises—that whatever novelty the CFPB may represent calls into question its constitutionality, and that the CFPB is in any relevant respect unprecedented.

Even if the CFPB were anomalous, PHH points to nothing that makes novelty *itself* a source of unconstitutionality.  Novelty "is not necessarily fatal; there is a first time for everything."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.); *see also Mistretta v. United States*, 488 U.S. 361, 385 (1989) (addressing the constitutionality of the Sentencing Commission and noting that "[o]ur constitutional principles of separated powers are not violated . . . by mere anomaly or innovation").  The independent counsel, the Sentencing Commission, and the FTC were each "novel" when initiated, but all are constitutional.  In the precedents PHH invokes, novelty alone was insufficient to establish a constitutional defect.

For instance, in *NLRB v. Noel Canning*, the Supreme Court interpreted the President's express constitutional authorization to "fill up all Vacancies that may happen during the Recess of the Senate."  134 S. Ct. 2550, 2556 (2014); *see* U.S. Const. art. II, § 2, cl. 3.  An historical practice of recess appointments "since the beginning of the Republic" aided in "expounding terms [and] phrases"—"Recess of the Senate" and "Vacancies that may happen"—and the Court treated "practice as an important interpretive factor."  134 S. Ct. at 2560 (quoting

Letter from James Madison to Spencer Roane (Sept. 2, 1819), *in* 8 *The Writings of James Madison* 450 (Hunt ed., 1908)). But novelty did not create the constitutional question or define the constitutional violation.

In *Free Enterprise Fund*, the Supreme Court quoted a dissenter in this court stating that "lack of historical precedent" for dual-layered protection may be "the most telling indication of [a] severe constitutional problem." 561 U.S. at 505 (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)). But it did so only after explaining how, under its own precedent, the unusual set-up of the Public Company Accounting Oversight Board directly impaired the President's "ability to execute the laws." 561 U.S. at 500-01. Other constitutional principles beyond novelty must establish why a specific regime is problematic.

A constrained role for novelty in constitutional doctrine is well justified. Our political representatives sometimes confront new problems calling for tailored solutions. The 2008 financial crisis, which Congress partially attributed to a colossal failure of consumer protection, was surely such a situation. The Constitution was "intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs." *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819). The judiciary patrols constitutional boundaries, but it does not use the Constitution merely to enforce old ways. Even if we agreed that the CFPB's structure were novel, we would not find it unconstitutional on that basis alone.

As for the descriptive premise of the novelty argument— that the CFPB's sole-director structure makes it historically exceptional, Pet'rs' Br. 23—we again must disagree. For starters, there is no appreciable difference between the

historical pedigree of single-member and multi-member independent agencies. The most notable early examples in either category (and the only pre-Twentieth Century ones) are sole-headed financial regulators: the Comptroller of the Treasury, dating back to the late-Eighteenth Century; and the Office of the Comptroller of the Currency, established in the mid-Nineteenth. *See* Act of Sept. 2, 1789, ch. 12, § 3, 1 Stat. at 66; Nat'l Bank Act of 1863, 12 Stat. at 665-66.

Other examples of single-headed independent agencies include the Social Security Administration, which was placed under a single director in 1994, *see* 42 U.S.C. § 902(a), and the Office of Special Counsel established under a sole director in 1978, the same year as the Office of Independent Counsel upheld in *Morrison*, *see* 5 U.S.C. § 1211; Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (1978). Congress established the sole-headed, for-cause-protected Federal Housing Finance Agency in 2008, in response to similar concerns as gave rise to the CFPB. *See* 12 U.S.C. § 4512. This longstanding tradition provides historical pedigree to the CFPB, and refutes the contention that the CFPB's single-director structure is anything new. *See supra* Parts I.B., I.C.3.

PHH and its amici try to undermine these analogues by asserting that Presidents have consistently objected to single-headed independent agencies. *See* Amicus Br. of United States 17-19. As an initial matter, no contemporaneous objection was voiced by the President or any dissenting faction within Congress to placing the CFPB itself under a Director rather than a board. PHH's contention is further belied by history. President Lincoln, for instance, signed *without* objection an act rendering the Comptroller of the Currency removable only with advice and consent of the Senate. Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive During the Second Half-Century*, 26 Harv. J.L. & Pub. Pol'y 667, 734 (2003);

George Wharton Pepper, *Family Quarrels: The President, The Senate, The House* 111 (1931); *see* Nat'l Bank Act of 1863, 12 Stat. 665, 665-66 (1863). And President George H.W. Bush *approved* that Congress had decided to "retain[] current law which provides that the Special Counsel may only be removed for inefficiency, neglect of duty, or malfeasance." George H.W. Bush, *Remarks on Signing the Whistleblower Protection Act of 1989* (Apr. 10, 1989), http://www.presidency.ucsb.edu/ws/?pid=16899.

Evidence proffered to show presidential contestation is recent, sparse, and nonspecific. *See* Amicus Br. of United States 17-19. Executive objections to removal restrictions have not made clear whether they opposed protecting a sole agency head in particular, or for-cause protections more generally. *See Statement by President William J. Clinton Upon Signing H.R. 4277*, 1994 U.S.C.C.A.N. 1624 (Aug. 15, 1994) (Clinton administration objection to Social Security Administration under a sole, independent administrator on the ground that "the provision that the President can remove the single Commissioner only for neglect of duty or malfeasance in office raises a significant constitutional question"); *Mem. Op. for the Gen. Counsel, Civil Serv. Comm'n*, 2 Op. O.L.C. 120, 120 (1978) (Carter administration objection to creation of Office of Special Counsel because it exercised "functions [that] are executive in character," such as investigation and prosecution); President Ronald Reagan, *Mem. of Disapproval on a Bill Concerning Whistleblower Protection*, 2 Pub. Papers 1391, 1392 (Oct. 26, 1988) (Reagan administration objection to law creating Office of Special Counsel because it "purports to insulate the Office from presidential supervision and to limit the power of the President to remove his subordinates from office"). The scant and ambivalent record of executive-branch contestation thus does not detract from the tradition of sole-headed agencies as precedents for the CFPB.

We are also unpersuaded by efforts to distinguish away agencies like the Social Security Administration and the Office of Special Counsel on the ground that they lack authority to bring law enforcement actions against private citizens. *See* Amicus Br. of United States 17-18. Those agencies perform important and far-reaching functions that are ordinarily characterized as executive. The Social Security Administration runs one of the largest programs in the federal government, overseeing retirement, disability, and survivors' benefits, handling millions of claims and trillions of dollars. And the Office of Special Counsel enforces workplace rules for federal government employers and employees. Casting these agencies as somehow less important than the CFPB does not show them to be less "executive" in nature. The CFPB's single Director is not an historical anomaly.

## C. Freestanding Liberty

Moving beyond precedent and practice, PHH and its amici ask us to compare single-headed and group-led agencies' relative contributions to "liberty." The CFPB, headed by an individual Director, is constitutionally invalid, they say, because it diminishes the President's firing authority without substituting a different, ostensibly liberty-protecting mechanism—collective leadership. *See, e.g.*, Pet'rs' Br. 2. If a majority of an agency's leadership group must agree before the agency can take any action, the agency might be slower and more prone to compromise or inaction. A sole-headed agency, by contrast, might be nimble and resolute. Because multiple heads might make the CFPB less likely to act against the financial services industry it regulates, group leadership is, according to PHH, constitutionally compelled.

There is no question that "structural protections against abuse of power [a]re critical to preserving liberty." *Bowsher*,

478 U.S. at 730; *see also Free Enterprise Fund*, 561 U.S. at 501 (quoting *Bowsher*, 478 U.S. at 730). Agencies' accountability to the President and the people, bolstered by the removal power, can ultimately protect liberty. But by arguing that sole-headed and group-headed agencies differ in terms of "liberty" without identifying any differential effect on accountability, PHH proposes a ground for our decision that lacks doctrinal footing and conflicts with *Morrison*'s approval of a sole-headed independent agency. *Morrison*, *Wiener*, and *Humphrey's Executor* hold that unbridled removal power in the President's hands is not a universal requirement for constitutional accountability; those cases thus underscore that such unbridled power is not in all contexts necessary to serve liberty or the myriad other constitutional values that undergird the separation of powers. Broad observations about liberty-enhancing effects are not themselves freestanding constitutional limitations.

PHH's brand of argument depends on a series of unsupported leaps. First, it treats a broad purpose of the separation of powers—safeguarding liberty—as if it were a judicially manageable constitutional standard. But, as criteria for judicial decision,

> the purposes of the separation of powers are too general and diverse to offer much concrete guidance. Among other things, the separation of powers and the accompanying checks and balances promote efficiency, energy, stability, limited government, control of factions, deliberation, the rule of law, and accountability. . . . [I]n the absence of any specific textual home or pattern of historical practice or judicial precedent, one could reasonably move from these broad and often-conflicting purposes to any number of

> fair conclusions about . . . almost any freestanding separation of powers question.

John F. Manning, *Foreword: The Means of Constitutional Power*, 128 Harv. L. Rev. 1, 56-57 (2014). As sustained by the Supreme Court, for-cause removal restrictions presumptively respect all of the "general and diverse" goals of separation of powers, *see id.* at 56, including liberty. Once the Supreme Court is satisfied that a removal restriction leaves the President adequate control of the executive branch's functions, the Court does not separately attempt to re-measure the provision's potential effect on liberty or any other separation-of-powers objective.

Another of PHH's leaps is its assumption that the CFPB's challenged characteristics diminish "liberty," writ large. It remains unexplained why we would assess the challenged removal restriction with reference to the liberty of financial services providers, and not more broadly to the liberty of the individuals and families who are their customers. Congress determined that, without the Dodd-Frank Act and the CFPB, the activities the CFPB is now empowered to regulate contributed to the 2008 economic crisis and Americans' devastating losses of property and livelihood. Financial Crisis Inquiry Commission, *The Financial Crisis Inquiry Report*, at xv-xvii. Congress understood that markets' contribution to human liberty derives from freedom of contract, and that such freedom depends on market participants' access to accurate information, and on clear and reliably enforced rules against fraud and coercion. Congress designed the CFPB with those realities in mind.

More fundamentally, PHH's unmoored liberty analysis is no part of the inquiry the Supreme Court's cases require: As Part I explains, the key question in the Court's removal-power

cases is whether a challenged restriction either aggrandizes the power of another branch or impermissibly interferes with the duty and authority of the President to execute the laws. The CFPB Director's for-cause restriction does neither. That result is liberty-protecting; it respects Congress's chosen means to cleanse consumer financial markets of deception and fraud, and respects the President's authority under the challenged law to ensure that the CFPB Director performs his or her job competently and in accordance with the law. The traditional for-cause protection leaves the President "ample authority" to supervise the agency. *Morrison*, 487 U.S. at 692.

If the CFPB Director runs afoul of statutory or constitutional limits, it is the President's prerogative to consider whether any excesses amount to cause for removal, the Financial Stability Oversight Council's expert judgment whether to step in to protect markets, and the courts' role to hem in violations of individual rights. The now-reinstated panel holding that invalidated the disgorgement penalties levied against PHH (a holding expressly approved by three additional members of the *en banc* court, *see* Concurring Op. (Tatel, J.)), illustrates how courts appropriately guard the liberty of regulated parties when agencies overstep. The fact that the CFPB is led by one Director, rather than several commissioners, does not encroach on the President's constitutional power and duty to supervise the enforcement of the law.

## D. The Cabinet and the Slippery Slope

Finally, PHH mounts a slippery-slope argument against the CFPB. Sustaining the CFPB's structure as constitutionally permissible, PHH argues, could threaten the President's control over the Cabinet. Pet'rs' Reply Br. 7.

We disagree. "[T]here are undoubtedly executive functions that, regardless of the enactments of Congress, must be performed by officers subject to removal at will by the President." *Bowsher*, 478 U.S. at 762 (White, J., dissenting); *see Morrison*, 487 U.S. at 690 (same). Should Congress ever seek to provide the Cabinet with for-cause protection against removal, at least two principled distinctions would differentiate this case from a challenge to such a law.

*First*, the Supreme Court's removal-power precedent, which we follow here, makes the nature of the agency's function the central consideration in whether Congress may grant it a measure of independence. The Court has held, time and again, that while the Constitution broadly vests executive power in the President, U.S. Const. art. II, § 1, cl. 1, that does not require that the President have at-will authority to fire every officer. Doctrine and history squarely place the CFPB Director among those officials who may constitutionally have for-cause protection. At the same time, there are executive officials whom the President must be able to fire at will. *See generally Marbury v. Madison*, 5 U.S. 137, 166 (1803) ("[W]here the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable."). Those would surely include Cabinet members—prominently, the Secretaries of Defense and State—who have open-ended and sweeping portfolios to assist with the President's core constitutional responsibilities. *See generally Myers*, 272 U.S. at 141 (suggesting that "ministerial" acts of Secretary of State were "entirely to be distinguished from his duty as a subordinate to the President in the discharge of the President's political duties which could not be controlled"). Executive functions specifically identified in Article II would be a good

place to start in understanding the scope of that executive core: It includes, at least, the President's role as Commander in Chief, and the foreign-affairs and pardon powers. U.S. Const. art. II, § 2; *see Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 211 (2012) ("The President has broad authority in the field of foreign affairs."). Although this case does not require us to catalogue every official on either side of the constitutional line, we emphasize that certain governmental functions may not be removal-restricted.

*Second*, Cabinet-level officers traditionally are close presidential advisers and allies. Under the 25th Amendment, Cabinet officials have the power (by majority vote and with the Vice President's assent) to remove the President temporarily from office. *See* U.S. Const. amend. XXV, § 4; *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 887 (1991) (suggesting that the 25th Amendment, which refers to "the principal officers of the executive departments," refers to "Cabinet-level entities"). We do not believe that the heads of independent agencies are executive-agency principals eligible under the 25th Amendment to vote on a President's incapacity. Cabinet officials are also, by statute, in the presidential line of succession, *see* 3 U.S.C. § 19(d)(1), and their agencies are specifically denoted as "Executive departments," 5 U.S.C. § 101. There is thus little prospect that Congress could require the President to tolerate a Cabinet that is not fully and directly accountable to him.

Indeed, the slipperiest slope lies on the other side of the mountain. PHH argues that, regardless of whether *Humphrey's Executor* itself turned on the FTC's multi-member character, we should reject any independent agency that does not precisely mimic the agency structure that the Court approved in that case. *See* Pet'rs' Br. 22. PHH gleans from *Free Enterprise Fund* the proposition that "when a court is asked 'to

consider a new situation not yet encountered by the [Supreme] Court,' there must be special mitigating 'circumstances' to justify 'restrict[ing the President] in his ability to remove' an officer." Pet'rs' Br. 22 (quoting 561 U.S. at 483-84). The Court held no such thing. And if we were to embrace an analysis invalidating any independent agency that does not mirror the 1935-era FTC, our decision would threaten many, if not all, modern-day independent agencies, perhaps including the FTC itself. *See* Pet'rs' Reply Br. 6 (noting that the FTC did not claim rulemaking authority until 1962).

PHH suggests that so-called "[h]istorical[]" multi-member independent agencies are different in kind—and thus would be safe even if the CFPB were invalidated—because "their own internal checks" somehow substitute for a check by the President. Pet'rs' Br. 23. The argument is that multi-member agency leadership could check or slow or stop agency action even when the President could not, and that such a check, in turn, protects liberty. PHH's newly devised theory posits that freestanding liberty is the goal, and that various agency design features might be a means—alternative to illimitable presidential control but nonetheless somehow mandated by Article II—to ensure that liberty. That theory lacks grounding in precedent or principle. *See supra* Part I.C.3. In *Free Enterprise Fund*, for example, the fact that the PCAOB and the SEC were both multi-member bodies did not salvage the Board's dual-layered removal limitation.

If PHH's version of liberty were the test—elevating regulated entities' liberty over those of the rest of the public, and requiring that such liberty be served by agencies designed for maximum deliberation, gradualism, or inaction—it is unclear how such a test could apply to invalidate only the CFPB. That test would seem equally to disapprove other features of many independent agencies. Consider, for example,

efficiency-promoting features like a strong chairperson, low quorum requirement, small membership, shared professional or partisan background, and electronic or negative-option voting. Even a multi-member independent agency might have features that offset that body's theoretical gradualism and, in practice, achieve the efficiency that PHH's liberty analysis condemns. Would such an agency be susceptible to challenge under PHH's theory as threatening to liberty?

By the same token, it is also unclear why a doctrine embracing PHH's brand of freestanding liberty analysis would not constitutionally obligate Congress to affirmatively impose additional internal checking mechanisms on all independent agencies. Many familiar processes and structures—such as partisan or sectoral balance, requirements of large and broadly representative membership; high quorum, supermajority or unanimity rules; or even mandatory in-person meetings and votes—might foster deliberation and check action as much if not more than mere multi-member leadership. Reading the Constitution, as PHH does, to require courts to impose group leadership at independent agencies would appear to throw open many other institutional design features to judicial second-guessing. For good reason, PHH's freestanding liberty analysis is not, and has never been, the law.

The reality that independent agencies have many and varied design features underscores that there is no one, constitutionally compelled template. Academic analyses to which PHH and dissenters point for the proposition that a multi-headed structure is the *sine qua non* of these agencies' constitutional validity, *see* Dissenting Op. at 28-29 (Kavanaugh, J.), do not support their theory. Those materials are more descriptive than prescriptive. And, contrary to the dissenters' suggestions, they do not treat multiple membership as indispensable. Rather, scholars identify various indicia of

agency independence that demonstrate the rich diversity of institutional design. *See* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 774 (2013) ("Congress can—and does—create agencies with many different combinations of indicia of independence . . . ."); Barkow, *Insulating Agencies*, 89 Tex. L. Rev. at 16-18 (urging a functionalist analysis beyond the "obsessive focus on removal as the touchstone of independence"—and emphasizing the "failure of banking agencies to guard against lending abuses" as a reason for agency independence); Lisa Schultz Bressman & Robert B. Thompson, *The Future of Agency Independence*, 63 Vand. L. Rev. 599, 607-10 (2010) (describing "[f]inancial agencies . . . [as] among the most prominent independent agencies" and independent agencies as having "some variety in design," with some generally "share[d]" attributes); Breger & Edles, *Established by Practice*, 52 Admin L. Rev at 1113-14 ("[W]e review the structure and internal operations of independent agencies, not[ing] several similarities and differences among them . . . ."); *id.* at 1137-38 (describing many "modern" independent agencies as adopting "the commission form" but describing "the protection . . . against removal 'for cause'" as the "critical element of independence"); The President's Committee on Administrative Management, *Report of the Committee with Studies of Administrative Management in the Federal Government* 216 (1937) (theorizing that there are "[s]ome regulatory tasks" that, per "popular belief," "ought to be performed by a group," while others call for "regional representation"); *id.* (emphasizing the importance of agency independence to ensure that certain regulatory functions are "kept free from the pressures and influences of political domination"); *see also Free Enterprise Fund*, 561 U.S. at 547 (Breyer, J., dissenting) (describing "[a]gency independence [a]s a function of several different factors" and finding the "absence" of one—in the case of the

SEC, an express "for cause" provision—"not fatal to agency independence"). Today's independent agencies are diverse in structure and function. They have various indicia of independence, including differing combinations of independent litigation and adjudication authority, budgetary independence, autonomy from review by the Office of Management and Budget, and the familiar removal restrictions. *See* Datla & Revesz, *Deconstructing Independent Agencies*, 98 Cornell L. Rev. at 772.

The particular design choice that PHH here highlights—whether to create a single-director or multi-member agency—implicates policy determinations that we must leave to Congress. There are countless structural options that might be theorized as promoting more or less thorough deliberation within agencies. Our own judgments of contested empirical questions about institutional design are not grounds for deeming such choices constitutionally compelled. After all, "[t]he court should . . . not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good"—including "liberty," however defined. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978).

Even accepting deliberative virtues of multi-member bodies under certain conditions, other structural choices serve other virtues of equal importance. We should not require Congress always to privilege the putative liberty-enhancing virtues of the multi-member form over other capabilities Congress may choose, such as efficiency, steadiness, or nuanced attention to market developments that also, in different ways, may serve the liberty of the people. That is why the Supreme Court has acknowledged congressional latitude to fashion agencies in different ways, recognizing that the

"versatility of circumstances often mocks a natural desire for definitiveness." *Wiener*, 357 U.S. at 352.

Judicial review of agency design choices must focus on ensuring that Congress has not "interfere[d] with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Morrison*, 487 U.S. at 690, 691 n.30. Internal agency dynamics to which PHH points have little to do with the President's ultimate duty to ensure that the laws are faithfully executed.

A constitutional analysis that condemns the CFPB's for-cause removal provision provides little assurance against—indeed invites—the judicial abolition of all independent agencies. PHH and dissenters do not dispel that concern. In PHH's view, the Supreme Court's entire line of precedent beginning with *Humphrey's Executor* was wrongly decided. *See* Pet'rs' Br. 22 n.4 (preserving argument for overrule of *Morrison* and *Humphery's Executor*); *see also* Dissenting Op. at 61 n.18 (Kavanaugh, J.) (noting PHH's preservation of that argument). PHH's course calls into question the legitimacy of every independent agency. We instead follow Supreme Court precedent to sustain the challenged Act of Congress.

## Conclusion

Applying binding Supreme Court precedent, we see no constitutional defect in the statute preventing the President from firing the CFPB Director without cause. We thus uphold Congress's choice.

The Supreme Court's removal-power decisions have, for more than eighty years, upheld ordinary for-cause protections of the heads of independent agencies, including financial regulators. That precedent leaves to the legislative process, not

the courts, the choice whether to subject the Bureau's leadership to at-will presidential removal. Congress's decision to provide the CFPB Director a degree of insulation reflects its permissible judgment that civil regulation of consumer financial protection should be kept one step removed from political winds and presidential will. We have no warrant here to invalidate such a time-tested course. No relevant consideration gives us reason to doubt the constitutionality of the independent CFPB's single-member structure. Congress made constitutionally permissible institutional design choices for the CFPB with which courts should hesitate to interfere. "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

The petition for review is granted in part and denied in part, and the case is remanded to the agency for further proceedings.

TATEL, *Circuit Judge*, with whom *Circuit Judges* MILLETT and PILLARD join, concurring: Finding no way to avoid the constitutional question, the *en banc* court reinstates the panel opinion's statutory holdings. Were this court to address the statutory questions, which are fully briefed, I would have resolved them differently. Specifically, I would have concluded that (1) the Bureau reasonably interpreted RESPA to impose liability on PHH, (2) the applicable statute of limitations reaches back five years to cover PHH's conduct, and (3) the Bureau's prospective injunction against PHH is permissible, even if its retrospective disgorgement penalties are not.

First, the Bureau's interpretation of RESPA. Section 8(c) states that "[n]othing in this section shall be construed as prohibiting . . . the payment to any person of a *bona fide salary or compensation or other payment* for goods or . . . services actually performed." 12 U.S.C. § 2607(c) (emphasis added). The CFPB interpreted this provision to insulate from liability just payments for referral services made "solely for the service actually being provided on its own merits," Director's Decision at 17—that is, that "bona fide" payments *excludes* payments whose purpose is to serve as a quid pro quo for referrals.

PHH argues that Section 8(c) unambiguously permits regulated entities to give or receive kickbacks in the form of reinsurance arrangements as long as the kickbacks do not exceed the reasonable market value for reinsurance services. In other words, PHH insists that "bona fide" admits of only one meaning—that a "payment is 'bona fide' if it bears a reasonable relationship to the value of the services actually provided in return." Pet'rs' Br. 43.

But Section 8(c)'s use of the phrase "bona fide" is not unambiguous. Neither it nor any other provision of RESPA defines the term, and looking to its "ordinary or natural

meaning"—as we must when the statute supplies no definition of its own, *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)—likewise fails to resolve the ambiguity. To the contrary, dictionary definitions reflect a range of meanings encompassed by the term, including the very definition adopted by the Bureau. *See* Webster's New Collegiate Dictionary 125 (1973) ("Made in good faith without fraud or deceit . . . , made with earnest intent . . . , neither specious nor counterfeit."); Black's Law Dictionary 223 (4th Ed. Rev'd 1968) ("In or with good faith; honestly, openly, and sincerely; without deceit or fraud . . . real, actual, genuine, and not feigned."). The existence of these varied definitions, "each making some sense under the statute, itself indicates" the statute's ambiguity. *National Railroad Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 418 (1992).

Moreover, the Bureau's interpretation of "bona fide" is perfectly reasonable, as the previous citations to both Webster's and Black's demonstrate. Indeed, PHH does not argue to the contrary, other than to claim that because RESPA has some criminal applications—none relevant here—the rule of lenity requires that any statutory ambiguity be resolved in PHH's favor. The Supreme Court, however, has done just the opposite, deferring to an agency's interpretation of a statute even though the Court recognized that violations of the statute could carry criminal penalties. *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687, 704 n.18 (1995) (noting that the Court has "never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement"). Though there is some dispute about whether *Chevron* deference remains appropriate for agency interpretations of statutes with both civil and criminal applications, *see Whitman v. United States*, 135 S. Ct. 352, 352–54 (2014) (Scalia, J., respecting the

denial of certiorari) (calling *Babbitt* into question (citing *Leocal v. Ashcroft*, 543 U.S. 1, 11–12 n.8 (2004))), our court continues to adhere to the view that it is, *see Competitive Enterprise Institute v. Department of Transportation*, 863 F.3d 911, 915 n.4 (D.C. Cir. 2017) ("We apply the *Chevron* framework to this facial challenge even though violating [the statute] can bring criminal penalties."). Even were *Chevron* inapplicable, given my view that the agency's interpretation was correct as well as reasonable, PHH has failed to show that the statute is sufficiently ambiguous as to merit application of the rule of lenity. "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *United States v. Castleman*, 134 S. Ct. 1405, 1416 (2014) (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)). Because RESPA Section 8 is ambiguous, and because the Bureau's interpretation is reasonable, I would have held that PHH is liable under the statute.

There remains the question of how far back the Bureau can reach in seeking to impose liability on regulated entities. Specifically, the question is whether administrative actions to enforce RESPA's ban on referral fees are subject to the specific three year statute of limitations contained in RESPA, 12 U.S.C. § 2614, as PHH argues, or whether, as the Bureau contends, they are subject only to the general five year statute of limitations on any action or administrative proceeding for "enforcement of any civil fine, penalty, or forfeiture" contained in 28 U.S.C. § 2462. Given that RESPA provides that "[a]ny action" to enforce the ban on referral fees initiated by the Bureau must be brought within three years, 12 U.S.C. § 2614, the question turns on whether the word "action" encompasses both court and administrative actions.

RESPA's plain text favors the Bureau's view that the provision limits the timing of only court actions, not administrative actions like the one at issue here. The clause expressly refers to actions that "may be brought in the United States district court" and specifies that such actions are generally subject to a one year statute of limitations, except that "actions brought by the Bureau, the Secretary, the Attorney General of any State, or the insurance commissioner of any State may be brought within 3 years." *Id.* Given that state attorneys general and insurance commissioners have no authority to bring administrative enforcement actions, even if they may bring actions in court, it would be odd to conclude that this provision circumscribes *when* the same actors can bring administrative actions that they could never have brought in the first place. Reinforcing this point, the RESPA provision is entitled "Jurisdiction of *courts*; limitations."

If the statute, read alone, was not clear enough, the Bureau would still be entitled to a presumption that statutes of limitations "are construed narrowly against the government"— a principle "rooted in the traditional rule . . . [that] time does not run against the King." *BP America Production Co. v. Burton*, 549 U.S. 84, 95–96 (2006). "A corollary of this rule is that when the sovereign elects to subject itself to a statute of limitations, the sovereign is given the benefit of the doubt if the scope of the statute is ambiguous." *Id.* at 96. Given this, the court would have to presume that RESPA's statute of limitations does *not* cover administrative actions. The Supreme Court addressed a remarkably similar issue in *BP America*, 549 U.S. 84, in which the Court unanimously held that a general statute of limitations for Government contract actions applied only to *court actions*, not to administrative proceedings initiated by the Government.

The Bureau thus reasonably interpreted PHH's actions as running afoul of RESPA and correctly concluded that it could impose liability on conduct falling within the five-year limitations period. Based on this liability, the Bureau sought two forms of relief: disgorgement for PHH's past harms and an injunction to prevent future ones. For substantially the reasons given by the panel, I agree that the Bureau ran afoul of the due process clause by failing to give PHH adequate notice in advance of imposing penalties for past conduct. Importantly for our purposes, however, the imposition of prospective relief is unaffected by that fair notice issue. *See, e.g.*, *Landgraf v. USI Film Products*, 511 U.S. 244, 273 (1994) ("When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive."); *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 221 (1988) (Scalia, J., concurring) ("Retroactivity [in agency adjudications] is not only permissible but standard.").

Though I disagree with the panel's now-reinstated statutory holdings, I completely agree with the *en banc* court that the Bureau's structure does not violate the constitutional separation of powers. PHH is free to ask the Supreme Court to revisit *Humphrey's Executor* and *Morrison*, but that argument has no truck in a circuit court of appeals. Attempts to distinguish those cases—by rereading *Humphrey's* as hinging on the multi-member structure of the FTC, or by characterizing the Independent Counsel in *Morrison* as an insignificant inferior officer—are, at best, strained. Indeed, to uphold the constitutionality of the Bureau's structure we need scarcely go further than *Morrison* itself, which approved a powerful independent entity headed by a single official and along the way expressly compared that office's "prosecutorial powers" to the "civil enforcement powers" long wielded by the FTC and other independent agencies. *Morrison v. Olson*, 487 U.S. 654, 692 n.31 (1988).

Although it may (or may not) be wise, as a policy matter, to structure an independent agency as a multimember body, nothing in the Constitution's separation of powers compels that result. The Constitution no more "enacts" social science about the benefits of group decision-making than it does "Mr. Herbert Spencer's Social Statics." *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J. dissenting).

WILKINS, *Circuit Judge*, with whom ROGERS, *Circuit Judge*, joins, concurring: I concur with the Court's decision in full. This petition involves a challenge to a final decision in an adjudication by the Consumer Financial Protection Bureau ("CFPB"). Petitioners are quite clear that they seek review of the "Decision of the Director" and the "Final Order" issued by the CFPB's Director that, together, constitute the Bureau's final agency action *in an adjudication*. Petition 1-3. The petitioners (and our dissenting colleagues) seek to downplay this basic fact, even though it is the bedrock for the exercise of our jurisdiction. They do so because acknowledging that the Director has significant adjudicatory responsibilities – indeed, the Director's adjudicatory functions are the only powers at issue in this case – seriously undermines the separation-of-powers challenge before us. All in all, those significant quasi-judicial duties, as well as the Director's quasi-legislative duties and obligations to coordinate and consult with other expert agencies, provide additional grounds for denial of the separation-of-powers claim before us.

## I.

Congress authorized the CFPB "to conduct hearings and adjudication proceedings" to "ensure or enforce compliance with" the provisions of the Dodd-Frank Act establishing the authority of the CFPB and any rules issued thereunder, and "any other Federal law that the Bureau is authorized to enforce . . . ." 12 U.S.C. § 5563(a)(1)-(2). The Bureau must do so in the "manner prescribed" under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* 12 U.S.C. § 5563(a). The CFPB can bring enforcement actions in either a court or an administrative proceeding. "The court (or the Bureau, as the case may be) in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant any appropriate legal or equitable relief . . . ." *Id.* § 5565.

In 2012, the CFPB issued a final rule pursuant to 12 U.S.C. § 5563(e) to establish rules of practice for adjudication proceedings. 12 C.F.R. § 1081.

The Director does not initiate investigations. Rather, "[t]he Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement have the nondelegable authority to initiate investigations," *id.* § 1080.4, just as they have the authority to close CFPB investigations, *id.* § 1080.11(c). If the investigation merits enforcement within the agency, Bureau lawyers commence the proceeding with the filing of a Notice of Charges, *id.* § 1081.200, as was done here, J.A. 41, and the matter proceeds to a hearing.

The "hearing officer," defined as "an administrative law judge or any other person duly authorized to preside at a hearing," *id.* § 1081.103, is vested with wide adjudicatory authority, including the power to issue subpoenas, order depositions, hold settlement conferences, and "rule upon, as justice may require, all procedural and other motions appropriate in adjudication proceedings." *Id.* § 1081.104(b)(2), (3), (7), (10). Most importantly, at the close of the administrative proceedings, "[t]he recommended decision shall be made and filed by the hearing officer who presided over the hearings . . . ." *Id.* § 1081.400(d).

The Director of the Bureau acts as the chief adjudicatory official. Whether or not the parties choose to appeal the recommended decision, it goes to the CFPB Director, who "shall . . . either issue a final decision and order adopting the recommended decision, or order further briefing regarding any portion of the recommended decision." *Id.* § 1081.402(b). If the Director determines that it would

"significantly aid[]" the decisional process, the Director may order oral argument. *Id.* § 1081.404(a). As the Director considers the recommended decision, the Director "will, to the extent necessary or desirable, exercise all powers which he or she could have exercised if he or she had made the recommended decision." *Id.* § 1081.405(a). The Director's final decision must be served on the parties and published in an order. *Id.* § 1081.405(e).

The Director rendered a final decision and order as the chief adjudicatory official of the Bureau in this case. J.A. 1-40. That *adjudication* is the basis of the petition for review, Petition 1-3, and that *adjudication* provides the basis for our subject matter jurisdiction. Pet'r's Br. 4.

## II.

The adjudicatory nature of the order under review is material to the questions raised by the instant petition. We have an extensive line of authority, from the time of the Framers to the present, establishing that removal restrictions of officers performing adjudicatory functions intrude far less on the separation of powers than removal restrictions of officers who perform purely executive functions.

From the time of the Constitution's enactment, the Framers recognized that adjudication poses a special circumstance. Even James Madison, one of strongest and most articulate proponents "for construing [Article II] to give the President the sole power of removal in his responsibility for the conduct of the executive branch," *Myers v. United States*, 272 U.S. 52, 117 (1926) (citation omitted), acknowledged the "strong reasons why" an executive officer who adjudicates disputes "between the United States and particular citizens . . . should not hold his office at the

pleasure of the Executive branch of the Government." 1 ANNALS OF CONG. 611-12 (1789) (Joseph Gales ed., 1834) (statement of James Madison). Consistent with Madison's view, the Supreme Court has held that the evaluation of removal restrictions for an officer "will depend upon the character of the office." *Humphrey's Executor v. United States*, 295 U.S. 602, 631 (1935). As a result, the scrutiny of a removal restriction for an officer "with no duty at all related to either the legislative or judicial power," differs from that of an officer who "perform[s] other specified duties as a legislative or as a judicial aid," as the latter "must be free from executive control," *id.* at 627-28. The Court continued:

> We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named. The authority of Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime. For it is quite evident that one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will.

*Id*. at 629.

Relying upon the "philosophy of *Humphrey's Executor*," the Court later held that the power to remove "a member of an adjudicatory body" at will and without cause is not "given to

the President directly by the Constitution." *Wiener v. United States*, 357 U.S. 349, 356 (1958).

To be sure, the adjudicatory nature of an officer's duties is not dispositive. The analysis is much more nuanced. The modern view is "that the determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'" *Morrison v. Olson*, 487 U.S. 654, 689 (1988). Thus, rather than "defin[ing] rigid categories of those officials who may or may not be removed at will by the President," courts focus squarely on the separation-of-powers principle at stake: "ensur[ing] that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Id*. at 689-90 (footnote omitted).

Despite its rejection in *Morrison* of the simple categorization of officers, the Supreme Court was clear that it "d[id] not mean to suggest that an analysis of the functions served by the officials at issue is irrelevant." *Id*. at 691. As Madison recognized, the faithful execution of the laws may require that an officer has some independence from the President. To provide for due process and to avoid the appearance of impropriety, agency adjudications are structured to be "insulated from political influence" and to "contain many of the same safeguards as are available in the judicial process." *Butz v. Economou*, 438 U.S. 478, 513 (1978) (holding, among other things, that safeguards from political influence entitled the Secretary of Agriculture's designee, who rendered final decisions in agency adjudications, to absolute immunity). The Article II inquiry is informed by the consistent recognition of the imperative to

safeguard the adjudicatory officer from undue political pressure. Thus, even if not dispositive, the quasi-judicial functions of the CFPB Director are still relevant to our inquiry, and those functions seriously undermine petitioners' separation-of-powers objection. *See Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 507 n.10 (2010) (noting that its holding, which struck down two layers of good-cause removal restrictions for members of the Public Company Accounting Oversight Board, did not necessarily apply to administrative law judges who, "unlike members of the Board, . . . perform adjudicative rather than enforcement or policymaking functions").[1]

---

[1] The substantive differences between the removal restrictions of Board members and ALJs provided another important distinction in *Free Enterprise Fund*. The tenure protection struck down in *Free Enterprise Fund* was "unusually high." 561 U.S. at 503. The only violations of law that could lead to removal were violations of "provision[s] of [the Sarbanes-Oxley] Act, the rules of the [PCAOB], or the securities laws," 15 U.S.C. § 7217(d)(3)(A), and Board members could only be removed if those violations or abuses were committed "willfully," *id.* § 7217(d)(3)(A)-(B). The Court noted that a Board member could not be removed even if, for example, he cheated on his taxes, even though such an action could greatly diminish the confidence that the member would faithfully carry out his or her duties. *Free Enterprise Fund*, 561 U.S. at 503.

By contrast, the removal standard for ALJs is quite modest. ALJs can be removed for "good cause," 5 U.S.C. § 7521, which has been interpreted to require that an ALJ "act at all times in a manner that promotes public confidence in [] independence, integrity, and impartiality . . . and . . . avoid[s] impropriety and the appearance of impropriety," a standard borrowed from the American Bar Association's Model Code of Judicial Conduct. *Long v. Soc. Sec. Admin.*, 635 F.3d 526, 533 (Fed. Cir. 2011). Accordingly, ALJs have been disciplined or removed for a wide variety of job-related

In sum, the Supreme Court has consistently rendered its "judgment that it was not essential to the President's proper execution of his Article II powers that [quasi-judicial and quasi-legislative] agencies be headed up by individuals who were removable at will." *Morrison*, 487 U.S at 691. Indeed, in his dissent in *Morrison*, Justice Scalia even acknowledged that "removal restrictions have been generally regarded as lawful" for independent agencies "which *engage substantially* in what has been called the 'quasi-legislative activity' of rulemaking" and "the 'quasi-judicial' function of adjudication." *Id.* at 724-25 (citations omitted, emphasis added). Here, is there any doubt that the CFPB Director *substantially engages* in both of these activities? Of course not. In addition to the final adjudication authority described above, Congress granted the Director rulemaking authority for the Bureau. 12 U.S.C. § 5512(b). Thus, the Director (and the Bureau) fit squarely within the zone "generally regarded as lawful" by every Justice in *Morrison* and in the unbroken line of authority from the Supreme Court described above and in our Majority Opinion.

---

misconduct, such as improperly using the imprimatur of the agency for personal business, *Steverson v. Soc. Sec. Admin.*, 383 F. App'x 939 (Fed. Cir. 2010); lack of productivity in comparison to colleagues, *Shapiro v. Soc. Sec. Admin.*, 800 F.3d 1332, 1334-36 (Fed. Cir. 2015); failure to follow mandatory office procedures, *Brennan v. Dep't of Health & Human Servs.*, 787 F.2d 1559, 1561 (Fed. Cir. 1986), as well as for misbehavior not directly connected to official duties, such as domestic violence, *Long*, 635 F.3d 526. And in contrast to the Court's concern in *Free Enterprise Fund* about the inability to remove a tax-cheating Board member, an ALJ has been fired for "financial irresponsibility" in failing to repay debts. *See McEachern v. Macy*, 341 F.2d 895 (4th Cir. 1965).

**III.**

Disagreeing with the weight of authority, the dissenters take two major tacks, neither of which is sufficient to overcome the Court's precedent.

First, the dissenters attempt to recast this case as more about the Director's pure executive power of enforcement rather than about the quasi-judicial power of adjudication. Henderson Dissenting Op. 33; Kavanaugh Dissenting Op. 15-17, 20-23 & n.2. But what we have before us is the Director's order of *adjudication*. Pet'r's Br. 4 (Jurisdictional Statement). This essential detail, along with the fact that the Director has substantial adjudicative responsibilities, is minimized.

This recasting is significant, because Judge Henderson contends that the Court's precedents should be read to deem removal protections for a principal officer in violation of the separation of powers unless the officer's "*primary function* is adjudication," Henderson Dissenting Op. 33 (emphasis in original), and Judge Kavanaugh emphasizes over and again that this case is "about executive power," Kavanaugh Dissenting Op. 1, because the CFPB Director has "substantial executive authority." *Id*. at 3; *see also id*. at 5, 7, 8, 18, 68, 73 (characterizing the Director's "substantial executive power" or "authority").

This line of attack collapses under its own weight. The vast majority of independent agencies have significant enforcement *and* adjudicative responsibilities, and these shared duties are expressly addressed by the APA. 5 U.S.C.

§ 554(d). If the dissenters were correct, then it would violate the separation of powers for any such independent agency to be headed by a principal officer with tenure protection. This has never been the law. At the time of *Humphrey's Executor*, the Court was well aware that the Federal Trade Commission ("FTC") exercised both enforcement, 15 U.S.C. §§ 45(b), 46, and adjudicative functions, *Fed. Trade Comm'n v. Winsted Hosiery Co.*, 258 U.S. 483, 490 (1922), but it nonetheless upheld the removal protections of FTC Commissioners. 295 U.S. at 629. Similarly, in *Free Enterprise Fund,* the Court was not troubled that Securities and Exchange Commission ("SEC") Commissioners enjoyed strong removal protection, 561 U.S. at 487, even though the Commission quite obviously both enforces and adjudicates. As explained by the Court in *Morrison*, the cramped view of the separation of powers favored by the dissenters must be rejected:

> The dissent says that the language of Article II vesting the executive power of the United States in the President requires that every officer of the United States exercising *any part of that power* must serve at the pleasure of the President and be removable by him at will. . . . This rigid demarcation—a demarcation incapable of being altered by law in the slightest degree, and applicable to tens of thousands of holders of offices neither known nor foreseen by the Framers—depends upon an extrapolation from general constitutional language which we think is more than the text will bear. It is also contrary to our holding in *United States v. Perkins*, [116 U.S. 483,] decided more than a century ago.

*Morrison*, 487 U.S. at 690, n.29 (emphasis added).

In sum, the dissenters have warped the current meaning of *Myers*. There is no rule requiring direct presidential supervision of all officers, with the only potential exception for "purely" judicial officers or officers having no "substantial" executive power; rather, *Humphrey's Executor* "narrowly confined the scope of the *Myers* decision to include only 'all purely executive officers.'" *Wiener*, 357 U.S. at 352 (quoting *Humphrey's Executor*, 295 U.S. at 628).[2]

In their other major line of attack, the dissenters seek to overcome the precedent upholding tenure protection for officers with significant quasi-judicial and quasi-legislative responsibilities by distinguishing the CFPB, headed by a single director, from independent agencies headed by multi-member commissions. In this regard, a few other points bear mention.

---

[2] The dissenters seek to cast aspersions on *Humphrey's Executor*, painting it as an outlier in the Court's separation-of-powers jurisprudence. *See* Kavanaugh Dissenting Op. 61 n.18; Henderson Dissenting Op. 36-37. Perhaps all that need be said in response is that the case binds us, as an inferior court. U.S. Const. Art. III, § 1. Nonetheless, it is worth noting that *Humphrey's Executor* was a unanimous opinion and that all four Justices from the *Myers* majority who remained on the Court nine years later joined the opinion; indeed, one of those members of the *Myers* majority, Justice Sutherland, wrote the opinion. It thus seems inconceivable that the Court in *Humphrey's Executor* did not understand what part of *Myers* was its holding rather than dictum.

As noted in the Majority Opinion, Congress mostly reshuffled existing responsibilities from other entities to the CFPB. Maj. Op. 11-12. I do not read the dissenting opinions as suggesting that the Constitution prohibits Congress from reassigning responsibilities from existing independent agencies to a new independent agency. Instead, the dissenters contend that the Constitution requires the new independent agency to be headed by multiple members in order to receive tenure protection; Congress cannot depart from that model. However, just as "[o]ur constitutional principles of separated powers are not violated . . . by mere anomaly or innovation," *Mistretta v. United States*, 488 U.S. 361, 385 (1989), I do not believe that the concept of "two heads are better than one" has been elevated to a constitutional requirement of agency leadership. Single individuals have been entrusted with important decision-making authority throughout our government from the Founding, *see* Maj. Op. 42-43, so I am not swayed by the dissenters' suggestion that the possibility of poor decisionmaking creates a constitutional defect.

For our separation-of-powers analysis, there are two critical questions: How much, if at all, does the single-director structure decrease the agency's accountability to the President in comparison to a multi-member agency? And is the President's control so diminished as to "interfere impermissibly with his constitutional obligation to ensure faithful execution of the laws"? *Morrison*, 487 U.S. at 693. As the Majority Opinion points out, the assumption that the single-director structure gives the President *less* control over the agency is dubious at best. Maj. Op. 43-45. Furthermore, we have a "duty . . . to construe [the CFPB] statute in order to save it from constitutional infirmities" and to avoid "overstat[ing] the matter" when describing the power and independence of the Director. *Morrison*, 487 U.S. at 682. I

fear the dissenters have overstated the power of the Director and understated the checks on that power.

I grant that having a single person in charge of the CFPB is different than having a multi-member body, but we cannot downplay the fact that Congress also required extensive coordination, expert consultation, and oversight of the Director. If much was given to the Director, then much was also required:

1. The CFPB is required to "coordinate" with the SEC, FTC, Commodity Futures Trading Commission ("CFTC"), and other federal and state regulators "to promote consistent regulatory treatment of consumer financial and investment products and services." 12 U.S.C. § 5495. There are numerous other "coordination" requirements. *See, e.g.*, *id.* § 5515(b)(2) (requiring coordination with prudential regulators and state bank regulatory authorities), § 5516(d)(2) (requiring coordination with prudential regulators for enforcement actions against banks).

2. The Director must establish a Consumer Advisory Board, full of experts, to "advise and consult with the Bureau" at least twice a year. 12 U.S.C. § 5494(a), (c).

3. The CFPB is required to "consult" with other federal agencies prior to proposing new rules to ensure "consistency with prudential, market, or systemic objectives administered by such agencies." 12 U.S.C. § 5512(b)(2)(B).

4. The CFPB is not only required to continue the consultation during the comment process regarding the category of proposed rules described above, but if any

agency objects to the proposed rule, the CFPB must also "include in the adopting release a description of the objection and the basis for the Bureau decision, if any, regarding such objection." 12 U.S.C. § 5512(b)(2)(C).

5. The CFPB must also consult with other federal agencies prior to promulgating a rule prohibiting unfair, abusive, or deceptive practices, again to ensure "consistency." 12 U.S.C. § 5531(e).

6. The CFPB is required to "conduct an assessment of each significant rule or order" addressing "the effectiveness of the rule or order in meeting the purposes and objectives" of the statute and the goals of the agency, using the "available evidence and any data that the [CFPB] reasonably may collect." 12 U.S.C. § 5512(d)(1).

7. Along with creating the CFPB, Congress created the Financial Stability Oversight Council ("FSOC"), 12 U.S.C. § 5321, and gave it authority to stay or veto any final CFPB rule by a two-thirds vote of its members if the Council finds that the regulation "would put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk." *Id.* § 5513.

In sum, Congress guided (and limited) the discretion of the Director of the CFPB in a very robust manner. Of course, the CFPB is not the only independent agency with consultation requirements, and the Dodd-Frank Act imposed new consultation requirements upon a number of agencies. *See* Jody Freeman & Jim Rossi, *Agency Coordination in Shared Regulatory Space*, 125 HARV. L. REV. 1131, 1168 (2012);

Susan Block-Lieb, *Accountability and the Bureau of Consumer Financial Protection*, 7 BROOK. J. CORP. FIN. & COM. L. 25, 55-56 (2012). But "[t]he Dodd-Frank Act does not subject any of the other federal financial regulators to similar overarching coordination requirements . . . ." U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-12-151, DODD FRANK ACT REGULATIONS: IMPLEMENTATION COULD BENEFIT FROM ADDITIONAL ANALYSES AND COORDINATION 22 (2011). With the amount of "coordination" and "consultation" required of the CFPB by statute, there can be no doubt that the Director operates with as much expert advice as any other independent agency. Congress went even further, repeatedly requiring the Director to seek "consistency" with other agencies, and in some circumstances, requiring the Director to explain why he or she failed to heed an objection of another agency. Congress even required the Director to give a yearly after-action report assessing the merits of every significant rule or order.

But here's the kicker: Congress created a new entity, the above-described Financial Stability Oversight Council, with veto power over any rule promulgated by the Director that the Council believes will "put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk." 12 U.S.C. § 5513. Any member of the Council can file a petition to stay or revoke a rule, which can be granted with a two-thirds majority vote. *See id.* Thus, if the Director's decisionmaking goes awry on a critical rulemaking, a multi-member body of experts can step in. Significantly, a supermajority of persons on the Council are designated by the President.[3]

---

[3] The Secretary of the Treasury, who serves at the pleasure of the President, chairs the Council. 12 U.S.C. § 5321(b)(1)(A). In

The veto is powerful enough, but the filing of a petition alone will trigger congressional oversight, since it "shall be published in the Federal Register and transmitted contemporaneously with filing to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives." 12 U.S.C. § 5513(b)(2). The choice Congress made to impose additional statutory requirements on CFPB action makes the CFPB Director more accountable to the President, not less.[4]

---

addition, the chairpersons of five independent agencies serve on the Council, each of whom the President has the opportunity to appoint either at the outset or near the beginning of the administration. *See* 15 U.S.C. § 78d (SEC Chair); 12 U.S.C. § 1812(b)(1) (Chair of the Federal Deposit Insurance Corporation); 7 U.S.C. § 2(a)(2)(B) (Chair of the Commodity Futures Trading Commission); 12 U.S.C. § 1752a(b)(1) (Chair of the National Credit Union Association); 12 U.S.C. §§ 241, 242, 244 (Chair of the Federal Reserve Board of Governors, whose four-year term expires just after the first year of a new presidential administration taking office in a presidential election year). Only four members of the FSOC have terms longer than four years and are thus potentially not appointed by a one-term President: the CFPB Director (five-year term), 12 U.S.C. § 5491(c)(1); the Director of the Federal Housing Finance Association (five-year term), 12 U.S.C. § 4512(b)(2); the Comptroller of the Currency (five-year term), 12 U.S.C. § 2; and the "independent member" of the FSOC (six-year term), 12 U.S.C. §§ 5321(b)(1)(J), (c)(1).

[4] Judge Kavanaugh makes much of the fact that the CFPB Director's five-year term could result in a one-term President being unable to remake the agency by naming a CFPB Director during his or her tenure. Kavanaugh Dissenting Op. 53-54. However, the same can be said of the Federal Reserve, where, absent the circumstance of a Board Member's early retirement, a President can never appoint a majority of the Board. *See* 12 U.S.C. §§ 241, 242

These myriad coordination and consultation requirements have further significance for the separation-of-powers analysis:  They give the President more potential ammunition to remove the CFPB Director than for the average officer.  For-cause removal protections are meaningful as a bulwark against undue political influence in agencies relied on for their expertise and independent judgment.  But the standard of removal for "inefficiency, neglect of duty, or malfeasance in office" does not afford officers who head independent agencies with unlimited discretion or untrammeled power.  Here, the Director's failure to abide by the stringent statutory requirements of consultation or coordination would almost certainly constitute "neglect of duty."  And the promulgation of a rule contrary to consensus expert advice without sufficient grounds or explanation would subject the Director to risk of removal for inefficiency.

Although the Supreme Court has largely avoided the task of spelling out precisely what conduct constitutes "cause" to remove officers under *Humphrey's Executor*, "inefficiency, neglect of duty, or malfeasance in office" provides a workable standard, and lower courts have long adjudicated the meaning of those terms in similar contexts.  Congress first used "inefficiency, neglect of duty, or malfeasance in office" as a removal standard for officers of the Interstate Commerce Commission and the General Board of Appraisers in 1887 and 1890, respectively.  *See* An Act to Regulate Commerce, ch. 104, § 11, 24 Stat. 379, 383 (1887); An Act to Simplify the Laws in Relation to the Collection of the Revenues, ch. 407,

(establishing a seven-member Board with staggered, fourteen-year terms, removable only for cause).

§ 12, 26 Stat. 131, 136 (1890).[5] The use of "efficiency" as a standard for removal of federal employees arose historically in the context of civil-service statutes around the same time period – the late-nineteenth and early-twentieth centuries. *See Myers*, 272 U.S. at 74-75 & nn. 30-32 (Brandeis, J., dissenting) (collecting statutes). The Lloyd-LaFollette Act of 1912, 5 U.S.C. § 7513 – like its predecessor, the Pendleton Act of 1883 – sought to establish a civil service based on merit and unshackled from patronage. The Lloyd-LaFollette Act included language providing that employees in competitive service could be removed "only for such cause as will promote the efficiency of the service." *Id.* § 7513(a).

As interpreted by courts and agencies for nearly a century, "inefficiency" provides a broad standard allowing for the removal of employees whose performance is found lacking. What constitutes "inefficiency" has varied depending on the context of the officer or employee's responsibilities and functions, but it is best described as incompetence or deficient performance. *See, e.g.*, *Burnap v. United States*, 53 Ct. Cl. 605, 609 (Ct. Cl. 1918) (upholding the removal of a landscape architect for inefficiency due to his

---

[5] Because Congress did not specify a term of years for appraisers, the Supreme Court concluded that inefficiency, neglect of duty and malfeasance were not exclusive grounds for removal, because otherwise, the office of appraiser would be a lifetime appointment. *Shurtleff v. United States*, 189 U.S. 311, 316 (1903). The Court "recognized and applied the strong presumption against the creation of a life tenure in a public office under the federal government." *De Castro v. Bd. of Comm'rs of San Juan*, 322 U.S. 451, 462 (1944) (explaining *Shurtleff*); *see also Humphrey's Executor*, 295 U.S. at 622-23 (finding the removal grounds exclusive for FTC Commissioners, because the statute provided for a fixed term of office, distinguishing *Shurtleff*).

failure to heed his supervisor's instructions to cease working for private clients), *aff'd*, 252 U.S. 512, 519-20 (1920) (rejecting procedural and constitutional challenges, and upholding the removal); *Thomas v. Ward*, 225 F.2d 953, 954 (D.C. Cir. 1955) (upholding a Navy personnel officer's removal for inefficiency when the officer was charged with "lack of professional knowledge and supervisory ability; poor personnel management and public relations and acts of misconduct involving failure to carry out orders; disloyalty to his superiors and untruthfulness in official relations with other employees"); *Seebach v. Cullen*, 338 F.2d 663, 665 (9th Cir. 1964) (upholding the dismissal of an IRS Auditor for "[i]nefficiency in handling tax cases as evidenced by technical and procedural errors, substandard report writing, and lack of proper audit techniques"); *King v. Hampton*, 412 F. Supp. 827 (E.D. Va. 1976) (upholding the removal of a Navy electronics engineer for inefficiency); *Alpert v. United States*, 161 Ct. Cl. 810 (Ct. Cl. 1963) (inefficiency removal sustained when an employee of a VA Hospital was charged with "Insubordination, Tardiness, Improper Conduct, and Unsatisfactory Interpersonal Relationships"); *DeBusk v. United States*, 132 Ct. Cl. 790 (Ct. Cl. 1955) (upholding removal of VA loan examiner for failure to "promote the efficiency of the service" based on charges of his disrespect of supervisors and failure to follow instructions); *Fleming v. U.S. Postal Serv.*, 30 M.S.P.R. 302, 308 (M.S.P.B. 1986) (upholding removal for "inefficiency" based on numerous unscheduled absences from work); *see also Arnett v. Kennedy*, 416 U.S. 134, 158-64 (1974) (upholding "efficiency" standard against vagueness challenge); *see generally*, 1 PETER BROIDA, A GUIDE TO MERIT SYSTEMS PROTECTION BOARD LAW & PRACTICE 1669, 1713 (Dewey Publ'ns Inc. 2012) (discussing cases upholding removal of federal employees for inefficiency); 1 ISIDORE SILVER, PUBLIC EMPLOYEE DISCHARGE & DISCIPLINE § 3.23 (John

Wiley & Sons Inc. 2d ed. 1995) (discussing the role of MSPB in adjudicating disputes over removals for inefficiency); OFFICE OF PERSONNEL MANAGEMENT, FEDERAL PERSONNEL MANUAL 752-15 (1989) (on file in the D.C. Circuit Library) (collecting cases upholding removal of federal employees for inefficiency); ROBERT VAUGHN, PRINCIPLES OF CIVIL SERVICE LAW §§ 1, 5 (Matthew Bender & Co. 1976) (discussing the origins of civil service law and the "efficiency" standard).

In sum, this body of authority from the past century demonstrates that the CFPB Director would be subject to supervision and discipline for "inefficiency" if he or she failed to comply with the various statutory mandates of coordination and consultation. It also shows that "inefficiency" is relatively broad and provides a judicially manageable standard. I agree with the overall sentiment of Judge Griffith that the broad removal authority gives the President adequate ability to supervise the CFPB Director,[6] Griffith Concurring Op. 25, but I do not agree that "inefficiency" is properly construed to allow removal for mere policy disagreements. Such a capacious construction would essentially remove the concept of "independence" from "independent agencies." After all, Congress established the CFPB as "an independent bureau," 12 U.S.C. § 5491(a), and an agency subject to the President's blanket control over its policy choices is hardly "independent." *See, e.g.*, NEW OXFORD AMERICAN DICTIONARY 857 (2d ed. 2005) ("free from outside control; not depending on another's authority");

---

[6] Of course, the above presumes that the President is forced to take formal action against a poorly performing Director. Defending against a personnel action brought by the President has grave personal and professional consequences. Thus, a Director under pressure may decide to step down to "spend more time with the family," preferring a soft landing to an ignominious expulsion.

BLACK'S LAW DICTIONARY 838 (9th ed. 2009) ("Not subject to the control or influence of another"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1148 (1993) ("not subject to control by others: not subordinate"); THE AMERICAN HERITAGE DICTIONARY 654 (2d College ed. 1985) ("1. Politically autonomous; self-governing.  2. Free from the influence, guidance, or control of another . . . .");  *see also* 5 THE CENTURY DICTIONARY AND CYCLOPEDIA 3055 (1911) ("Not dependent; not requiring the support or not subject to the control or controlling influence of others; not relying on others for direction or guidance"); HENRY CAMPBELL BLACK, A LAW DICTIONARY 616 (2d ed. 1910) ("Not dependent; not subject to control, restriction, modification, or limitation from a given outside source"); NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE 156 (1806) ("not subject to control, free . . . ."). Black's Law Dictionary has traced the term "independent agency" back to 1902 and defines it as "a federal agency, commission, or board that is *not* under the direction of the executive . . . ." BLACK'S LAW DICTIONARY 71-72 (9th ed. 2009) (emphasis added).

Thus, even if the meaning of "inefficiency" could be construed, in isolation, as broadly as Judge Griffith contends, "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (quoting *United States v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 122 (1849)). The removal standard must be interpreted in light of the fact that Congress designated the CFPB as "an independent bureau," 12 U.S.C. § 5491(a), and even if agency independence exists on a spectrum, Griffith Concurring Op. 23-24, the spectrum has a limit. The essence of an independent agency is that it "be independent of executive authority, except in its selection, and free to

exercise its judgment without the leave or hindrance of [the President]," *Humphrey's Executor*, 295 U.S. at 625. Judge Griffith's broad reading of the removal power is inconsistent with the common understanding of "independent" and "would render part of the statute entirely superfluous, something we are loath to do." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166 (2004). *See also* Maj. Op. 30-34 (discussing the historical independence of financial regulators). This is why the interpretation of "inefficiency" for lower-level federal workers is instructive, but not dispositive, because no one imagines that federal employees are entitled to be "independent" of their bosses in the way Congress clearly intended the Director of the CFPB to remain "independent" from the President.

Although the dissenters take great pains to distinguish the single-director structure of the CFPB from the multi-member structure of other agencies, they fail to show that this structural difference so impairs presidential control that it poses a constitutional problem. Or even that it provides the President less control over the CFPB than over other independent agencies. The upshot of the dissenters' cramped reading of the Supreme Court's separation-of-powers jurisprudence is that the President cannot exercise meaningful control over the Executive branch without the ability to remove all principal officers for any reason (or no reason at all). That is not the import of the Supreme Court's separation-of-powers cases from *Myers* to *Free Enterprise Fund*. Those cases establish constitutional boundaries which the CFPB falls well within.

* * * *

While the Constitution requires that the President be permitted to hold principal and inferior officers to account, it

also accommodates – and may, at times, even require – a degree of independence for those officers who perform quasi-judicial and quasi-legislative functions.  So here.  And just as the commissioners on a multi-member board must consult with each other before acting, the CFPB Director is required to consult with a plethora of colleagues and experts.  Furthermore, the unique combination of oversight provisions in the Dodd-Frank Act gives the President greatly enhanced control over the CFPB compared to other independent agencies.

A proper balancing of these considerations against the factors that arguably diminish the President's control requires that we uphold the present "good cause" tenure protections applicable to the CFPB Director.  In sum, "[I] do not think that this limitation as it presently stands sufficiently deprives the President of control over the [CFPB Director] to interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws," *Morrison*, 487 U.S. at 693.  I therefore concur in the denial of the constitutional claim in the petition.

GRIFFITH, *Circuit Judge*, concurring in the judgment:[1] I agree that the challenged features of the CFPB do not violate the Constitution, but for different reasons than the majority. My colleagues debate whether the agency's single-Director structure impermissibly interferes with the President's ability to supervise the Executive Branch. But to make sense of that inquiry, we must first answer a more fundamental question: How difficult is it for the President to remove the Director? The President may remove the CFPB Director for "inefficiency, neglect of duty, or malfeasance in office." After reviewing these removal grounds, I conclude they provide only a minimal restriction on the President's removal power, even permitting him to remove the Director for ineffective policy choices. Therefore, I agree that the CFPB's structure does not impermissibly interfere with the President's ability to perform his constitutional duties.

I

Although most principal officers of Executive Branch agencies serve at the pleasure of the President as at-will employees, in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Supreme Court held that Congress may protect some principal officers by specifying the grounds upon which the President may remove them from office. The Court permitted Congress to establish these for-cause removal protections for officers who carry out "quasi judicial" and "quasi legislative" tasks, but not those who perform "purely executive" functions. *Id.* at 629-32.

Some fifty years later in *Morrison v. Olson*, 487 U.S. 654 (1988), the Supreme Court recast the inquiry established in *Humphrey's Executor*. The Court's evaluation of the

---

[1] Although I concur in the majority's reinstatement of the panel's statutory holding, I concur only in the judgment regarding the constitutional question.

"functions" performed by an officer did not "define rigid categories" but only sought to "ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Id.* at 689-90 (quoting U.S. Const. art. II, §§ 1, 3). According to the *Morrison* Court, "the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light." *Id.* at 691; *see also id.* at 692 (asking whether a restriction "impermissibly burdens" or "interfere[s] impermissibly" with the President's constitutional obligations). More recently, in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), the Supreme Court applied *Morrison*'s test to strike down a particularly restrictive removal scheme, holding that "multilevel protection from removal . . . . contravenes the President's 'constitutional obligation to ensure the faithful execution of the laws.'" *Id.* at 484 (quoting *Morrison*, 487 U.S. at 693).[2]

In this case, my colleagues conduct the *Morrison* inquiry by debating how the CFPB's novel institutional design affects the President's supervision of the agency. They focus on the agency's single-Director structure and consider whether a single agency head is more or less responsive to the President than a multimember commission. And they debate whether,

---

[2] I agree with Judge Kavanaugh's statements in footnotes 7 and 18 of his dissent: *Humphrey's Executor* and *Morrison* appear at odds with the text and original understanding of Article II. The Framers understood that the President's constitutional obligations entitle him to remove executive officers; the Supreme Court said as much in *Free Enterprise Fund*. But until the Court addresses this tension, we are bound to faithfully apply *Humphrey's Executor* and *Morrison* to the question before us.

because of the single Director's five-year term, a one-term President has sufficient supervisory power over the CFPB. Although these difficult questions may matter in a future case, we cannot understand their constitutional significance in this case until we know the strength of the Director's removal protection.

For-cause removal protections are generally considered the defining feature of independent agencies. *See Free Enterprise Fund*, 561 U.S. at 483.[3] But not all removal protections are created equal. *See id.* at 502-03 (emphasizing that the "unusually high" removal standard that protected the Board members in that case "present[ed] an even more serious threat to executive control"). Here, the President may remove the CFPB Director for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). Until we know what these causes for removal mean and how difficult they are to satisfy, we cannot determine whether the CFPB's novel

---

[3] Legal commentators have traditionally agreed that for-cause removal protection is an essential characteristic of independent agencies. In recent years some scholars have argued that other factors—various indicia of independence, political considerations, and agency conventions—must also be considered when assessing agency independence. *See generally* Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15 (2010); Lisa Schultz Bressman & Robert B. Thompson, *The Future of Agency Independence*, 63 Vand. L. Rev. 599 (2010); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769 (2013); Aziz Z. Huq, *Removal as a Political Question*, 65 Stan. L. Rev. 1 (2013); Adrian Vermeule, *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163 (2013). Yet even these scholars generally acknowledge that removal protections play an important role for independent agencies. Although the presence of removal protections may not be the last question when assessing agency independence, it is generally the first.

4

structural features unconstitutionally impede the President in his faithful execution of the laws. Indeed, the only reason we are debating the constitutionality of the CFPB in the first place is because the Director enjoys removal protection. That's why the three-judge panel's initial remedy simply eliminated the Director's removal protection, thereby ameliorating the panel's constitutional concerns with the CFPB's structure. But if it is the Director's removal protection that prompts our examination of the CFPB's constitutionality, we must necessarily ask: How much does this removal protection actually constrain the President? If the Director is only marginally more difficult to remove than an at-will officer, then it is hard to imagine how the single-Director structure of the CFPB could impermissibly interfere with the President's supervision of the Executive Branch.[4]

---

[4] For decades legal scholars have suggested that the *Humphrey's Executor* standard of "inefficiency, neglect of duty, or malfeasance in office" provides a low barrier to presidential removal. *See, e.g.*, Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1, 110-12 (1994) ("Purely as a textual matter . . . 'inefficiency, neglect of duty, or malfeasance in office' seem best read to grant the President at least something in the way of supervisory and removal power—allowing him, for example, to discharge, as inefficient or neglectful of duty, those commissioners who show lack of diligence, ignorance, incompetence, or lack of commitment to their legal duties. The statutory words might even allow discharge of commissioners who have frequently or on important occasions acted in ways inconsistent with the President's wishes with respect to what is required by sound policy."); Geoffrey P. Miller, *Independent Agencies*, 1986 Sup. Ct. Rev. 41, 86-87 (arguing that for-cause provisions like the standard from *Humphrey's Executor* can and should be interpreted broadly to permit extensive presidential removal); Richard H. Pildes & Cass R. Sunstein, *Reinventing the Regulatory State*, 62 U. Chi. L. Rev. 1, 30 (1995) (noting that the removal standard from *Humphrey's Executor* may permit the President to remove officers for "inefficiency" if "he

5

Moreover, when addressing the constitutionality of independent agencies, the Supreme Court has directed us to focus on the President's removal power instead of squinting at "bureaucratic minutiae" such as the structural intricacies debated by the parties here. *Free Enterprise Fund*, 561 U.S. at 499-500. In *Free Enterprise Fund*, the Court chided the dissent for "dismiss[ing] the importance of removal as a tool of supervision" and instead focusing on political and institutional design features. *Id.* Rather than relying on those features, the Court decided the case on the basis of the removal power, noting that the power to appoint and remove is "perhaps *the* key means" for the President to protect the constitutional prerogatives of the Executive Branch. *Id.* at 501; *see also Morrison*, 487 U.S. at 695-96 (noting that the Ethics in Government Act gave the President "several means of supervising or controlling" the independent counsel—"*[m]ost importantly . . .* the power to remove the counsel for good cause" (emphasis added) (internal quotation marks omitted)); *cf. Bowsher v. Synar*, 478 U.S. 714, 727 (1986) (observing that the broad statutory removal provision allowing Congress to remove the Comptroller General was the "critical factor" in determining that Congress controlled the official).

---

finds [them] incompetent because of their consistently foolish policy choices"); Lindsay Rogers, *The Independent Regulatory Commissions*, 52 Pol. Sci. Q. 1, 7-8 (1937) (claiming that "[n]o 'institutional consequences' are to be expected from the *Humphrey* case" because presidents will be able to remove officers with ease under the *Humphrey's Executor* standard); Paul R. Verkuil, *The Status of Independent Agencies After* Bowsher v. Synar, 1986 Duke L.J. 779, 797 n.100 (noting that the *Humphrey's Executor* standard "could be construed so as to encompass a general charge of maladministration, in which event even if the terms of removal are deemed to be exclusive they could still be satisfied by a removal by the President on the ground of policy incompatibility").

A faithful application of *Morrison* requires us to determine the extent to which the CFPB's removal standard actually prevents the President from removing the Director. In addition, this approach allows us to forgo, at least for now, the more vexing constitutional questions about institutional design. *Cf. Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 787 (2000) (explaining that "statutes should be construed so as to avoid *difficult* constitutional questions" (emphasis added)); John F. Manning, *The Independent Counsel Statute: Reading "Good Cause" in Light of Article II*, 83 Minn. L. Rev. 1285, 1288 (1999) (arguing that, to avoid a "serious constitutional question," the "good cause" removal provision in the Ethics in Government Act should be interpreted to allow removal for insubordination).

## II

The Dodd-Frank Wall Street Reform and Consumer Protection Act provides that the President may remove the CFPB Director for "inefficiency, neglect of duty, or malfeasance in office." Pub. L. No. 111-203, § 1011, 124 Stat. 1376, 1964 (2010) (codified at 12 U.S.C. § 5491(c)(3)). For purposes of simplicity, I refer to this as the "INM standard." Congress first used the INM standard in the late nineteenth century, *see* An Act To Regulate Commerce, ch. 104, § 11, 24 Stat. 379, 383 (1887), and it has since become a common for-cause removal provision for independent agencies, *see e.g.*, An Act To Complete the Codification of Title 46, Pub. L. No. 109-304, § 301(b)(3), 120 Stat. 1485, 1488 (2006); ICC Termination Act of 1995, Pub. L. No. 104-88, § 701(a)(3), 109 Stat. 803, 933; Federal Mine Safety and Health Act of 1977, Pub. L. No. 95-164, § 113, 91 Stat. 1290, 1313; Federal Aviation Act of 1958, Pub. L. No. 85-726, § 201(a)(2), 72 Stat. 731, 741; Bituminous Coal Act of 1937, ch. 127, § 2(a), 50 Stat.

72, 73; An Act To Create the Federal Trade Commission, ch. 311, § 1, 38 Stat. 717, 718 (1914); *see also* Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1144-45 (2000) (describing the INM standard as the prototypical removal provision).

In spite of the repeated use of the INM standard throughout the U.S. Code and its prominent role in *Humphrey's Executor*, the meaning of the standard's three grounds for removal remains largely unexamined. Congress has nowhere defined these grounds and the Supreme Court has provided little guidance about the conditions under which they permit removal. *See* Lessig & Sunstein, *supra* note 4, at 110-12.

Some suggest that the Court in *Humphrey's Executor* established that the INM standard prohibits the President from removing an agency officer for disagreements over policy. *See, e.g.*, Concurring Op. at 19-21 (Wilkins, J.) (arguing that "mere policy disagreements" cannot satisfy the INM standard).[5] After all, the Court noted in *Humphrey's Executor* that President Roosevelt had mentioned to Humphrey their disagreement over the "policies" and "administering of the Federal Trade Commission." 295 U.S. at 619 (internal quotation marks omitted). However, *Humphrey's Executor* established only that the President's removal power is not "illimitable" and that the INM standard in the Federal Trade Commission Act is a permissible limitation. *Id.* at 629. The Court nowhere addressed the extent to which the INM standard insulated Humphrey. When the Court determined that President

---

[5] *See also* Abner S. Greene, *Checks and Balances in an Era of Presidential Lawmaking*, 61 U. Chi. L. Rev. 123, 171 n.187 (1994) ("It is fairly clear that the *Humphrey's Executor* Court construed the removal language to prevent removal for policy disagreement.").

Roosevelt failed to comply with the INM standard, it was not because he removed Humphrey for any specific policy the Commissioner had pursued. Instead, the President failed to comply with the INM standard because he expressly chose to remove Humphrey *for no cause at all*. *See id.* at 612; *Bowsher*, 478 U.S. at 729 n.8 (noting that in *Humphrey's Executor* "the President did not assert that he had removed the Federal Trade Commissioner in compliance with one of the enumerated statutory causes for removal").

*Humphrey's Executor* came to the Supreme Court as a certified question from the Court of Claims. The certificate stipulated as an undisputed fact that the President never removed Humphrey pursuant to the INM standard.[6] And if this admission were not enough, one need look no further than President Roosevelt's own words to see that he never purported to remove Humphrey under the INM standard. In his first letter to Humphrey, Roosevelt expressly disavowed any attempt to remove the Commissioner for cause: "Without any reflection at all upon you personally, or upon the service you have rendered in your present capacity, I find it necessary to ask for your resignation as a member of the Federal Trade Commission." Certificate from Court of Claims at 4, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935) (No. 667). After several more exchanges, the President wrote Humphrey saying: "I still hope that you will be willing to let me have your resignation. . . . I feel that, for your sake and for mine, it would be much better if you could see this point of view and let me have your resignation *on any ground you may*

---

[6] Certificate from Court of Claims at 12, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935) (No. 667) ("The decedent [Humphrey] was not removed from his office as aforesaid on account of any inefficiency, neglect of duty, or malfeasance in office."). And by filing its demurrer, the United States "admit[ted] the facts stated in the petition to be true." *Id.* at 15.

*care to place it*." *Id.* at 6 (emphasis added). After Humphrey continued to resist, Roosevelt had had enough and simply asserted: "Effective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission." *Id.* at 8.[7]

Moreover, even if *Humphrey's Executor* could be read to address the extent to which the INM standard insulates an officer, it would offer little guidance. We would first need to assume that President Roosevelt's general reference to the "policies" and "administering" of the FTC functioned as a ground for removal under one or more of the INM terms (though it is unclear which). And even then, the Court's ruling tells us only that Roosevelt's removal of Humphrey based on their ideological differences does not satisfy any of the three INM grounds. Abstract policy differences are not enough.[8] But

---

[7] *See also* 78 Cong. Rec. 1679 (1934) (statement of Sen. Simeon Fess) (reviewing President Roosevelt's letters to Humphrey and noting that the President made no attempt to remove the Commissioner under the INM standard); William E. Leuchtenburg, *The Supreme Court Reborn: The Constitutional Revolution in the Age of Roosevelt* 60-63 (1996) (recounting a Cabinet meeting in which the President acknowledged that he erred by trying to pressure Humphrey gently instead of removing him for cause under the INM standard).

[8] *See* Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 Colum. L. Rev. 573, 615 (1984) (observing that President Roosevelt "had given Commissioner Humphrey no particular directive; he had asked no advice that Humphrey then refused to give; he did not, perceiving insubordination, direct [Humphrey] to leave" and therefore the Court did not address "whether the President could give the FTC Commissioners binding directives . . . or what might be the consequences of any failure of theirs to honor them"). The Supreme Court in *Free Enterprise Fund* likewise suggested in dicta that *Humphrey's Executor* precludes removal based on "simple

that does not mean an officer's policy choices can never satisfy the INM standard. Nor would such a categorical rule make much sense. Certainly *some* policy disagreements may justify removal under the INM standard. Judge Wilkins even acknowledges as much. *See* Concurring Op. at 16 (Wilkins, J.) ("[T]he promulgation of a rule contrary to consensus expert advice without sufficient grounds or explanation would subject the Director to risk of removal for inefficiency."). All told, nothing in the facts, constitutional holding, or logic of *Humphrey's Executor* protects an officer from removal if he pursues a particular policy that the President determines to be inefficient, neglectful, or malfeasant.

The Supreme Court's most substantive discussion of the INM terms came in *Bowsher v. Synar*. There, the Court declared unconstitutional Congress's delegation of executive power to the Comptroller General, who was an official in the Legislative Branch. 478 U.S. at 728-34. By joint resolution, Congress could remove the Comptroller General for several statutorily specified causes including the three INM grounds. *Id.* at 728. In assessing Congress's control over the Comptroller General, the Court emphasized that the INM terms are "very broad and, as interpreted by Congress, could sustain removal of a Comptroller General for any number of actual or perceived *transgressions of the legislative will*." *Id.* at 729 (emphasis added). In other words, the Court determined that the INM removal grounds were so broad that Congress retained significant power to supervise and direct the Comptroller General. However, the Court did not proceed to explore the

disagreement" with a principal officer's "policies and priorities." 561 U.S. at 502. In light of the facts of *Humphrey's Executor*, the Court's reference to "simple disagreement" over policy refers precisely to the abstract, generalized policy differences Roosevelt arguably invoked when removing Humphrey. *See Humphrey's Executor*, 295 U.S. at 618-19.

meaning of the individual grounds for removal because that was unnecessary to resolve the case. *See id.* at 730.

In sum, although Congress has provided little guidance on the meaning of the INM standard, the Supreme Court in *Bowsher* nevertheless recognized the general breadth of the INM terms. Picking up where *Bowsher* left off, we must now determine the meaning of the INM standard as we would any other statutory text and interpret it according to the traditional tools of construction.

III

I begin with the text of the INM standard: "The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). Because Congress has not defined these terms, we give them their ordinary meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). To discern a term's ordinary meaning, the Court generally begins with dictionaries. *See, e.g.*, *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876-77 (2014); *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407-08 (2011); *MCI Telecomm'ns Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225-28 (1994). Based on the following analysis, I conclude that the ordinary meaning of the INM terms—particularly given the breadth of the "inefficiency" ground—allow the President enough supervisory authority to satisfy *Morrison*.

A

Generally, the ordinary meaning of a statutory term is fixed at the time the statute was adopted. *See, e.g.*, *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("[W]ords will be interpreted as taking their ordinary, contemporary, common

meaning."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012). Were we to strictly follow that approach here, we would seek to determine the ordinary meaning of each INM term in 2010 when the Dodd-Frank Act established the CFPB.

But there is good reason to think that 2010 is not the correct time period to fix the ordinary meaning of the INM terms. The INM standard was first used by Congress in the Interstate Commerce Act in 1887 and has since been readopted in dozens of statutes spanning over a century. *See supra* Part II. "[W]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005).[9] Since the INM standard was introduced in the Interstate Commerce Act, and approved by the Supreme Court in *Humphrey's Executor*, Congress has deliberately and repeatedly borrowed its precise language. *See* Steven G.

---

[9] *See also Lawson v. FMR LLC*, 134 S. Ct. 1158, 1176 (2014) ("[P]arallel text and purposes counsel in favor of interpreting . . . provisions consistently."); *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412 U.S. 427, 428 (1973) (per curiam) (stating that when two provisions of different statutes share similar language, that is a "strong indication" they are to be interpreted consistently); *Morissette v. United States*, 342 U.S. 246, 263 (1952) (explaining that "where Congress borrows terms of art" it also borrows their meaning); *see also* William N. Eskridge Jr., *Interpreting Law: A Primer on How To Read Statutes and the Constitution* 123 (2016) (explaining that when "similar or identical terminology is not a coincidence, because the legislature has borrowed it from a previous law," interpreters should consider maintaining "[c]onsistency across the U.S. Code"); Scalia & Garner, *supra*, at 323 ("[W]hen a statute uses the very same terminology as an earlier statute . . . it is reasonable to believe that the terminology bears a consistent meaning.").

Calabresi & Christopher S. Yoo, *The Unitary Executive: Presidential Power from Washington to Bush* 287 (2008) (noting "Congress's interest in imposing removal restrictions revived after *Humphrey's Executor*"). Because Congress has regularly adopted the same INM text for the same general purpose—securing for agency officers at least a modicum of independence from the President—it is appropriate to attribute a uniform meaning to the INM standard that is consistent with the meaning it bore when it was first adopted. For these reasons, I rely on sources from the late-nineteenth and early twentieth centuries to determine the meaning of the standard.

B

The INM standard provides three separate grounds for removal. Although the standard may seem to be a unitary, general "for cause" provision, the Supreme Court has clarified that these three grounds carry discrete meanings. In *Humphrey's Executor* the Court explained that the INM standard prevented the President from removing any officer except for "one or more of the causes named in the applicable statute." 295 U.S. at 632. Moreover, Congress has enacted other statutes that include only two of the three INM removal grounds, indicating that each term bears a distinct meaning. For instance, weeks after the Court decided *Humphrey's Executor*, Congress added a removal provision to the National Labor Relations Act, but it narrowed the INM standard by eliminating "inefficiency." *See* ch. 372, § 3, 49 Stat. 449, 451 (1935) (codified at 29 U.S.C. § 153).

Turning then to each basis for removal, "malfeasance" was defined as "the doing of that which ought not to be done; wrongful conduct, especially official misconduct; violation of a public trust or obligation; specifically, the doing of an act which is positively unlawful or wrongful, in contradistinction

14

to misfeasance." 6 *The Century Dictionary and Cyclopedia* 3593 (Benjamin E. Smith ed., 1911).[10] "Neglect of duty" meant "failure to do something that one is bound to do," a definition broadly echoed by courts and dictionaries alike. *See A Law Dictionary* 404-05, 810 (Henry Campbell Black ed., 2d ed. 1910).[11]

However, I concentrate on "inefficiency" because it is the broadest of the three INM removal grounds and best illustrates the minimal extent to which the INM standard restricts the President's ability to supervise the Executive Branch.

---

[10] Contemporary definitions of malfeasance are generally comparable. *See, e.g.*, *Malfeasance*, *Black's Law Dictionary* (10th ed. 2014) ("A wrongful, unlawful, or dishonest act; esp., wrongdoing or misconduct by a public official."); *see also Daugherty v. Ellis*, 97 S.E.2d 33, 42-43 (W. Va. 1956) (collecting definitions of "malfeasance"). Courts have likewise interpreted malfeasance to mean corrupt conduct that is wholly wrongful, if not positively unlawful. *See, e.g.*, *State ex rel. Neal v. State Civil Serv. Comm'n*, 72 N.E.2d 69, 71 (Ohio 1947) ("Nonfeasance is the omission of an act which a person ought to do; misfeasance is the improper doing of an act which a person might lawfully do; and malfeasance is the doing of an act which a person ought not to do at all.") (quoting *Bell v. Josselyn*, 69 Mass. (3 Gray) 309, 311 (1855))). Courts have often interpreted "malfeasance in office" to require a wrongful act that was done in an official capacity. *See, e.g.*, *Arellano v. Lopez*, 467 P.2d 715, 717-18 (N.M. 1970).

[11] *See also Cavender v. Cavender*, 114 U.S. 464, 472-74 (1885) (finding "neglect of duty" when a trustee failed to perform his duty to invest the trust funds he had received); *Holmes v. Osborn*, 115 P.2d 775, 783 (Ariz. 1941) (defining "neglect of duty" as equivalent to "nonfeasance," which means the "substantial failure to perform duty" (quoting *State v. Barnett*, 69 P.2d 77, 87 (Okla. Crim. App. 1936))).

Dictionaries consistently defined the word "inefficiency" to mean ineffective or failing to produce some desired result. For example, one prominent turn-of-the-century dictionary defined "efficient" as "[a]cting or able to act with due effect; adequate in performance; bringing to bear the requisite knowledge, skill, and industry; capable; competent." 3 *The Century Dictionary and Cyclopedia*, *supra*, at 1849. The same dictionary also defined "inefficient" to mean "[n]ot efficient; not producing or not capable of producing the desired effect; incapable; incompetent; inadequate." 5 *id.* at 3072. Other dictionaries from the time period reiterated these definitions. *See, e.g.*, 3 *A New English Dictionary on Historical Principles* 52 (Henry Bradley ed., 1897) (defining "efficient" as "productive of effects; effective; adequately operative. Of persons: Adequately skilled"); 5 *id.* at 240 (James A.H. Murray ed., 1901) (defining "inefficient" as "[n]ot efficient; failing to produce, or incapable of producing, the desired effect; ineffective. Of a person: Not effecting or accomplishing something; deficient in the ability or industry required for what one has to do; not fully capable").[12] These dictionaries indicate

---

[12] *See also* 2 *Universal Dictionary of the English Language* 1817 (Robert Hunter & Charles Morris eds., 1897) ("Efficient" defined as "[c]ausing or producing effects or results; acting as the cause of effects; effective," and as "[h]aving acquired a competent knowledge of or acquaintance with any art, practice, or duty; competent; capable"); *id.* at 2660 ("Inefficient" defined as "wanting the power to produce the desired or proper effect; inefficacious; powerless," and as "[i]ncapable; wanting in ability or capacity; incompetent," and as "[i]ncapable of or indisposed to effective action"); *A Dictionary of the English Language* 306 (James Stormonth ed., 1885) ("Efficient" defined as "producing effects; able; competent" and "effectual; effective; capable, efficacious"); *id.* at 491 ("Inefficient" defined as "not possessing the power or qualities desired; not efficacious; not active" and as "want of power or qualities to produce the effects desired; inactivity"); *Webster's*

that an individual acts inefficiently when he fails to produce some desired effect or is otherwise ineffective in performing or accomplishing some task.

This broad understanding of "inefficiency" is supported by other contemporaneous sources, such as the debates in Congress both before and after *Humphrey's Executor*. Legislative history is a permissible tool of statutory interpretation when used "for the purpose of establishing linguistic usage" or "showing that a particular word or phrase is capable of bearing a particular meaning." Scalia & Garner, *supra*, at 388. The debates in Congress during the early twentieth century display how the "inefficiency" ground for removal was understood by "intelligent and informed people of the time." Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, *in* A Matter of Interpretation 3, 38 (Amy Gutmann ed., 1997).

When discussing congressional control of the Comptroller General, who was protected by the INM terms, Members of

---

*International Dictionary of the English Language* 472 (Noah Porter ed., 1898) ("Efficient" defined as "[c]ausing effects; producing results; that makes the effect to be what it is; actively operative; not inactive, slack, or incapable; characterized by energetic and useful activity"); *id.* at 756 ("Inefficient" defined as "not producing the effect intended or desired; inefficacious" and as "[i]ncapable of, or indisposed to, effective action; habitually slack or remiss; effecting little or nothing; as, *inefficient* workmen; an *inefficient* administrator"); *Dictionary of the English Language* 465 (Joseph E. Worcester ed., 1878) ("Efficient" defined as "[a]ctually producing or helping to produce effects; that produces directly a certain effect; causing effects; effective; efficacious; effectual; competent; able; active; operative"); *id.* at 747 ("Inefficient" defined as "[n]ot efficient; having little energy; inactive; ineffectual; inefficacious").

Congress assumed the Comptroller could be removed for "inefficiency" if he failed to produce Congress's desired effects. One Congressman maintained that if the Comptroller "was *inefficient* and was not carrying on the duties of his office as he should *and as the Congress expected*, [then Congress] could remove him" under the INM standard. 61 Cong. Rec. 1081 (1921) (statement of Rep. Joseph Byrns) (emphases added); *see also Bowsher*, 478 U.S. at 728 (inferring from this quotation that "inefficiency" constitutes a broad ground for removal). And another Member reiterated that when the Comptroller General "fails to do that work [of Congress] in a strong and efficient way, *in a way the Congress would have the law executed*, Congress has its remedy, and it can reach out and say that if the man is not doing his duty, if he is *inefficient* . . . he can be removed." 61 Cong. Rec. at 1080 (statement of Rep. James Good) (emphases added). Thus, even though the Comptroller General was protected by the INM terms, the breadth of the "inefficiency" ground permitted Congress to remove him for failing to perform his duties in the manner Congress wanted.

Three years after *Humphrey's Executor*, Congress again considered the meaning of "inefficiency" when debating whether to include INM protections for officials of the Civil Aeronautics Authority. One Senator participating in the debate, fearing that the "inefficiency" cause did not provide sufficient independence for agency officials, even lamented: "If we provide that the President may remove a man for inefficiency, to my mind we give him unlimited power of removal. Under such authority he could have removed Mr. Humphrey, had he assigned that as a reason. . . . I do not see anything to be gained by discussing the legal question if we are to leave the word 'inefficiency' in the provision." 83 Cong. Rec. 6865 (1938) (statement of Sen. William Borah). While this sentiment somewhat overstates the breadth of the "inefficiency" ground,

it reflects a broader truth exemplified in the Congressional Record: well-informed people in the early twentieth century understood the word "inefficiency" in a manner consistent with its dictionary definition.

And for those who find it relevant, turning to the contemporary meaning of "inefficiency" would not change much in this analysis. The word has maintained a fairly stable meaning throughout the life of the INM standard. If anything, the contemporary definition of "inefficiency" has gradually become *more* expansive than it was at the time of *Humphrey's Executor*. While older definitions of inefficiency largely discuss ineffectiveness, modern definitions have increasingly adopted an additional definition of "wasteful." *See, e.g.*, *Efficiency*, *Oxford English Dictionary* (2d ed. 1989) (outlining the etymological evolution of "efficiency"). And this broad understanding of "inefficiency" is further supported by contemporary usage. *See, e.g.*, *Budget Hearing—Consumer Financial Protection Bureau Before the Subcomm. on Oversight & Investigations of the H. Comm. on Fin. Servs.*, 112th Cong. 8 (2012) (statement of Rep. Barney Frank, Ranking Member, H. Comm. on Fin. Servs.) (discussing the INM standard and stating that "this notion that the Director cannot be removed is fanciful. . . . No one doubts that if a change in Administration comes, and the new President *disagrees* with the existing Director, he or she can be removed. And proving that you were not *inefficient*, the burden of proof being on you, would be overwhelming" (emphases added)).[13]

---

[13] One commentator has suggested that the contemporary understanding of official "inefficiency" is limited to instances of "pecuniary or temporal waste." Kent H. Barnett, *Avoiding Independent Agency Armageddon*, 87 Notre Dame L. Rev. 1349, 1386 (2012) (citing *The New Oxford American Dictionary* 867 (2001)). This assertion is unconvincing for at least two reasons. First, the very dictionary on which the commentator relies also defines

While ordinary usage reveals that an officer is "inefficient" when he fails to produce or accomplish some end, one might wonder *who* or *what* sets the end that the officer must efficiently pursue. In context, it is clear that the end cannot be set by the officer himself. After all, it is a *removal* ground that we are interpreting. Congress establishes the broad purposes of an independent agency, *see, e.g.*, 12 U.S.C. § 5511 (outlining the purpose, objectives, and functions of the CFPB), and the President assesses whether the officer has produced the "desired effect." Put differently, an officer is inefficient when he fails to produce or accomplish the agency's ends, as understood or dictated by the President operating within the parameters set by Congress.

All told, the President retains significant authority under the INM standard to remove the CFPB Director. The breadth of the standard—particularly the inefficiency ground—

---

"inefficient" to include the failure to "achiev[e] *maximum productivity*" and the failure "to make *the best use* of time or resources." *The New Oxford American Dictionary*, *supra*, at 867 (emphases added). These definitions would seemingly allow a finding of "inefficiency" any time the President determined an officer used resources imperfectly, for instance by pursuing an unwise policy. Second, a host of other contemporary dictionaries provide definitions of "inefficiency" that are entirely consistent with the turn-of-the-century usage presented here. *See, e.g.*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2014) (defining "inefficient" as: "not producing the effect intended or desired . . . wasteful of time or energy . . . incapable, incompetent"); Bryan A. Garner, *Garner's Modern American Usage* 293, 462 (2009) (similar); *Inefficient*, *The American Heritage Dictionary of the English Language* (2017) (similar).

preserves in the President sufficient supervisory power to perform his constitutional duties.[14]

---

[14] Judge Wilkins argues that my interpretation of "inefficiency" is overly broad because it permits removal for some policy disagreements. However, he does not address the dictionaries and other contemporaneous sources that support my analysis, nor the Supreme Court's construal of the INM terms in *Bowsher*. Instead, Judge Wilkins relies on a line of cases pertaining to the termination of federal employees under the civil-service statutes, which permit termination of government employees "for such cause as will promote the efficiency of the service." *See* Concurring Op. at 16-19 (Wilkins, J.) (citing 5 U.S.C. § 7513). I am skeptical that this line of cases can explain the meaning of "inefficiency" in the INM standard. Establishing that a removal will "promote the efficiency of the service" calls for different considerations than establishing that an officer himself has acted inefficiently. Moreover, every single case Judge Wilkins cites *upholds* the removal of an employee, so none demonstrate what official conduct—including policy choices—would fail to meet the inefficiency standard. And more fundamentally, if these civil-service cases controlled our interpretation of the INM standard, they would actually increase the President's control of independent agencies. This court has held that the "efficiency of the service" standard permits removal for insubordination and for abstract policy differences. If this standard were applied to INM-protected officers, it's unclear how agencies could retain any independence from presidential control. *See, e.g.*, *Meehan v. Macy*, 392 F.2d 822, 836 (D.C. Cir. 1968) ("There can be no doubt that an employee may be discharged for failure to obey valid instructions, or that a discharge for insubordination will promote the efficiency of the service."), *reh'g on other grounds*, 425 F.2d 469 (D.C. Cir. 1968), *aff'd en banc*, 425 F.2d 472 (D.C. Cir. 1969); *Leonard v. Douglas*, 321 F.2d 749, 750-53 (D.C. Cir. 1963) (upholding the removal of a Justice Department attorney whose "professional competence [wa]s not questioned" but whose superior found him to be generally "unsuitab[le]" for a "policy-determining position").

C

The INM standard provides a broad basis for removing the CFPB Director, but what steps must the President take to effect such a removal? It appears well-settled that an officer with removal protection is entitled to notice and some form of a hearing before removal. *See Shurtleff v. United States*, 189 U.S. 311, 313-14 (1903) (concluding that where removal is sought pursuant to statute for "inefficiency, neglect of duty, or malfeasance in office . . . the officer is entitled to notice and a hearing"); *Reagan v. United States*, 182 U.S. 419, 425 (1901) (stating that where causes of removal are specified by the Constitution or statute, "notice and hearing are essential").[15] Although the Supreme Court has not defined the precise contours of this process, there is little reason to think it would impose an onerous burden on the President. *See* Breger & Edles, *supra*, at 1147-50. Afterwards, removal would be permissible if the President determined that the CFPB Director had been ineffective or incapable of "producing the desired

---

[15] The Supreme Court's due-process cases from the 1970s and 1980s also suggest that an officer covered by the INM standard would be constitutionally entitled to some procedural protections before removal. *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985) (ruling that persons classified as civil servants under state law who could be terminated only for cause possessed a property right in their job security); *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-77 (1972); *see also* Robert E. Cushman, *The Independent Regulatory Commissions* 466 (1972). Most agency statutes do not prescribe specific procedures for removal hearings. Breger & Edles, *supra*, at 1147-51. But if removal protections secure a type of property interest for officers, *see, e.g.*, *Roth*, 408 U.S. at 576-77, then the removal procedures would need to satisfy an officer's procedural due-process rights, *see Mathews v. Eldridge*, 424 U.S. 319, 332-35 (1976). This would generally require something less than a formal hearing under the Administrative Procedure Act. *See* Breger & Edles, *supra*, at 1147-50.

effect." Because removing an officer for "inefficiency" is a removal *for cause*, the President should identify what the Director *did* that was inefficient. In other words, the President should identify the action taken by the Director that constitutes the cause for which he is being removed. Then the President must simply offer a reasoned, non-pretextual explanation of how those actions were inefficient.[16]

In practical effect, my approach yields a result somewhat similar to Judge Kavanaugh's proposed remedy. He would sever the for-cause provision from the CFPB's authorizing statute, making the Director removable at will. *See* Dissenting Op. at 7, 68-73 (Kavanaugh, J.). My interpretation of the INM standard would not disturb Congress's design of the CFPB, but it would allow the President to remove the Director based on policy decisions that amounted to inefficiency. In addition, my analysis of the INM standard would likely have broader implications. For example, the definition of "inefficiency" presented here would presumably apply to other independent agencies protected by the INM standard. *See supra* Part III.A. And while I conclude here that the INM standard is a permissible restriction on the President's ability to remove the CFPB Director, *other* removal standards—particularly those lacking the "inefficiency" ground—may not be defensible under *Humphrey's Executor* and *Morrison*.

---

[16] A future case challenging a President's decision to actually remove an officer may require courts to articulate the appropriate standard for judicial review, though that question is beyond the scope of this case. *See generally Dalton v. Specter*, 511 U.S. 462, 474-77 (1994); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1135-36 (D.C. Cir. 2002); Breger & Edles, *supra*, at 1151; *cf.* John F. Dillon, *Commentaries on the Law of Municipal Corporations* § 484, at 815 (1911) ("[T]he power of the courts to review the acts of the removing power is necessarily limited." (emphasis omitted)).

23

IV

Judge Wilkins argues this interpretation of the INM standard defeats the purpose of the provision. *See* Concurring Op. at 19-21 (Wilkins, J.). After all, the Court in *Humphrey's Executor* examined the legislative history of the Federal Trade Commission Act and concluded that the "congressional intent" underlying the Act was to create an "independent" body of experts. 295 U.S. at 625. How can agency directors be independent if the President can remove them so easily for "inefficiency"?

As a preliminary matter, the Court's discussion of FTC "independence" in *Humphrey's Executor* was part of its statutory holding, not its constitutional analysis. *See* Maj. Op. at 45-46. In its statutory analysis, the Court merely attempted to discern if the INM standard was intended to limit the President's removal power. The Court determined that it did, staking its conclusion on the text of the statute: "The words of the act are definite and unambiguous." 295 U.S. at 623. The Court then proceeded to address the legislative history, but it expressly disavowed any reliance on that discussion, *see id.* at 623-25, and concluded that the INM standard was designed to reduce the President's otherwise "illimitable" removal power. But as described above, the Court never addressed just *how much* the INM standard limits that power. *See supra* Part II.

More fundamentally, a straightforward textual analysis of "inefficiency" does not remove the "concept of 'independence' from 'independent agencies,'" Concurring Op. at 19 (Wilkins, J.), because agency independence is not a binary but rather a matter of degree. This principle is at the heart of *Morrison*, which does not forbid *all* interference with the President's executive power but only forbids *too much* interference. *See* 487 U.S. at 692. Insisting that each INM term be interpreted to

maximize director independence thwarts Congress's specific choice of means to protect the Director. "[N]o legislation pursues its purposes at all costs. . . . [I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam). With the INM standard, Congress chose to provide three discrete grounds for removal, at least one of which is very broad. In other words, Congress specified the amount of removal protection the CFPB Director would receive, and that amount is minimal. Elsewhere Congress has elected to provide greater protection. For example, only weeks after *Humphrey's Executor* Congress chose not to include "inefficiency" as a ground for removal in the National Labor Relations Act. *See* ch. 372, § 3, 49 Stat. 449, 451 (1935) (codified at 29 U.S.C. § 153) (permitting removal "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause").

Since *Humphrey's Executor*, Congress has created a wide range of removal protections, some stronger than others. *See Free Enterprise Fund*, 561 U.S. at 549-56 (Breyer, J., dissenting) (listing numerous agency removal protections, many of which provide different statutory grounds for removal). "[L]aw is like a vector. It has length as well as direction. We must find both, or we know nothing of value. To find length we must take account of objectives, of means chosen, and of stopping places identified." Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv. J.L. & Pub. Pol'y 59, 63 (1988). Here, Congress specified that the INM standard would move certain agencies in the direction of greater independence from the President, compared to those officers subject to at-will removal. But Congress also specified just how far that principle of independence would reach, and it is not for us to second-

guess that choice. "The removal restrictions set forth in the statute mean what they say." *Free Enterprise Fund*, 561 U.S. at 502.

\* \* \*

The challenged features of the CFPB do not violate Article II because they do not prevent the President from performing his constitutional duty to supervise the Executive Branch. That is so because the INM standard creates only a minimal barrier to the President removing the CFPB Director. Of course, if Congress desires, it may pass a more restrictive removal provision, as it has with other agencies. At that point, my colleagues' thorough evaluation of the CFPB's bureaucratic structure may be necessary. But as it stands today, such an evaluation is neither required nor consistent with the mandate from *Morrison*.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting: Effective 1789, we Americans "set up government by consent of the governed." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 641 (1943). Under the United States Constitution, all of the federal government's power derives from the people. U.S. CONST. pmbl.; *see McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819) ("In form, and in substance, it emanates from them."). Much of that power has been further delegated to a warren of administrative agencies, making accountability more elusive and more important than ever. Nowadays we the people tolerate bureaucrats "poking into every nook and cranny of daily life," *City of Arlington v. FCC*, 133 S. Ct. 1863, 1879 (2013) (Roberts, C.J., dissenting), on the theory that if they exercise their delegated power unjustly, inexpertly or otherwise at odds with the popular will, we can elect legislators and a President who will take corrective action, *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 865 (1984) (underscoring that "[w]hile agencies are not directly accountable to the people," they report to political actors who are).

But consent of the governed is a sham if an administrative agency, by design, does not meaningfully answer for its policies to either of the elected branches. Such is the case with the Consumer Financial Protection Bureau (CFPB). The CFPB, created by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank), Pub. L. No. 111-203, Title X, 124 Stat. 1376, 1955-2113 (July 21, 2010), perma.cc/6K2U-CD9W,[1] is an agency like no other. Its Director has immense power to define elastic concepts of unfairness, deception and abuse in an array of consumer

---

[1] The perma.cc links throughout this opinion archive materials that are available online. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2123 (2016) (using perma.cc); *Bandimere v. SEC*, 844 F.3d 1168, 1170 n.1 (10th Cir. 2016) (same).

contexts; to enforce his rules in administrative proceedings overseen by employees he appoints; to adjudicate such actions himself if he chooses; and to decide what penalties fit the violation. The Director does all that and more without any significant check by the President or the Congress. Dodd-Frank gives the Director a five-year tenure—thereby outlasting a Presidential term—and prohibits the President from removing him except for cause. At the same time, the statute guarantees the CFPB ample annual funding from the Federal Reserve System, outside the ordinary appropriations process. It thus frees the agency from a powerful means of Presidential oversight and the Congress's most effective means short of restructuring the agency. Finally, the Director is unique among the principal officers of independent agencies in that he exercises vast executive power unilaterally: as a board of one, he need not deliberate with anyone before acting.

In my view, Dodd-Frank Title X, otherwise known as the Consumer Financial Protection Act, violates Article II: its "language providing for good-cause removal is . . . one of a number of statutory provisions that, working together, produce a constitutional violation." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509 (2010). Under Article II, "[t]he executive Power shall be vested in a President" who "shall take Care that the Laws be faithfully executed." U.S. CONST. art. II, §§ 1, 3. In *Myers v. United States*, 272 U.S. 52 (1926), the United States Supreme Court explained that the President must ordinarily have "unrestricted power" to remove executive officers if he is to faithfully execute the laws. *Id*. at 176. More recently, the Court in *Free Enterprise Fund* emphasized "the importance of removal"—based on "simple disagreement with [an agency's] policies or priorities"—as a means of ensuring that the modern administrative state does not "slip from the Executive's control, and thus from that of the people." 561 U.S. at 499, 502. Here, when taken together with the rest of Title X, the

for-cause removal provision in effect puts the CFPB beyond the people's reach.

I recognize that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), made an exception to the President's "exclusive power of removal," *Myers*, 272 U.S. at 122, in holding that the Congress "can, *under certain circumstances*, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause," *Free Enter. Fund*, 561 U.S. at 483 (emphasis added) (citing *Humphrey's Ex'r*, 295 U.S. 602). But *Humphrey's Executor* remains the exception, not the rule, and it does not apply here.

*Humphrey's Executor* upheld a for-cause limit on the President's authority to remove commissioners of the Federal Trade Commission (FTC), a "legislative agency" headed by a "non-partisan" "body of experts" whose staggered terms ensure that the commission does not "complete[ly] change at any one time" but instead gains collective expertise even as individual members come and go. 295 U.S. at 624, 628. By contrast, the CFPB is not a legislative agency, if that means an agency that reports to the Congress.[2] Nor is it a nonpartisan body of experts. Unlike the five FTC commissioners, only three of whom can be members of the same political party, the CFPB's sole Director does not have to bother with the give and take required of a bipartisan multimember body. Also, the CFPB's membership *is* subject to complete change all at once, at five-year intervals that do not coincide with the four-year

---

[2] The Congress's abdication of financial responsibility for the CFPB may give rise to Article I objections beyond the scope of this opinion. For my purpose, the deficiency in congressional oversight is important because it is one of several factors distinguishing this case from *Humphrey's Executor*.

term of the President. The imperfect overlap means that for much of the President's term—sometimes all of it—the sole "regulator of first resort . . . for a vital sector of our economy," *Free Enter. Fund*, 561 U.S. at 508, might well be faithful to the policies of the last President, not the views of the current one.

First principles, not *Humphrey's Executor*, control here. This unaccountable agency violates them. I disagree with the majority's conclusion to the contrary. Further, although I agree with portions of Judge Kavanaugh's dissent, I cannot join it, primarily because it would strike and sever Title X's for-cause removal provision. Even assuming that remedy would bring the CFPB fully in line with the Constitution, I do not think we can dictate it to the Congress.

Severability turns on whether the statute, minus any invalid provision, "will function in a *manner* consistent with the intent of Congress" and "is legislation that Congress would . . . have enacted." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) (emphasis in original). Statutory text, structure and history manifest the 111th Congress's belief that the CFPB's independence from *both* of the elected branches is indispensable. Excising only the for-cause removal provision would leave behind a one-legged agency that, by all indications, the Congress would not have created. True, the introduction to the 849-page Dodd-Frank legislation includes a standard-form severability clause. But such a clause raises only a "presumption" that "the objectionable provision can be excised." *Alaska Airlines*, 480 U.S. at 686. The presumption is rebutted here. As I see it, Dodd-Frank's severability clause speaks to severing Title X from other titles of the legislation but does not support severing the for-cause removal provision from the rest of Title X.

Accordingly, I would invalidate Title X in its entirety and let the Congress decide whether to resuscitate—and, if so, how to restructure—the CFPB. I would set aside the Director's decision as *ultra vires* and forbid the agency from resuming proceedings. Because the en banc Court's decision permits this case to continue before the agency, I respectfully dissent.[3]

## I. THE CFPB'S STRUCTURE VIOLATES ARTICLE II

The administrative agencies sprawled across Washington, D.C.—especially the "independent" ones—do not fit

---

[3] I found it unnecessary to decide the CFPB's constitutionality at the panel stage because PHH sought the same relief ("vacatur") whether we endorsed its constitutional claim or its statutory claims, the latter of which the panel unanimously found meritorious. *PHH Corp. v. CFPB*, 839 F.3d 1, 56-60 (D.C. Cir. 2016) (Henderson, J., concurring in part and dissenting in part), *vacated upon grant of reh'g en banc* (Feb. 16, 2017); *see* PHH Panel Br. 23-24, 61-62; PHH Panel Reply Br. 31. But unlike its panel briefs, PHH's en banc briefs expressly ask that the Director's decision "be vacated without remand" and that the Court "forbid the CFPB from resuming proceedings." PHH Br. 58; PHH Reply Br. 29. Because that relief is warranted only if the CFPB is unconstitutionally structured, I believe the constitutional question can no longer be avoided. *See Citizens United v. FEC*, 558 U.S. 310, 375 (2010) (Roberts, C.J., concurring) ("When constitutional questions are 'indispensably necessary' to resolving the case at hand, 'the court must meet and decide them.'" (quoting *Ex parte Randolph*, 20 F. Cas. 242, 254 (No. 11,558) (CC Va. 1833) (Marshall, C.J.))); *see also infra* note 17. In any event, because the majority decides the constitutional question and gets it wrong, I see no reason to withhold my views. *Cf. Freytag v. Comm'r*, 501 U.S. 868, 892-922 (1991) (Scalia, J., concurring in part and concurring in the judgment) (expressing views on merits after disagreeing with Court's decision to reach Appointments Clause issue).

comfortably within the text and structure of the Constitution.[4] *FTC v. Ruberoid Co.*, 343 U.S. 470, 487 (1952) (Jackson, J., dissenting) ("[A]dministrative bodies . . . have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories . . . ."); *see* PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? 1-2 (2014) ("Constitution generally establishes three avenues of power" but administrative state "prefers to drive off-road"). Cognizant of modern-day complexities, and bowing to perceived necessity, the judiciary has made accommodations such as *Humphrey's Executor*.  But the accommodations have limits and the CFPB exceeds them.

## A. THE PRESIDENT'S REMOVAL POWER

Three Article II cases—*Myers*, *Humphrey's Executor* and *Free Enterprise Fund*—set forth the legal framework for deciding the CFPB's constitutionality.  I discuss each in turn.

### 1. *Myers*

One would not know it from the CFPB's one-sentence treatment, CFPB Br. 32, but *Myers* is a "landmark," *Free Enter. Fund*, 561 U.S. at 492.  In 1917, President Wilson, by and with the advice and consent of the Senate, appointed Frank Myers to a four-year term as first-class postmaster.  *Myers*, 272 U.S. at 56, 106.  He did so pursuant to an 1876 statute providing in relevant part that "[p]ostmasters of the first, second and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate."  *Id*. at 107 (quoting Act of July 12, 1876, ch.

---

[4]  In this opinion, I use the term "independent agency" to mean an agency whose principal officers enjoy protection from removal at the President's will.  *See Free Enter. Fund*, 561 U.S. at 483.

179, § 6, 19 Stat. 80, 81). In 1920, for reasons undisclosed in the *Myers* opinion,[5] President Wilson removed Myers from office without the Senate's advice and consent. *Id*. at 106-07. Invoking the 1876 statute, Myers sued for "salary from the date of his removal." *Id*. at 106. He lost. In an opinion authored by Chief Justice Taft—Wilson's predecessor as President—the Supreme Court held that requiring the President to obtain advice and consent in order to remove an executive officer violates Article II. *Id*. at 108, 176.

Because the Constitution contains "no express provision respecting removals" and "[t]he subject was not discussed in the Constitutional Convention," 272 U.S. at 109-10, the Court focused on the First Congress, *id*. at 111-36. In 1789, the First Congress enacted a law that effectively recognized "the power of the President under the Constitution to remove the Secretary of Foreign Affairs"—now the Secretary of State—"without the advice and consent of the Senate." *Id*. at 114; *see id*. at 111-15. The Court gave "great[] weight" to the debates on the bill because the First Congress "numbered among its leaders those who had been members of the Convention." *Id*. at 136, 174-75. The Court pointed especially to James Madison's "masterly" arguments about the removal power because they "carried the House." *Id*. at 115. Collecting the views of Madison and his colleagues, and "supplementing them" with "additional considerations" of its own, the Court declared that generally the President's "executive power" "includ[es] . . . the

---

[5] Many years later, the Supreme Court noted that Myers had been suspected of fraud. *Raines v. Byrd*, 521 U.S. 811, 827 (1997). Historical records indicate that he also alienated colleagues and ensnared himself in one political dustup after another. *See* Jonathan L. Entin, *The Curious Case of the Pompous Postmaster:* Myers v. United States, 65 CASE W. RES. L. REV. 1059, 1062-64 (2015) (citing contemporaneous news accounts and personal letters).

exclusive power of removal." *Id*. at 115, 122. The Court supported that general proposition with four reasons rooted in constitutional text, structure and function. *Id*. at 115-35.

*First*, Article II gives the President not only the *power* to execute the laws but the *obligation* "to take care that they be faithfully executed." 272 U.S. at 117. He cannot do so "unaided"; he needs "the assistance of subordinates." *Id*. Because "his selection of administrative officers is essential to" his faithful execution of the laws, "so must be his power of removing those for whom he can not continue to be responsible." *Id*. (citing 1 ANNALS OF CONG. 474 (1789) (Joseph Gales ed., 1834) (available in photo. reprint, William S. Hein & Co. 2003) (statement of Fisher Ames)). And because the crown—the British executive—had the power to appoint *and* remove executive officers, "it was natural" for the Framers "to regard the words 'executive power' as including both." *Id*. at 118.

*Second*, the Constitution divides legislative and executive powers, giving them to two separate but coequal political branches as a check against oppression by either. 272 U.S. at 120-21. Some Framers had thought it an "unchaste" "mingling" of the legislative and executive powers even to give the Senate the job of advising on and consenting to the President's appointments. *Id*. at 120 (quoting 1 ANNALS OF CONG. 557 (statement of Abraham Baldwin)). In the First Congress, Madison and others cautioned against "'extend[ing] this connexion'" to "the removal of an officer who has served under the President." *Id*. at 121 (quoting 1 ANNALS OF CONG. 380 (statement of James Madison)). Whereas a veto on the appointment power merely "enables the Senate to prevent the filling of offices with bad or incompetent men," a veto on the President's "exclusive power of removal" entangles the Congress in an executive function: deciding whether an

9

incumbent officer has the requisite "loyalty" to the President's agenda. *Id*. at 121-22, 131, 134.

*Third*, the President's removal power is especially strong with respect to principal executive officers. 272 U.S. at 126-29. The first half of the Appointments Clause requires the President personally to appoint, with the Senate's advice and consent, "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. CONST. art. II, § 2, cl. 2. By way of an "exception," 272 U.S. at 127, the second half of the Appointments Clause provides: "[B]ut the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2. The Congress accordingly has "legislative power in the matter of appointments and removals in the case of inferior executive officers." 272 U.S. at 127 (citing *United States v. Perkins*, 116 U.S. 483, 485 (1886)). "By the plainest implication," however, the Appointments Clause "excludes Congressional dealing with appointments or removals of executive officers not falling within the [inferior-officer] exception, and leaves unaffected the executive power of the President to appoint and remove" principal officers. *Id*.

*Fourth*, the Framers did not "intend[], without express provision, to give to Congress . . . the means of thwarting the Executive . . . by fastening upon him, as subordinate executive officers, men who by their inefficient service," "lack of loyalty" or "different views of policy" would make it "difficult or impossible" for him to "faithfully execute[]" the laws. 272 U.S. at 131. The removal power was vested in the President to help him "secure th[e] unitary and uniform execution of the laws," *id*. at 135, and to preserve a discernible "chain" of

"responsibility" from appointed officers to the President and from the President to the people, *id*. at 131-32 (quoting 1 ANNALS OF CONG. 499, 523 (statements of James Madison and Theodore Sedgwick)).

For those four reasons, the Court concluded that the President must ordinarily have "unrestricted power" to "remov[e] executive officers who ha[ve] been appointed by him by and with the advice and consent of the Senate." 272 U.S. at 176. Because the 1876 statute restricting removal of postmasters violated that general rule, the Court invalidated the statute. *Id*.

## 2. *Humphrey's Executor*

Less than a decade after *Myers*, the Supreme Court in *Humphrey's Executor* again addressed the scope of the President's removal power, this time in the context of the FTC. Under section 1 of the Federal Trade Commission Act (FTC Act), an FTC commissioner "may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41. In 1933, President Roosevelt requested the resignation of William Humphrey, a business-friendly FTC commissioner appointed by President Coolidge and reappointed by President Hoover. 295 U.S. at 618; *see* RICHARD A. HARRIS & SIDNEY M. MILKIS, THE POLITICS OF REGULATORY CHANGE: A TALE OF TWO AGENCIES 153 (2d ed. 1996) (noting that Humphrey's appointment was perceived as "transform[ing] the FTC into an agency that served not as an overseer but a partner of business" (internal quotation omitted)). In his correspondence with Humphrey, President Roosevelt cited "polic[y]" differences and "disclaim[ed] any reflection upon the commissioner personally or upon his services." 295 U.S. at 618-19 (internal quotation omitted). Humphrey refused to resign and the President removed him.

*Id*. at 619.   Humphrey died shortly thereafter but his executor sued to recover Humphrey's salary from the date of removal. *Id*. at 618-19.

The Court in *Humphrey's Executor* confronted two questions.   First, does section 1 of the FTC Act prohibit the President from removing an FTC commissioner for any reason other than inefficiency, neglect or malfeasance?   295 U.S. at 619.   Second, if so, "is such a restriction or limitation valid under the Constitution"?   *Id*.   The Court answered yes to both questions.   *Id*. at 632.   In considering the first question, the Court described at length "the character of the commission," *id*. at 624, as manifested in the FTC Act's text and legislative history, *id*. at 619-26.   And in considering the second question, the Court indicated that "the character of the office" would determine the Congress's ability to restrict the President's removal power.   *Id*. at 631.

In other words, the constitutionality of the FTC Act, like any other law, depended on its content.   The CFPB resists this truism, suggesting the "Court's discussion of the FTC's structure" is irrelevant because it "comes in the statutory interpretation part of the decision."   CFPB Br. 31.   But *Humphrey's Executor* makes plain that, if we are to understand what it says about Article II, we must understand the structure of the agency it sustained.   295 U.S. at 632 (holding that President's "unrestrictable power" of removal "does not extend to an office *such as that here involved*" (emphasis added)); *see Free Enter. Fund*, 561 U.S. at 516 (Breyer, J., dissenting) (recognizing that applicability of *Humphrey's Executor* turns in part on "the nature of the office," "its function" and "its subject matter"); *see also* Maj. Op. 22, 36 ("Supreme Court looks to the character of the office" and "the sort of agency involved" when "analyzing where Congress may deploy . . . for-cause protection" (internal quotation omitted)).

12

As summarized in *Humphrey's Executor*, the FTC's structure is as follows:

- It is composed of five commissioners. 295 U.S. at 619-20. Together they "are called upon to exercise the trained judgment of a body of experts . . . informed by experience." *Id*. at 624 (internal quotation omitted).

- The FTC has certain "powers of investigation," *id*. at 621, but they are legislative rather than executive because they are for the purpose of making reports and recommendations to the Congress, *id*. at 621, 628.

- With the advice and consent of the Senate, the President appoints each commissioner to a seven-year term staggered with those of his fellow commissioners. *Id*. at 620, 624. The duration and "arrange[ment]" of the terms foster collective expertise. *Id*. at 624 (seven years is "'long enough'" to "'acquire . . . expertness'" if "membership [is not] subject to complete change at any one time" (quoting S. REP. NO. 63-597, at 11 (1914))).

- The FTC is a "non-partisan" "agency of the legislative and judicial departments." *Id*. at 624, 630. "Its duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative." *Id*. at 624; *see id*. at 628-29. To ensure the FTC's "entire impartiality" in carrying out its duties—and to insulate it from "suspicion of partisan direction"—no more than three of its commissioners can be members of the same political party. *Id*. at 620, 624-25.

Having made these observations, the Court concluded that an FTC commissioner "is so essentially unlike" a first-class

postmaster that *Myers* "cannot be accepted as controlling our decision here." 295 U.S. at 627. Unlike a postmaster, the Court reasoned, an FTC commissioner "exercises no part of the executive power . . . in the constitutional sense." *Id*. at 628. Rather, "[t]o the extent that [the FTC] exercises any executive function, . . . it does so in the discharge and effectuation of its quasi-legislative and quasi-judicial powers" as an expert agency "charged with the enforcement of no policy except the policy of the law." *Id*. at 624, 628. In the Court's view, just as the Congress has limited power to interfere with the President's removal of executive officers, the President has "[]limitable power" to remove FTC commissioners because they are legislative or judicial officers. *Id*. at 629; *see id*. at 630 ("The sound application of a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there.").

### 3. *Free Enterprise Fund*

In *Free Enterprise Fund*, the Supreme Court's most recent decision on the scope of the removal power, the Court was asked to extend *Humphrey's Executor* to "a new situation" it had "not yet encountered." 561 U.S. at 483. It declined the invitation. At issue were provisions that precluded the Securities and Exchange Commission (SEC) from removing members of the Public Company Accounting Oversight Board (Board) except for cause. *Id*. at 486 (citing 15 U.S.C. §§ 7211(e)(6), 7217(d)(3)). Based on the "understanding" that SEC commissioners "cannot themselves be removed by the President except" for cause, *id*. at 487, the Court held that two layers of "good-cause protection" violate Article II because together they prevent the President from "oversee[ing] the faithfulness" of officers who "determine[] the policy and enforce[] the laws of the United States," *id*. at 484.

The Court acknowledged that the Congress has "power to create a vast and varied federal bureaucracy" to ensure "apolitical expertise." 561 U.S. at 498-99 (internal quotation omitted). But faced with a "novel structure" not squarely authorized by *Humphrey's Executor* or any other precedent, *id.* at 496; *see id.* at 483, 492-96, 514, the Court returned to the most fundamental of first principles: "Our Constitution was adopted to enable the people to govern themselves, through their elected leaders." *Id.* at 499. In view of that principle, the Court held that the Congress could not "encase[]" the Board "within a Matryoshka doll of tenure protections" and thereby "immun[ize] from Presidential oversight" the "regulator of first resort . . . for a vital sector of our economy." *Id.* at 497, 508; *see id.* at 485 (detailing Board's "expansive powers to govern an entire industry" through rulemaking, audits, inspections, investigations, monetary penalties and other forms of discipline). Concluding otherwise, the Court reasoned, would sever the chain of responsibility linking the Board to the people via the President. *Id.* at 495 ("The result is a Board that is not accountable to the President, and a President who is not responsible for the Board.").

## B. THE CFPB'S STRUCTURAL DEFECTS

Under the foregoing framework and considering Title X as a whole, I believe the CFPB's structure violates Article II.

### 1. Novelty

For me the initial question is whether the Supreme Court has "encountered" an agency like the CFPB or if, instead, its structure is "novel." *Free Enter. Fund*, 561 U.S. at 483, 496. Although structural "innovation" is not itself unconstitutional, *Mistretta v. United States*, 488 U.S. 361, 385 (1989); *see* Maj. Op. 53-54, a novel agency fights uphill: "the lack of historical precedent for [an] entity" is "[p]erhaps the most telling

indication of [a] severe constitutional problem." *Free Enter. Fund*, 561 U.S. at 505 (internal quotation omitted). The CFPB argues that it is sufficiently like the FTC to fall within the ambit of *Humphrey's Executor*. CFPB Br. 13-14, 18-21, 23, 30-31. It also relies on *Morrison v. Olson*, 487 U.S. 654 (1988), which involved the independent counsel. CFPB Br. 18-21, 24-25, 31-32. Finally, along with *Humphrey's Executor* and *Morrison*, my colleagues invoke *Wiener v. United States*, 357 U.S. 349 (1958), which involved a claims adjudicator. Maj. Op. 7-9, 20-30, 36, 38, 42, 58, 66-67; Wilkins Concurring Op. 4-5, 10. None of this is precedent for the CFPB or its Director. Before explaining why, I recap essential elements of the CFPB's design.

### a. Title X

Equating financial products with household appliances, Professor Elizabeth Warren in 2007 advocated for the creation of a federal agency to protect consumers from "[u]nsafe" mortgages, student loans and credit cards in the same way the Consumer Product Safety Commission protects consumers from exploding toasters. Elizabeth Warren, *Unsafe at Any Rate*, DEMOCRACY (Summer 2007), perma.cc/52X3-892V. She proposed that the Congress consolidate in the new agency the power to administer most federal consumer-protection laws, the result being "the review of financial products in a single location." *Id*. The proposed agency was to be "independent" of "national politic[s]," the "financial . . . industry lobby" and "legislative micromanaging." *Id*. Freed of such burdens, the agency could take "quick action" to solve the problems regularly generated by a financial services industry bent on "increas[ing] profits." *Id*. The agency, in short, was to "side" with consumers against the industry. *Id*.

Consistent with Professor Warren's proposal, Title X established the CFPB as "an independent bureau" to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a). It transferred to the CFPB the authority to enforce eighteen existing laws previously administered by seven different federal agencies. *Id*. §§ 5481(12), 5581(a)(2), (b). Those eighteen laws cover most consumer credit products, including mortgages, student loans and credit cards. The CFPB now has all but exclusive power "to prescribe rules or issue orders or guidelines pursuant to" all eighteen laws. *Id*. § 5581(a)(1)(A); *see id*. §§ 5481(12), 5512(b)(4). The agency also has expansive *new* powers under Title X to investigate, charge, adjudicate and penalize—through (*inter alia*) subpoena, rescission, restitution, disgorgement and monetary penalties—a consumer-connected "act or practice" the agency defines as "unfair, deceptive, or abusive." *Id*. § 5531(a), (b); *see id*. §§ 5562-5565.

The CFPB's expansive powers are vested in and derive from its sole Director. 12 U.S.C. § 5491(b)(1) (Director is "head" of CFPB); *id*. § 5491(b)(5)(A) (Director appoints Deputy Director); *id*. § 5492(b) (Director "may delegate to any duly authorized employee, representative, or agent any power vested in the Bureau by law"); *id*. § 5493(a)(1)(A) (Director "fix[es] the number of" CFPB employees and "appoint[s]" and "direct[s]" all of them); *id*. § 5512(b)(1) (Director "may prescribe rules and issue orders and guidance, as may be necessary or appropriate to enable the Bureau to administer and carry out the purposes and objectives of the Federal consumer financial laws, and to prevent evasions thereof").

The President appoints the Director "by and with the advice and consent of the Senate." 12 U.S.C. § 5491(b)(2). The Director is thereafter insulated from both political

branches. He has a five-year term, *id*. § 5491(c)(1), and the President may remove him only "for cause," i.e., "inefficiency, neglect of duty, or malfeasance in office," *id*. § 5491(c)(3).[6] At the same time, the Director obtains funding from the Federal Reserve System, outside the Congress's appropriations process. *Id*. § 5497(a)(1). On a quarterly basis, the Director determines how much money the CFPB "reasonably" needs, *id*., up to 12 per cent of the Federal Reserve budget, *id*. § 5497(a)(2)(A)(iii). The Federal Reserve "shall" then transfer that amount to the CFPB.[7] *Id*. § 5497(a)(1). The money "shall not be subject to review by the Committees on Appropriations of the House of Representatives and the Senate." *Id*. § 5497(a)(2)(C). Nor does the Director need "any" form of "consent or approval" from the executive branch's Office of Management and Budget (OMB), which lacks "any jurisdiction or oversight over the affairs or operations of the Bureau." *Id*. § 5497(a)(4)(E).

---

[6] Title X permits the Director to continue serving "after the expiration of the term for which [he is] appointed, until a successor has been appointed and qualified." 12 U.S.C. § 5491(c)(2). Citing a CFPB concession, Oral Arg. Tr. 48-49, the Court suggests the President may remove the Director at will during any holdover period, Maj. Op. 12 n.1. I agree. Nothing in the statute authorizes the Senate to keep a holdover Director in office against the President's will by failing to act on a nominee even after expiration of the Director's term has triggered the President's appointment power under 12 U.S.C. § 5491(b)(2). *Cf. Swan v. Clinton*, 100 F.3d 973, 981-88 (D.C. Cir. 1996) (no good-cause protection for holdover board member of National Credit Union Administration).

[7] Through three quarters of fiscal year 2017, the Director claimed $517.4 million, putting him on pace for the maximum of $646.2 million for the year. CFPB, *Semiannual Report* 122 (Spring 2017), perma.cc/M7XD-4QMT.

### b. CFPB distinguished from FTC

The agency just described is not even a distant cousin of the FTC blessed by *Humphrey's Executor*. I see at least three critical distinctions.

*First*, like nearly all other administrative agencies, the FTC is and always has been subject to the appropriations process. 15 U.S.C. § 42; *see* HARRIS & MILKIS, *supra*, at 146, 204-05 (discussing FTC appropriations); *see also* Note, *Independence, Congressional Weakness, and the Importance of Appointment: The Impact of Combining Budgetary Autonomy with Removal Protection*, 125 HARV. L. REV. 1822, 1823 (2012) (*Budgetary Autonomy*) ("A complete exemption from appropriations is rare . . . ."). Accordingly, the FTC must go to the Congress every year with a detailed budget request explaining its expenditure of public money. *See, e.g.*, FTC, *Fiscal Year 2018 Congressional Budget Justification* (May 22, 2017) (185-page request), perma.cc/4V7G-83JL. The procedure provides a measure of public accountability and helps explain the Supreme Court's description of the FTC as a "quasi-legislative" agency that "report[s] to Congress." *Humphrey's Ex'r*, 295 U.S. at 621, 624, 628-29.

The CFPB is different. As the agency itself declares, it is "fund[ed] outside of the congressional appropriations process to ensure full independence." CFPB, *Strategic Plan: FY2013-FY2017*, at 36 (Apr. 2013), perma.cc/XQW5-5S5S. The agency has made the most of its autonomy: when legislators have sought explanation for its spending or policies, it has stonewalled. *See, e.g.*, Letter from Rep. Randy Neugebauer et al. to Richard Cordray (May 2, 2012) (noting CFPB's "wholly unresponsive" posture to "requests for additional budget information"), perma.cc/NTH6-KR98; Letter from Sen. Rob Portman et al. to Richard Cordray (Oct. 30, 2013) (seeking

"greater transparency for the Bureau's activity"), perma.cc/5N3Z-GGCQ. Perhaps the best illustration is a 2015 hearing in which a legislator asked the Director who authorized a CFPB project that cost more than $215 million. House Financial Services Committee, *Hearings and Meetings* (Mar. 17, 2015), www.congress.gov/committees/video/house-financial-services/hsba00/5IxSfJ638cs. The Director replied: "Why does that matter to you?" *Id.*

The appropriations process has long been considered "the most potent form of Congressional oversight." 2 SENATE COMMITTEE ON GOVERNMENT OPERATIONS, STUDY ON FEDERAL REGULATION: CONGRESSIONAL OVERSIGHT OF REGULATORY AGENCIES 42 (1977); *see* MICHAEL J. KLARMAN, THE FRAMERS' COUP: THE MAKING OF THE UNITED STATES CONSTITUTION 16 (2016) (founding generation "generally embraced the maxim that the power which holds the purse-strings absolutely will rule" (internal quotation and brackets omitted)). Because of its freedom from appropriations, the CFPB cannot be called "an agency of the legislative . . . department[]" and the Congress cannot be called its "master." *Humphrey's Ex'r*, 295 U.S. at 630. The agency argues that, whatever its accountability to the *Congress*, its budgetary independence "does not interfere with the *President's* power to take care that the laws be faithfully executed." CFPB Br. 28 & n.8 (emphasis added); *see* Maj. Op. 41 ("The CFPB's budgetary independence . . . does not intensify any effect on the President of the removal constraint."). The contention overlooks the President's constitutional role in the budget process.

Lest it be forgotten, the Presentment Clause gives the President the power to veto legislation, including spending bills. U.S. CONST. art. I, § 7, cl. 2. Armed with that authority and the prerogative to "recommend to [the Congress's]

Consideration such Measures as he shall judge necessary and expedient," U.S. CONST. art. II, § 3, the President has for the past century submitted an annual budget to the Congress, *see* LOUIS FISHER, CONGRESSIONAL ABDICATION ON WAR AND SPENDING 24 (2000) (tracing practice to Budget and Accounting Act of 1921). Indeed, the President has long been *required* to submit an annual budget. 31 U.S.C. § 1105(a).

Acting through OMB, the President uses his annual budget to influence the policies of independent agencies, including the FTC. Eloise Pasachoff, *The President's Budget as a Source of Agency Policy Control*, 125 YALE L.J. 2182, 2191, 2203-04 (2016) (independent agencies "must participate in the annual budget cycle under [the] oversight" of OMB's Resource Management Offices, which in turn "serve as a conduit for policy and political direction from the President" and his staff); *see, e.g.*, HARRIS & MILKIS, *supra*, at 204-05 (noting policy-driven budget cuts at FTC under President Reagan). The President lacks that leverage over the CFPB, which stands outside the budget. 12 U.S.C. § 5497(a)(1).

Similarly, the President requires the FTC and other independent agencies to (*inter alia*) "prepare an agenda of all regulations under development or review" and submit them to the Office of Information and Regulatory Affairs, an arm of OMB, to ensure "coordination of regulations" that "promote the President's priorities." Exec. Order No. 12866 § 4, 58 Fed. Reg. 51735 (Sept. 30, 1993); *see* Exec. Order No. 13563 § 1(b), 76 Fed. Reg. 3821 (Jan. 18, 2011) ("reaffirm[ing]" 1993 order). But the requirements apply only "to the extent permitted by law," Exec. Order No. 12866 § 4, and Title X exempts the CFPB by shielding it from OMB's "jurisdiction or oversight," 12 U.S.C. § 5497(a)(4)(E).

*Second*, unlike the FTC, the CFPB is not a "non-partisan" commission pursuing "entire impartiality" in law and policy. *Humphrey's Ex'r*, 295 U.S. at 624. In contrast to the FTC, *see id*. at 620, the CFPB does not have a partisan balance requirement. Its single Director is from a single party—in most cases, presumably, the party of the President who appoints him.

The CFPB contends that its single-Director, single-party structure is no greater threat to the President's faithful execution of the laws than is the FTC's multimember bipartisan structure. CFPB Br. 23-32. In fact, the CFPB says, the President can more easily replace or persuade one Director than three of five commissioners. *See, e.g.*, Oral Arg. Tr. 49; *see also* Maj. Op. 35, 43-44 (making similar points). But if the President's dissatisfaction is rooted in policy, it is just as impossible for him to remove a single official with for-cause protection as it is to remove several such officials.[8] And

---

[8] Some commentators have suggested that a provision permitting removal for "'inefficiency, neglect of duty, or malfeasance in office'" allows the President "to discharge officials whom he finds incompetent because of their consistently foolish policy choices." Richard H. Pildes & Cass R. Sunstein, *Reinventing the Regulatory State*, 62 U. CHI. L. REV. 1, 30 (1995). *Humphrey's Executor* leaves little or no room for that argument: the Supreme Court rebuffed President Roosevelt's attempt to remove Humphrey based on the policies Humphrey had pursued for years. 295 U.S. at 619 (President told Humphrey, "I do not feel that your mind and my mind go along together on either the policies or the administering of the Federal Trade Commission" (internal quotation omitted)); *see Free Enter. Fund*, 561 U.S. at 502 (reading *Humphrey's Executor* to suggest that "simple disagreement with [an official's] policies or priorities" does not "constitute 'good cause' for [his] removal"); *see also* Amicus Br. of Current and Former Members of Congress Supporting CFPB 2 (arguing that 12 U.S.C. § 5491(c)(3) does not permit President to remove Director "for policy differences alone");

whether directed at one officer or more, attempts at persuasion are no substitute for removal. *Free Enter. Fund*, 561 U.S. at 502 ("Congress cannot reduce the Chief Magistrate to a cajoler-in-chief.").

Moreover, because of the mismatch between the President's four-year term and the Director's five-year term, the CFPB's *entire leadership* may for much of the President's tenure—and sometimes all of it—identify with a political party other than the President's. This does not happen at the FTC. The difference matters for accountability: a minority party of a multimember agency is "a built-in monitoring system," dissenting when appropriate and serving as a "fire alarm" for the President and the public. Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 TEX. L. REV. 15, 41 (2010).

Further, whereas the FTC is structured to administer the laws apolitically and with "impartiality," *Humphrey's Ex'r*, 295 U.S. at 624, the CFPB's design encourages the opposite. Title X gives the Director latitude to define and punish "unfair, deceptive, or abusive acts or practices" broadly or narrowly,

---

Press Conference, *Financial Regulations Bill*, C-SPAN (Mar. 24, 2010) (Rep. Frank: "I am obviously committed to a very strong independent consumer agency that can't be overruled on policy grounds . . . ."), www.c-span.org/video/?292698-2/financial-regulations-bill (3:52-3:58). In a testament to how difficult it may be to remove a principal officer for cause, the CFPB admits that it "cannot" provide "any example where an agency head has been actually successfully removed for cause." Oral Arg. Tr. 72. In any event, if Article II authorizes the President to remove a particular officer at will, he should not have to concern himself with the potential political cost of asserting inefficiency, neglect or malfeasance as cover for a policy choice. *Cf. Free Enter. Fund*, 561 U.S. at 547 (Breyer, J., dissenting).

depending on his policy preferences. 12 U.S.C. § 5531(a), (b); *see id.* § 5531(c), (d) (malleable statutory definitions of "unfair" and "abusive"). The legislators who supported Title X expected the Director to use that power—together with his authority over eighteen other laws—to "stick[] up for the little guy" in the "battle" against "all the big sharks and lobbyists and lawyers who are ganged up against [him]." 156 CONG. REC. 6364, 6366, 7015 (2010) (statements of Sen. Whitehouse); *see id.* at 3187 (statement of Sen. Kaufman) (CFPB is to "look[] out totally for the interest of consumers and consumers alone").[9] The agency's first Director shared that one-sided vision, describing his "sole focus" as "protecting consumers." CFPB, *Written Testimony of CFPB Director Richard Cordray Before the House Committee on Financial Services* (Mar. 3, 2015), perma.cc/GAG6-ENDN.

I do not question the importance of protecting consumers. But an agency cannot be considered "impartial[]" under *Humphrey's Executor* if in partisan fashion it uniformly crusades for one segment of the populace against others. Consistent with its design, that is what the CFPB has done. *See* Dep't of Treasury, *A Financial System That Creates Economic Opportunities: Banks and Credit Unions* 82-87

---

[9] *See also, e.g.*, 156 CONG. REC. 2052 (statement of Rep. Tsongas) (CFPB was designed to "level [the] playing field"); *id.* at 6240 (statement of Sen. Franken) (it is "an independent watchdog for consumers"); *id.* at 7486 (statement of Sen. Dodd) (it is "one single, empowered, focused cop on the consumer protection beat"); *id.* at 11814 (statement of Rep. Lee) (it "puts consumers first"); *id.* (statement of Rep. Fudge) (it "hold[s] Wall Street and the big banks accountable"); *id.* at 12414 (statement of Rep. McGovern) (it "empower[s] consumers"); *id.* at 12434 (statement of Rep. Maloney) (it is "on their side"); *id.* at 13135 (statement of Sen. Cardin) (it "represent[s]" consumers "in the financial structure").

(June 2017) (*Economic Opportunities*) (cataloging questionable practices CFPB has undertaken at expense of regulated parties), perma.cc/V3SC-VXBH; Amicus Br. of U.S. Chamber of Commerce 16-29 (same).

By at least some accounts, for instance, the CFPB under its first Director hired all but exclusively from one political party, deliberately weeding out applicants from other parties and the banking industry. Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace?*, 81 GEO. WASH. L. REV. 856, 877, 895 (2013) (asserting that agency hired staffers and "true believers" from one political party); Ronald L. Rubin, *The Tragic Downfall of the Consumer Financial Protection Bureau*, NAT'L REV., Dec. 21, 2016 (alleging, from insider's perspective, that agency used "screening techniques"), perma.cc/VR9F-TWHQ; *cf.* Bill McMorris, *100% of CFPB Donations Went to Democrats*, WASH. FREE BEACON, Nov. 23, 2016 (reporting that, during 2016 Presidential election, CFPB employees made more than 300 donations totaling about $50,000, all of which went to candidates of one party), perma.cc/6JVQ-RRRQ.

Additionally, the CFPB provides an online forum for consumers to complain publicly about providers of mortgages, student loans, credit cards and other financial products. CFPB, *Consumer Complaint Database*, perma.cc/VT2D-E6K5. The agency acknowledges that some complaints may be misleading or flat wrong. Disclosure of Consumer Complaint Narrative Data, 79 Fed. Reg. 42765, 42767 (July 23, 2014) ("[T]he narratives may contain factually incorrect information . . . ."). Without attempting to verify them, the agency publishes the complaints anyway, knowing it is providing a "megaphone" for debtors who needlessly damage business reputations. CFPB, *Prepared Remarks of CFPB Director Richard Cordray at the Consumer Response Field*

*Hearing* (July 16, 2014), perma.cc/4S3G-9ALK. Compare that blinkered outlook with the FTC's approach. The FTC likewise provides a complaint database to help deter and detect unfair business practices. But its database can be accessed only by law enforcement agencies, yielding similar value without the reputational costs. FTC, *Consumer Sentinel Network*, perma.cc/M5TZ-5USM. One cannot help but think that the difference in the FTC's policy owes at least in part to the difference in its design.

Consider also PHH's case. In rulings reinstated today, *see* Maj. Op. 16-17, the panel rejected: the Director's new interpretation of the anti-kickback provision of the Real Estate Settlement Procedures Act (RESPA), *PHH Corp. v. CFPB*, 839 F.3d 1, 39-44 (D.C. Cir. 2016), *vacated upon grant of reh'g en banc* (Feb. 16, 2017); his attempt to apply that interpretation retroactively to PHH, *id*. at 44-49; his construction of RESPA's limitations provision, *id*. at 52-55; and his theory that the CFPB is bound by *no* limitations period in *any* administrative enforcement action under *any* of the laws the agency administers, *id*. at 50-52. The issues were "not a close call": the CFPB flunked "Rule of Law 101" and was called out for "gamesmanship" and "absurd[]" reasoning. *Id*. at 41, 48-49, 55. An agency that gets the law so badly wrong four times over in its first major case in this circuit has a steep climb in claiming "[i]t is charged with the enforcement of no policy except the policy of the law." *Humphrey's Ex'r*, 295 U.S. at 624.

*Third*, and relatedly, the Director is not a "body of experts" "informed by experience," *Humphrey's Ex'r*, 295 U.S. at 624 (internal quotation omitted), because he is not a body at all. When a Director leaves at the end of his term, he takes with him *all* of the expertise and experience that his board of one has collected in five years. The new Director—faced with a

one-sided mission and armed with unilateral power to administer a complex web of laws at the heart of the credit economy—starts with no expertise *qua rector* and has no coequal colleagues with whom to deliberate. Far from "promot[ing] stability and confidence," Maj. Op. 13; *see id.* at 7, 33, full turnover from one insulated Director to the next is a recipe for jarring policy changes and costly rookie mistakes, *see, e.g.*, *PHH Corp.*, 839 F.3d at 7 (multitude of errors "resulted in a $109 million order against" PHH).

By contrast, each FTC commissioner is informed by fellow commissioners who have years of collective experience as commissioners. *See* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 CORNELL L. REV. 769, 794 (2013) ("[M]ultimember agencies allow for the development of institutional memory."). From the FTC's inception, its staggered multimember structure has been central to its functions. The Congress passed the FTC Act in part because of dissatisfaction with the Bureau of Corporations, "a single-headed organization" better suited to "investigation and publicity" than to "judgment and discretion." 51 CONG. REC. 11092 (1914) (statement of Sen. Newlands, sponsor of FTC Act). As the Senate Report explained:

> It is manifestly desirable that the terms of the commissioners shall be long enough to give them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience. The terms of the commissioners should expire in different years, in order that such changes as may be made from time to time shall not leave the commission deprived of men of experience in such questions.

> One of the chief advantages of the proposed commission over the Bureau of Corporations lies in the fact that it will have greater prestige and independence, and its decisions, coming from a board of several persons, will be more readily accepted as impartial and well considered.

S. REP. NO. 63-597, at 10-11 (1914).

The CFPB's proponents view its single-Director structure as a strong selling point. In the 111th Congress, they advocated for a regulator who can "keep pace with the changing financial system" and "respond quickly and effectively to . . . new threats to consumers." S. REP. NO. 111-176, at 18, 40 (2010); *see id.* at 11 (agency must be "streamlined" and "have enough flexibility to address future problems as they arise"); 156 CONG. REC. 6237 (2010) (statement of Sen. Whitehouse) (agency must "monitor the market and act quickly when there is a consumer hazard"); *id.* at 12436 (statement of Rep. Meeks) (agency must "act swiftly" to protect consumers "from unscrupulous behavior"); *id.* at 15025 (statement of Sen. Durbin) (agency must "keep up with the[] lawyers and accountants" of "the big banks on Wall Street"); *cf.* Warren, *Unsafe at Any Rate*, *supra* (agency must be prepared to take "quick action" against financial services industry). Similarly, in this Court, the agency's proponents tout its single-Director structure as essential to preventing "the delay and gridlock to which multimember commissions are susceptible." Amicus Br. of Current and Former Members of Congress Supporting CFPB 2; *see id.* at 15-20.

I do not begin to assert that the Constitution "enacts social science about the benefits of group decision-making." Tatel Concurring Op. 6 (internal quotation omitted). Far be it from

a judge to question the Congress's conclusion that a single Director beats a multimember commission as a fast-acting solution to real-time problems. *See Buckley v. Valeo*, 424 U.S. 1, 138-39 (1976) (per curiam) (subject to constitutional constraints, Congress has authority to create and structure government offices "as it chooses"). My point is more modest: if the Director is a speedy unitary actor, he cannot also be a "quasi-legislative and quasi-judicial" "body of experts" exercising "trained judgment" by considered consensus. *Humphrey's Ex'r*, 295 U.S. at 624, 629; *compare* THE FEDERALIST NO. 70, at 472 (Alexander Hamilton) (J. Cooke ed., 1961) ("power in a single hand" is exercised with "dispatch"), *with* John Locke, *The Second Treatise of Civil Government*, *in* 2 THE TRADITION OF FREEDOM 201, 252 § 160 (M. Mayer ed., 1957) (legislative power is "too numerous and so too slow for the dispatch requisite to execution").

In sum, the FTC is a deliberative expert nonpartisan agency that reports to the Congress. The CFPB is a unitary inexpert partisan agency that reports to no one. Because the former is no precedent for the latter, *Humphrey's Executor* does not control here.

### c. CFPB Director distinguished from independent counsel

As for *Morrison*, that case and this one are not on the same jurisprudential planet. At issue in *Morrison* was (*inter alia*) whether the Ethics in Government Act "impermissibly interferes with the President's exercise of his constitutionally appointed functions" by "restricting the Attorney General's power to remove the independent counsel to only those instances in which he can show 'good cause.'" 487 U.S. at 685. The Supreme Court found no violation. *Id*. at 685-93, 695-96. Crucially, however, the Court recognized that "the independent counsel [was] an *inferior officer* under the

Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority." *Id*. at 691 (emphasis added).

The CFPB Director has even less in common with the independent counsel than with an FTC commissioner. As no one disputes, the Director is a *principal officer*: he has no "superior" who "direct[s] and supervise[s]" his work. *Edmond v. United States*, 520 U.S. 651, 662-63 (1997). The distinction between principal and inferior makes a considerable difference. The Constitution gives the Congress much more power over the appointment and removal of an inferior officer than over the appointment and removal of a principal officer, *see* U.S. CONST. art. II, § 2, cl. 2; *Myers*, 272 U.S. at 126-29, at least where, as here, the principal officer is not a legislative agent under *Humphrey's Executor*.[10]

---

[10] During oral argument before the en banc Court, there was much discussion about our being bound by *Morrison* whether we like it or not. Oral Arg. Tr. 12-17, 25-26, 30-31, 82-83. Today, three of my colleagues continue to push the point. Tatel Concurring Op. 5 (joined by Millett and Pillard, JJ.). I do not contradict it. *See Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of [the Supreme] Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."). All but lost in that discussion, however, has been the distinction between this case's principal officer and *Morrison*'s inferior officer. Counsel at oral argument only fleetingly mentioned it. Oral Arg. Tr. 15, 30-31, 83. The majority relegates it to an *ipse dixit* footnote, Maj. Op. 42 n.2, ignoring vital discussion in *Myers*, 272 U.S. at 126-29; *see supra* p. 9. And my colleagues in concurrence denigrate the distinction as "strained" without explaining why. Tatel Concurring Op. 5. I submit they can't. The Supreme Court has described *Morrison*, together with *Perkins*, 116 U.S. at 485, as cases in which "the Court sustained . . .

The distinction makes good sense "in the context of a Clause designed to preserve political accountability relative to important Government assignments." *Edmond*, 520 U.S. at 663. The more important the officer's assignments, the more directly his actions implicate the President's responsibility to faithfully execute the laws. *Myers*, 272 U.S. at 132 (President's oversight "varies with the character of [the officer's] service"); *see id*. at 132-33 (each principal executive officer charged with "highest and most important duties" of his department "must be the President's *alter ego*"). And the more powerful the officer, the more likely the people will hold the President personally responsible if the officer formulates bad policy. 1 ANNALS OF CONG. 499 (statement of James Madison) (describing "chain of dependence" from "lowest officers" to "middle grade" to "highest" to "President" to

---

restrictions on the power of principal executive officers—themselves responsible to the President—to remove their own *inferiors*," *Free Enter. Fund.*, 561 U.S. at 483 (emphasis added). Administrations across the political spectrum have recognized that *Morrison* does not apply to removal of a principal officer. *See* The Constitutional Separation of Powers Between the President and Congress, 20 Op. O.L.C. 124, 169 (1996) ("The *Morrison* Court . . . had no occasion to consider the validity of removal restrictions affecting principal officers, officers with broad statutory responsibilities, or officers involved in executive branch policy formulation."), perma.cc/DF3R-FFER; Amicus Br. of United States 14 n.3 (*Morrison* "obviously does not apply to any principal officer who heads an executive agency"). And most importantly, Article II itself distinguishes between principal and inferior. U.S. CONST. art. II, § 2, cl. 2; *see* 1 ANNALS OF CONG. 548 (statement of James Madison) ("If the gentleman admits that the Legislature may vest the power of removal, with respect to inferior officers, he must also admit that the Constitution vests the President with the power of removal in the case of superior officers; because both powers are implied in the same words.").

"community"); *see, e.g.*, Editorial, *President Cordray Strikes Again*, WALL ST. J., Oct. 5, 2017 (criticizing President for not removing Director), on.wsj.com/2xmzcii; Editorial, *Republicans for Richard Cordray*, WALL ST. J., Aug. 11, 2017 (same), on.wsj.com/2fjuMpe; Editorial, *Richard Cordray's Financial Damage*, WALL ST. J., July 12, 2017 (same), on.wsj.com/2w7nuIr; Editorial, *Trump to Cordray: You're Not Fired*, WALL ST. J., June 20, 2017 (same), on.wsj.com/2hjw2G5.

The Director is more powerful than the independent counsel and poses a more permanent threat to the President's faithful execution of the laws. The independent counsel had "limited jurisdiction" to investigate and prosecute crimes pursuant to Department of Justice policy. *Morrison*, 487 U.S. at 691; *see id*. at 672. She lacked "any authority to formulate policy" of her own. *Id*. at 671; *see id*. at 691. She performed no "administrative duties outside of those necessary to operate her office." *Id*. at 671-72. She had "limited . . . tenure" and "no ongoing responsibilities": her "temporary" office "terminated" when she finished investigating or prosecuting the matters for which she was called to duty. *Id*. at 672 (internal quotation omitted); *see id*. at 664, 691.

The Director's jurisdiction and tenure, by contrast, are anything but "limited" and "temporary." He has all but exclusive power to make and enforce rules under eighteen preexisting consumer laws and a nineteenth in Title X itself. 12 U.S.C. §§ 5481(12), 5512(b)(4), 5562-5565, 5581(a)(1)(A). Under the latter, his power to define and punish "unfair, deceptive, or abusive acts or practices" is cabined by little more than his imagination. *Id*. § 5531(a), (b). Absent inefficiency, neglect or malfeasance, he is guaranteed five years in which to impose on the people his version of consumer protection. 12

U.S.C. § 5491(c)(1), (3). And the cycle immediately begins again when he is through.

### d. CFPB Director distinguished from claims adjudicator

*Wiener* has still less bearing on this case than *Morrison* does. The parties apparently recognize as much, as their briefs do not cite it.

In 1948, the Congress established the War Claims Commission, a temporary body consisting of three Commissioners whose sole task was to "adjudicate according to law" claims seeking compensation for injuries suffered during World War II. *Wiener*, 357 U.S. at 349-50 (quoting War Claims Act of 1948, Pub. L. No. 80-896, § 3, 62 Stat. 1240, 1241 (July 3, 1948)). In 1950, President Truman, by and with the advice and consent of the Senate, appointed Myron Wiener as a Commissioner. *Id*. In 1953, President Eisenhower removed Wiener not for lack of "rectitude" but because the President wanted "'personnel of my own selection.'" *Id*. at 350, 356. The Commission was abolished in 1954. *Id*. at 350. Wiener sued for salary from the date of his removal. *Id*. at 350-51.

Viewing Wiener's case as a "variant" of *Humphrey's Executor*, the Supreme Court held that the War Claims Act implicitly protected him from removal except for cause and that the statute so construed was consistent with Article II. *Wiener*, 357 U.S. at 351; *see id*. at 352-56. The Court noted that *Humphrey's Executor* "explicitly 'disapproved' the expressions in *Myers* supporting the President's inherent constitutional power to remove members of quasi-judicial bodies." *Id*. at 352 (quoting *Humphrey's Ex'r*, 295 U.S. at 626-27). Emphasizing "the intrinsic judicial character of the task with which the Commission was charged"—i.e., adjudicating individual claims based on "evidence and

governing legal considerations"—the Court concluded that "[t]he philosophy of *Humphrey's Executor*" controlled. *Id*. at 355-56.

As I read it, *Wiener* stands for the narrow proposition that the Congress can constitutionally bestow for-cause protection on an officer whose *primary function* is adjudication, given his need for independence. 357 U.S. at 355; *see* The Constitutional Separation of Powers Between the President and Congress, 20 Op. O.L.C. 124, 170 & n.120 (1996) (suggesting *Wiener* is limited to officers "whose only functions are adjudicatory" or at most to officers "whose primary duties involve the adjudication of disputes involving private persons"), perma.cc/DF3R-FFER.

The CFPB is not a quasi-judicial body. Nor does its Director have an "intrinsic judicial character." *Wiener*, 357 U.S. at 355. Nor does the Director have as his primary function the adjudication of disputes. Adjudicative power is only a fraction of his entire authority. He is no less than the czar of consumer finance. In that realm, he is legislator, enforcer *and* judge. *See supra* pp. 16-17, 31-32. James Madison wrote that "[t]he accumulation of all powers legislative, executive, and judiciary in the same hands . . . may justly be pronounced the very definition of tyranny." THE FEDERALIST NO. 47, at 324. The Director's adjudicative power is part of the *reason* he meets Madison's definition of a tyrant. And a tyrant with complete authority over "a vital sector of our economy," *Free Enter. Fund*, 561 U.S. at 508, cannot but threaten the President's faithful execution of the laws in that realm. In my estimation, then, the Director's

adjudicative power does not exempt him from at-will removal.[11]

My colleagues invoke Madison for the opposite conclusion. Maj. Op. 21, 31; Wilkins Concurring Op. 3-5. They point to his statement in the First Congress that "there may be strong reasons why" the Comptroller of the Treasury "should not hold his office at the pleasure of the Executive branch." 1 ANNALS OF CONG. 612. He underscored that the Comptroller—whose "principal duty seems to be deciding upon the lawfulness and justice of the claims and accounts subsisting between the United States and particular citizens"— "partakes strongly of the judicial character." *Id.* at 611-12. For reasons just explained, that observation is inapposite here. It does not describe the CFPB Director, whose "principal duty" consists of far more than adjudicating "claims and accounts" through rote application of existing law.[12]  *Id.*

---

[11]  Two of my colleagues think it significant not just that the Director has adjudicative power but that *this case* involves adjudication rather than enforcement. Wilkins Concurring Op. 1, 3, 8 (joined by Rogers, J.). At best that is an argument for reserving judgment until, in a future case, a regulated party challenges the CFPB's structure in the context of a rulemaking. It is not a basis for giving the agency an all-encompassing stamp of Article II approval in an opinion that does not purport to limit itself to cases involving adjudication. *See generally* Maj. Op. 1-68 (joined by Rogers and Wilkins, JJ.). In any event, no one has cited any authority for the idea that the CFPB's constitutionality may differ case by case, depending on whether and to what extent the Director is wearing his adjudicator's hat.

[12]  My colleagues also neglect the context of Madison's statement. He made it in proposing that the Comptroller have fixed tenure "unless sooner removed by the President," presumably for cause only. 1 ANNALS OF CONG. 612. His colleagues, including

\* \* \* \* \*

In short, the CFPB and its Director have no ancestor in *Humphrey's Executor*, *Morrison* or *Wiener*. Undeterred, the CFPB takes a divide-and-conquer approach to the structural features that in combination differentiate it from any predecessor. It contends that each feature has no constitutional import standing alone and that, collectively, they add up to no problem at all. Oral Arg. Tr. 66-67 ("[W]hen you add them all together you're adding zero plus zero plus zero plus zero, and at the end of the day . . . you're still there with zero."). The apt analogy is not math but chemistry: even if innocuous in isolation, some elements are toxic in combination. *See, e.g.*, THE CAMBRIDGE ENCYCLOPEDIA 328 (D. Crystal ed., 1990) (cyanide, merely carbon plus nitrogen, is deadly); *see also Free Enter. Fund*, 561 U.S. at 496 (second layer of for-cause protection did not only "add to the Board's independence, but transform[ed] it"); *id*. at 509 ("a number of statutory provisions," "working together," "produce[d] a constitutional violation"); *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 721 F.3d 666, 673 (D.C. Cir. 2013) ("[J]ust because

---

his allies, disagreed with the proposal. Theodore Sedgwick, for one, objected that the Comptroller's duties were both sufficiently "important" and sufficiently "Executive" that "the man who has to perform them ought . . . to be dependent upon the President." *Id*. at 613. Likewise, Egbert Benson lamented that Madison's proposal "set[] afloat" what the House had already resolved: namely, that "judges hold their[] [offices] during good behaviour, as established by the Constitution" and that "all others [serve] during pleasure." *Id.* at 614. Madison—who was known to change his mind, *see, e.g.*, KLARMAN, *supra*, at 384, 392-93, 561-66, 574-75, 737 n.300, 799 n.58; David A. O'Neil, *The Political Safeguards of Executive Privilege*, 60 VAND. L. REV. 1079, 1134 & nn.232-35 (2007)—withdrew his proposal the very next day. 1 ANNALS OF CONG. 615.

two structural features raise no constitutional concerns independently does not mean Congress may combine them in a single statute."), *vacated on other grounds*, 135 S. Ct. 1225 (2015).

The CFPB is not the first agency exempt from appropriations. *See Budgetary Autonomy*, *supra*, at 1823 (pointing out, however, that list of other exempt agencies is "short" and "composed of narrowly focused" regulators "operat[ing] in technical sectors"). It is not the first agency headed by a single official or lacking a partisan balance requirement. *See* Datla & Revesz, *supra*, at 793-94 & nn.125, 127 (listing agencies headed by single official); *id.* at 797 (listing agencies with no partisan balance requirement). It is not the first agency with sweeping rulemaking and enforcement powers over an entire sector of the economy—the SEC comes to mind. But the CFPB *is* the only agency that combines each and every one of these elements with for-cause removal protection and a mission to "side" with one segment of the population against others. Neither the Supreme Court nor our Court has upheld anything like it before.

## 2. Diminution of the Presidency

Because the CFPB falls between the existing removal cases, our job is to decide the agency's validity under first principles.[13]

---

[13] I concede that *Myers* and *Free Enterprise Fund* do not squarely dictate the outcome here. The CFPB Director does not resemble a first-class postmaster and Title X does not purport to require the Senate's advice and consent to remove him. Nor is the Director ensconced in multiple layers of for-cause removal protection. Recognizing as much, however, does not negate the textual, structural and functional lessons of *Myers* and *Free*

*Humphrey's Ex'r*, 295 U.S. at 632 (acknowledging possible "field of doubt" between *Myers* and *Humphrey's Executor* and "leav[ing] such cases as may fall within it for future consideration"). So I go back to the beginning. Because "[o]ur Constitution was adopted to enable the people to govern themselves, through their elected leaders," the President "as a general matter" has power to remove the principal officers of an agency—based on "simple disagreement with the [agency's] policies or priorities"—as a means of ensuring that the agency does not "slip from the Executive's control, and thus from that of the people." *Free Enter. Fund*, 561 U.S. at 499, 502, 513; *see id.* at 509 ("Under the traditional default rule, removal is incident to the power of appointment."); *id.* at 513 ("The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so."). If it were otherwise, the President would be "fasten[ed]" to subordinates who "by their lack of loyalty" or "different views of policy" would make it "difficult or impossible" for him to "faithfully execute[]" the laws. *Myers*, 272 U.S. at 131.

To date, the Supreme Court has recognized only one exception to the default rule: *Humphrey's Executor*. The CFPB violates the rule, *see* 12 U.S.C. § 5491(c)(3), and does not fit within the exception, *see supra* pp. 15-28. The question, then, is whether we should stretch the exception to reach the CFPB. That is what my colleagues do today, even if they do not say so. But just as we cannot overrule Supreme Court decisions, *Shea v. Kerry*, 796 F.3d 42, 54 (D.C. Cir. 2015); *see* Tatel Concurring Op. 5, we have no business fundamentally recalibrating them, *Humphries v. Ozmint*, 397 F.3d 206, 225 n.9 (4th Cir. 2005) (en banc) ("we, as judges of

_____

*Enterprise Fund*. They are the best guidance we have about the original and enduring meaning of Article II.

an inferior court, are without liberty to change" Supreme Court "framework"). Even if the FTC and the CFPB were not as dissimilar as I believe they are, I would be loath to cede *any* more of Article II than *Humphrey's Executor* squarely demands. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 525-26 (2009) (opinion of Scalia, J.) ("There is no reason to magnify the separation-of-powers dilemma posed by the headless Fourth Branch . . . ."); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1864 (2017) ("[E]ven a modest extension is still an extension.").

Given the CFPB's novelty, we must "[a]t the very least" "'pause to consider the implications of'" sustaining it. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 550 (2012) (opinion of Roberts, C.J.) (quoting *United States v. Lopez*, 514 U.S. 549, 564 (1995)). The CFPB assures us that "the President has an 80 percent chance . . . to be guaranteed an opportunity to replace the Bureau's Director." Oral Arg. Tr. 49. That is hardly comforting. It means there is a twenty per cent chance the President will have no at-will opportunity to replace the agency's leader—and no real policy influence over the agency—for the *entirety* of the President's four-year term. Furthermore, the odds grow ever larger that the President will have no such opportunity or influence during his first three years, first two years, first year and first hundred days. The President cannot be reduced to appointer-in-chief, *cf. Free Enter. Fund*, 561 U.S. at 502, especially if his appointment power turns on luck of the draw, *see id.* at 500 (separation of powers "cannot be permitted to turn on" "bureaucratic minutiae" (internal quotation omitted)).

Even assuming the CFPB violates Article II only some of the time—a year here, a couple years there—that is not a strong point in its favor. Heedless of the implications for the Presidency, my colleagues plow ahead and sustain the agency

anyway. The case-specific result is disturbing enough: the people will suffer this agency's unnecessary mistakes for years to come. Worse, however, is that the majority's logic invites aggregation. Suppose the Congress over time decides to restructure, say, the FTC, the SEC, the Federal Election Commission (FEC) and the National Labor Relations Board (NLRB) so that each stands outside of the appropriations process and is headed by a single political-minded director removable only for cause and tenured for five years.[14] Or make it seven years. *Cf.* 15 U.S.C. § 41 (tenure for FTC commissioner). Or fourteen years. *Cf.* 12 U.S.C. § 241 (tenure for member of Federal Reserve Board of Governors). Now throw in fourteen years for the CFPB Director. I can discern no reason why the majority would not approve all of that and more if it happened one step at a time. But if the FTC, SEC, FEC, NLRB and CFPB were each headed by a fast-acting partisan director with fourteen years of tenure, the policy havoc they could collectively inflict from within the executive branch without having to answer to the executive would be too much for Article II to bear.

---

[14] This is not a farfetched hypothetical. The principal officers of each agency already have for-cause removal protection. 15 U.S.C. § 41 (expressly providing it for FTC commissioners); *Free Enter. Fund*, 561 U.S. at 487 (assuming, even absent express provision, that SEC commissioners have it); *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (same as to FEC commissioners); 29 U.S.C. § 153(a) (expressly providing it for NLRB members). Also, the principal officers of each agency already enjoy tenure of at least five years. 15 U.S.C. § 41 (seven years for FTC commissioners); 15 U.S.C. § 78d(a) (five years for SEC commissioners); 52 U.S.C. § 30106(a)(2)(A) (six years for FEC commissioners); 29 U.S.C. § 153(a) (five years for NLRB members).

The erosion of Presidential responsibility, no less than the "accretion" of Presidential power, can be "dangerous" even when it "does not come in a day." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594 (1952) (Frankfurter, J., concurring); *see Free Enter. Fund*, 561 U.S. at 497 ("[I]f allowed to stand, this dispersion of responsibility could be multiplied."); *id*. at 499 ("[W]here, in all this, is the role for oversight by an elected President?"). I would draw the line right here and now.

### 3. Lack of accountability

If forced to expand the *Humphrey's Executor* exception, I would limit it to an agency that answers in *some* meaningful way to the policy oversight of at least one political branch. *See Myers*, 272 U.S. at 131-32 (emphasizing need for "chain" of "responsibility" from appointed officers to populace (quoting 1 ANNALS OF CONG. 499, 523 (statements of James Madison and Theodore Sedgwick))); *see also Free Enter. Fund*, 561 U.S. at 501 ("The Framers created a structure in which '[a] dependence on the people' would be the 'primary controul on the government.'" (quoting THE FEDERALIST NO. 51, at 349 (James Madison)))); *McCulloch*, 17 U.S. (4 Wheat.) at 405 (ours is "a government of the people"). The CFPB fails even this minimal test of accountability. The agency and its proponents cite a grab bag of purported checks on the agency's authority but none is an adequate substitute for removal at the President's will.[15]

---

[15] In my view, there is *no* constitutionally appropriate stand-in for the President's removal power. *See Horne v. USDA*, 135 S. Ct. 2419, 2428 (2015) (because Constitution "is concerned with means as well as ends," court cannot permit "shorter cut than the constitutional way" (internal quotation omitted)). But because the majority downgrades at-will removal to a congressional benefaction,

*First*, the Congress's ability to restructure the CFPB is not an adequate substitute check. *Contra, e.g.*, CFPB Br. 28 n.8 (emphasizing that Congress can pass legislation subjecting CFPB to appropriations process); Amicus Br. of Americans for Financial Reform et al. 15 (pointing out that Congress can amend "organic statute" if it wants to "revisit[]" agency's design).

In *Free Enterprise Fund*, the Supreme Court rejected the contention that the SEC's functional control over the Public Company Accounting Oversight Board "blun[ted] the constitutional impact of for-cause removal." 561 U.S. at 504 (internal quotation omitted). The Court explained that "altering the budget or powers of an agency as a whole is a problematic way to control an inferior officer. The [SEC] cannot wield a free hand to supervise individual members if it must destroy the Board in order to fix it." *Id.*

The Court's reasoning applies with equal force to the Congress's ability to restructure the CFPB. *See* Oral Arg. Tr. 34, *Free Enter. Fund v. PCAOB*, S. Ct. No. 08-861 (Dec. 7, 2009) (Justice Scalia: "I'm not sure that [the Congress's] ability to take away responsibility . . . from an agency is the same as *controlling* what authority that agency does exercise." (emphasis added)). Refashioning the agency as a whole is a ham-handed way to monitor the Director's handling of a specific policy matter. Similarly, *threatening* to alter the agency does not give the Congress much leverage either. Any Director with the political instinct for the job knows that, nowadays especially, transformative legislation is akin to a bolt of lightning. *See Perry v. MSPB*, 137 S. Ct. 1975, 1990 (2017) (Gorsuch, J., dissenting) ("[T]he demands of bicameralism and

_____

we should at least require the Congress to devise a second-best way of ensuring the CFPB answers to the people.

presentment are real and the process can be protracted. [And] the difficulty of making new laws isn't some bug in the constitutional design; it's the point of the design . . . ."); *Budgetary Autonomy*, *supra*, at 1831-32 (describing hurdles such as "crowded agenda," "filibuster" and need for "support of congressional leadership"). At all events, an otherwise invalid agency is no less invalid merely because the Congress can fix it at some undetermined point in the future.

*Second*, judicial review under the Administrative Procedure Act is not a meaningful substitute check. *Contra, e.g.*, Amicus Br. of Americans for Financial Reform et al. 15. Some of the CFPB's excesses will "occur[] in the twilight of judicially unreviewable discretion." *PHH Corp.*, 839 F.3d at 35; *see Chevron*, 467 U.S. at 844-45; 12 U.S.C. §§ 5512(b)(4)(B), 5581(b)(5)(E)(ii); 15 U.S.C. § 1693b(e)(1). And even if the courts could review de novo everything the CFPB does, that would not suffice for today's purpose. The chain of responsibility from the agency to the judiciary does not then link to the people. Federal judges "have no constituency," *Chevron*, 467 U.S. at 866, and are therefore no proxy for the people's representatives in deciding consumer-finance policy, *TVA v. Hill*, 437 U.S. 153, 195 (1978) (courts decide legal questions, leaving it to "political branches" to decide "what accords with common sense and the public weal" (internal quotation omitted)).

*Third*, procedural requirements associated with CFPB rulemaking are not a meaningful substitute check. *Contra, e.g.*, Amicus Br. of Financial Regulation Scholars 23. Granted, the agency must adhere to notice-and-comment procedures, 5 U.S.C. §§ 500(a)(1), 551, 553; must "consider" the costs and benefits of proposed rules, 12 U.S.C. § 5512(b)(2)(A); and must "consult" with other financial regulators about the rules, *id.* § 5512(b)(2)(B). But

rulemaking requirements cannot constrain the CFPB when it formulates policy through an enforcement action rather than rulemaking. The CFPB has done this a lot, perhaps because of the rulemaking requirements. *See* Dep't of Treasury, *Economic Opportunities*, *supra*, at 82-83 (describing CFPB's "[e]xcessive reliance on enforcement actions, rather than rules and guidance, to regulate conduct"). Notably, the CFPB has initiated no rulemaking to explain to the regulated public, ex ante, what the agency will deem "an unfair, deceptive, or abusive act or practice." 12 U.S.C. § 5531(a). Nor is there any indication in the briefs or the record before us that the agency has any plans to change its know-it-when-we-see-it approach. *See* CFPB, *Prepared Remarks of CFPB Director Richard Cordray at the Consumer Bankers Association* (Mar. 9, 2016) (suggesting that CFPB's critics "set[] the bar too high" in expecting agency to "think through and explicitly articulate rules for every eventuality" before initiating enforcement actions), perma.cc/79TC-BQMA.

*Fourth*, and finally, the threat of supermajority veto by the Financial Stability Oversight Council is not a meaningful substitute check. *Contra, e.g.*, Amicus Br. of Financial Regulation Scholars 23; Wilkins Concurring Op. 13-15. The Council (another unelected body) can "set aside a final regulation" of the CFPB only if the regulation "would put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk." 12 U.S.C. § 5513(a). As far as the Council is concerned, then, the CFPB can break the law or abuse its power as long as it does so (1) in an enforcement action or (2) in a regulation that does not threaten national financial ruin.

A recent episode illustrates how toothless the Council's veto is in controlling CFPB policy. In July 2017, the CFPB finalized one of its most controversial policies to date: a rule

prohibiting certain providers from entering arbitration agreements with consumers to stave off class actions. CFPB, *Final Rule: Arbitration Agreements* (July 10, 2017), perma.cc/N3JH-573A. The acting Comptroller of the Currency, one of the Council's ten voting members, 12 U.S.C. § 5321(b)(1)(C), sought data so that he could determine the rule's "safety and soundness implications." Letter from Keith Noreika to Richard Cordray (July 17, 2017), perma.cc/3X6D-YZS6. In response, the CFPB Director asserted that, because the rule's projected impact is "less than $1 billion per year," it is "plainly frivolous" to suggest the rule "poses a safety and soundness issue." Letter from Richard Cordray to Keith Noreika (July 18, 2017), perma.cc/76MU-39PC. The Director also implied that the Comptroller was "distort[ing] the FSOC process" because of a mere "disagree[ment] with the policy judgments for the rule." *Id*.

The rule was published in the Federal Register the next day.[16] Arbitration Agreements, 82 Fed. Reg. 33210 (July 19, 2017). The fact that anyone mentions the Council's narrow

---

[16] A few months later, the Congress passed and the President signed a joint resolution that disapproves the rule. Joint Resolution of Nov. 1, 2017, Pub. L. No. 115-74, 131 Stat. 1243, perma.cc/U4GE-6W72. The Congress acted pursuant to the Congressional Review Act (CRA), 5 U.S.C. §§ 801 *et seq.*, which authorizes it to disapprove an agency rule by simple majority in both Houses within 60 legislative days after the agency submits the rule. *See* Daniel Cohen & Peter L. Strauss, *Congressional Review of Agency Regulations*, 49 ADMIN. L. REV. 95, 96-102 (1997) (detailing CRA's provisions and procedures). Regarding the CFPB, the CRA is not an adequate substitute for at-will removal, especially in light of its inapplicability to enforcement actions.

veto as a check is instead a testament to the CFPB's unaccountable policymaking power.

## II. THE FOR-CAUSE REMOVAL PROVISION CANNOT BE SEVERED FROM THE REST OF TITLE X

Judge Kavanaugh and I agree that Title X's for-cause removal provision, 12 U.S.C. § 5491(c)(3), is unconstitutional. But he would excise section 5491(c)(3) and preserve the rest of Title X. Kavanaugh Dissenting Op. 68-73. I respectfully disagree with that approach. Above all else, the 111th Congress wanted the CFPB to be independent: free, that is, from industry influence and the changing political tides that come with accountability to the President. Severing section 5491(c)(3) would yield an executive agency entirely at odds with the legislative design. In my view, the Congress would not have enacted Title X in its current form absent for-cause removal protection. I believe, therefore, that the appropriate remedy for the CFPB's Article II problem is to invalidate Title X in its entirety.[17]

---

[17] I recognize that severability is to be considered "when confronting a constitutional flaw in a statute," *Free Enter. Fund*, 561 U.S. at 508 (internal quotation omitted), and that my colleagues in the majority find no such flaw in Title X. I nonetheless address severability because it bears on my threshold view that we must decide the Article II question in light of the relief PHH now seeks: vacatur without remand and cessation of any further proceedings. *See supra* note 3; *cf. INS v. Chadha*, 462 U.S. 919, 931-36 (1983) (addressing severability at threshold because it bore on standing).

## A. THE LAW OF SEVERABILITY

When remedying a constitutional defect, a court should not "nullify more of a legislature's work than is necessary" because the "ruling of unconstitutionality" already "frustrates the intent of the elected representatives of the people." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006) (internal quotation omitted). Neither, however, should the court use the severability doctrine to "rewrit[e]" an unconstitutional statute because that also "circumvent[s] the intent of the legislature." *Id*. at 329-30 (internal quotation omitted); *see Free Enter. Fund*, 561 U.S. at 510 (doctrine does not give court "editorial freedom"); *United States v. Reese*, 92 U.S. 214, 221 (1875) (court cannot "introduce words" into statute).

With those competing considerations in mind, the court must ask whether the statute minus any invalid provision "will function in a *manner* consistent with the intent of Congress" and "is legislation that Congress would . . . have enacted." *Alaska Airlines*, 480 U.S. at 685 (emphasis in original). If the answer to either component of the question is no, the invalid provision cannot be severed. *Id*. In deciding the question, the court looks to the statute's "language," "structure" and "legislative history." *Id*. at 687; *see, e.g.*, *id*. at 687-97 (weighing all three); *Regan v. Time, Inc.*, 468 U.S. 641, 652-55 (1984) (plurality opinion) (same); *INS v. Chadha*, 462 U.S. 919, 931-35 (1983) (same); *see also* 2 NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES & STATUTORY CONSTRUCTION § 44:3, at 591-92 (7th ed. 2009) (noting related factors such as "circumstances" of enactment and "object" of statute).

A severability clause can be probative of legislative intent but it is by no means dispositive. *Dorchy v. Kansas*, 264 U.S.

286, 290 (1924) ("[I]t is an aid merely; not an inexorable command."); *see United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968) ("[T]he ultimate determination of severability will rarely turn on the presence or absence of such a clause."); 2 SINGER & SINGER, *supra*, § 44:8, at 627 ("Because of the frequency with which it is used, the separability clause is regarded as little more than a mere formality.").  In the federal courts, a severability clause creates only a rebuttable "presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *Alaska Airlines*, 480 U.S. at 686; *see Dorchy*, 264 U.S. at 290 (treating severability clause as "a rule of construction").  Thus, the Supreme Court sometimes declines to sever an invalid provision despite a severability clause.  *See, e.g.*, *City of Akron v. Akron Ctr. for Reprod. Health, Inc.*, 462 U.S. 416, 425 n.8, 445-46 n.37 (1983), *overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 83-84 (1976); *Sloan v. Lemon*, 413 U.S. 825, 833-35 (1973); *Hill v. Wallace*, 259 U.S. 44, 70-71 (1922).

## B.  INDEPENDENCE AS *SINE QUA NON* OF TITLE X

At the outset of Title X, the Congress "established" the CFPB as "an independent bureau."  12 U.S.C. § 5491(a).[18] The Supreme Court has long used the term "independent

---

[18]    Section 5491(a) also says that the CFPB "shall be considered an Executive agency, as defined in section 105 of Title 5."  All that really means, however, is that the agency is an arm of the federal government: for the purpose of 5 U.S.C. § 105, an "Executive agency" includes not only "an Executive department" but also "a Government corporation" and "an independent establishment."

agenc[y]" to describe an agency run by principal officers sheltered from the "President's power to remove." *Buckley*, 424 U.S. at 136; *see, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 725 n.4 (1986). Significantly, the Court used the same definition in *Free Enterprise Fund* just a few weeks before the Congress enacted Title X. 561 U.S. at 483 ("Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause."). Because we are to assume the Congress is familiar with Supreme Court precedents—especially the "unusually important" ones, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 699 (1979)—"an independent bureau" is best understood to mean the kind of agency *Free Enterprise Fund* described: one whose principal officer enjoys for-cause removal protection.

In other words, section 5491(a) ties the CFPB's very existence to its freedom from the President. That is powerful evidence the Congress opposed the idea of a CFPB answerable to him. Other statutory features reinforce the conclusion.

As discussed earlier, the Congress transferred to the CFPB the authority to enforce and issue rules under eighteen existing laws previously administered by seven different federal agencies. 12 U.S.C. §§ 5481(12), 5512(b)(4), 5581. A majority of those agencies are themselves more or less free from Presidential control. *Id.* § 5581(a)(2)(A) (Federal Reserve Board of Governors, Federal Deposit Insurance Corporation, FTC and National Credit Union Administration). Reinventing the CFPB as an executive agency through excision of section 5491(c)(3) would by judicial decree transfer to the executive branch far-reaching new powers that, before Title X, resided with several non-executive agencies.

Even if that result might be worth cheering for the purpose of accountability, it is not what the Congress had in mind. The floor statements in support of Title X highlighted, more than any other consideration, the CFPB's need for independence. *See, e.g.*, 156 CONG. REC. 2052 (2010) (statement of Rep. Tsongas); *id.* at 3187 (statement of Sen. Kaufman); *id.* at 6237, 6365, 7015 (statements of Sen. Whitehouse); *id.* at 6240 (statement of Sen. Franken); *id.* at 6990 (statement of Sen. Reid); *id.* at 7481, 7485-86, 8931 (statements of Sen. Dodd); *id.* at 9447 (statement of Rep. Kilroy); *id.* at 9839 (statement of Rep. Holt); *id.* at 11814 (statement of Rep. Lee); *id.* at 12434 (statement of Rep. Maloney); *id.* at 13135 (statement of Sen. Cardin).

Likewise, in this Court, the CFPB's strongest backers have repeatedly emphasized its independence as a *sine qua non*. *See, e.g.*, Amicus Br. of Current and Former Members of Congress Supporting Rehearing En Banc 2 ("By . . . severing the provision that made [the] Director removable only for cause, the panel decision fundamentally altered the CFPB and hampered its ability to function as Congress intended."); Amicus Br. of Americans for Financial Reform et al. 2-3 ("The Bureau's independence has been critical to its ability to remain a steadfast enforcer of the consumer protection laws despite massive political opposition from the financial industry."); Amicus Br. of Financial Regulation Scholars 17-18 ("Regulated industries are likely to bring concentrated political pressure to bear on the White House to influence an agency whose head is subject to at-will removal to adjust policy in favor of the industry."); *cf.* Maj. Op. 16, 68 (Congress sought to "insulat[e]" CFPB "from political winds and [P]residential will" but panel majority, by excising section 5491(c)(3), "effectively turned the CFPB into an instrumentality of the President").

Indeed, the Congress so valued the CFPB's independence that it forfeited its *own* oversight by exempting the agency from appropriations. The intent, as the CFPB's architects made plain, was to give the agency watertight freedom from *both* of the elected branches, lest the agency's mission be compromised by shifting popular will, the "financial . . . industry lobby" or "legislative micromanaging." Warren, *Unsafe at Any Rate*, *supra*; *see, e.g.*, S. REP. NO. 111-176, at 163 (finding that "adequate funding, independent of the Congressional appropriations process, is absolutely essential" to CFPB's "independent operations"); 156 CONG. REC. 8931 (statement of Sen. Dodd) ("[T]he [CFPB's] funding will be independent and reliable so that its mission cannot be compromised by political maneuvering.").[19]

The upshot is that excising section 5491(c)(3) would yield a mutant CFPB responsive to the President—and hence to majoritarian politics and lobbying—*but nowise accountable to the Congress*. Where, as here, severing a statutory provision "alters the balance of powers between the Legislative and Executive Branches," we must consider whether our effective "delegation[] of power to the Executive . . . may have been so controversial or so broad that Congress would have been

---

[19] Title X's proponents modeled the CFPB in part on the Consumer Product Safety Commission. *See, e.g.*, Warren, *Unsafe at Any Rate*, *supra*; 156 CONG. REC. 6219 (statement of Sen. Dodd); *id.* at 6237 (statement of Sen. Whitehouse); *id.* at 6239 (statement of Sen. Merkley); *id.* at 6363 (statement of Sen. Durbin). But they also learned a lesson from the Commission: because it is subject to appropriations, it answers to "budgetary politics" and has long suffered policy-based cuts. HARRIS & MILKIS, *supra*, at 124; *see, e.g.*, *id.* (describing cuts under President Reagan); Eric Lipton, *Safety Agency Faces Scrutiny Amid Changes*, N.Y. TIMES, Sept. 2, 2007 (describing cuts under President George W. Bush), nyti.ms/2jKal6h.

unwilling to make the delegation without a strong oversight mechanism." *Alaska Airlines*, 480 U.S. at 685 (considering severability of legislative veto). After all, "one branch's handicap is another's strength" and vice versa. *Free Enter. Fund*, 561 U.S. at 500.

A CFPB responsive to the President would have been too "controversial" to pass the 111th Congress. *Alaska Airlines*, 480 U.S. at 685. At the very least it would not have passed absent "strong oversight" via the appropriations process. *Id.* But we judges cannot subject the agency to appropriations; to do so would be to "blue-pencil" still more of Title X, *Free Enter. Fund*, 561 U.S. at 509, and potentially introduce new provisions of our own. Nor can we convert the agency into a multimember commission. True, in contrast to a CFPB responsive to the President, a multimember CFPB "would deviate less radically from Congress' intended system." *United States v. Booker*, 543 U.S. 220, 247 (2005); *see* Amicus Br. of Current and Former Members of Congress Supporting CFPB 17-20 (Congress seriously considered multimember structure). Yet that alternative, too, would be a rewrite for the Congress and not the courts. *See Free Enter. Fund*, 561 U.S. at 509-10; *Ayotte*, 546 U.S. at 329-30; *Reese*, 92 U.S. at 221.

The best argument for excising section 5491(c)(3) is Dodd-Frank's severability clause, 12 U.S.C. § 5302, but it does not change my view. Appearing in the mega Dodd-Frank legislation 574 pages before section 5491(c)(3), *see* 124 Stat. at 1390, 1964, section 5302 provides in relevant part that "[i]f any provision of this Act . . . is held to be unconstitutional, the remainder of this Act . . . shall not be affected thereby." The clause says nothing specific about Title X, let alone the CFPB's independence, let alone for-cause removal, let alone the massive transfer of power inherent in deleting section 5491(c)(3), let alone whether the Congress would have

endorsed that transfer of power even while subjecting the CFPB to the politics of Presidential control. Instead, as one of Dodd-Frank's architects said decades earlier of a materially identical clause: "This is just boilerplate severability." 134 CONG. REC. 12280 (1988) (statement of Rep. Frank). Thus, beyond the standard presumption that section 5302 creates, *see Alaska Airlines*, 480 U.S. at 686, it tells us little about how the Congress would deal with invalidation of section 5491(c)(3) in particular, *see* Max Radin, *A Short Way With Statutes*, 56 HARV. L. REV. 388, 419 (1942) ("Are we really to imagine that the legislature . . . weighed each paragraph literally and c[a]me to the conclusion that it would have enacted that paragraph if all the rest of the statute were invalid?").

For reasons already stated, the presumption of severability is rebutted here. A severability clause "does not give the court power to amend" a statute. *Hill*, 259 U.S. at 71. Nor is it a license to cut out the "heart" of a statute. *Cf. Alaska Airlines*, 480 U.S. at 691. Because section 5491(c)(3) is at the heart of Title X, I would strike Title X in its entirety.

\* \* \* \* \*

As a guarantor of self-government, Article II has always been "one of the Constitution's best provisions." Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. ILL. L. REV. 701, 725 (quoting 1788 North Carolina ratification debate) (brackets omitted). But it suffers a major defeat today and will suffer more if today's decision stands. In my view, the CFPB violates Article II and should be invalidated top to bottom.

Accordingly, I dissent.

KAVANAUGH, *Circuit Judge*, with whom *Senior Circuit Judge* RANDOLPH joins, dissenting:

## INTRODUCTION AND SUMMARY

This is a case about executive power and individual liberty.

To prevent tyranny and protect individual liberty, the Framers of the Constitution separated the legislative, executive, and judicial powers of the new national government. To further safeguard liberty, the Framers insisted upon accountability for the exercise of executive power. The Framers lodged full responsibility for the executive power in a President of the United States, who is elected by and accountable to the people. The first 15 words of Article II speak with unmistakable clarity about who controls the executive power: "The executive Power shall be vested in a President of the United States of America." U.S. CONST. art. II, § 1. And Article II assigns the President alone the authority and responsibility to "take Care that the Laws be faithfully executed." *Id.* § 3. The purpose "of the separation and equilibration of powers in general, and of the unitary Executive in particular, was not merely to assure effective government but to preserve individual freedom." *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting).

Of course, the President executes the laws with the assistance of subordinate executive officers who are appointed by the President, often with the advice and consent of the Senate. To carry out the executive power and be accountable for the exercise of that power, the President must be able to supervise and direct those subordinate officers. In its landmark decision in *Myers v. United States*, 272 U.S. 52 (1926), authored by Chief Justice and former President Taft, the Supreme Court recognized the President's Article II

authority to supervise, direct, and remove at will subordinate officers in the Executive Branch.

In 1935, however, the Supreme Court carved out an exception to *Myers* and Article II by permitting Congress to create *independent* agencies that exercise executive power. *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935). An agency is "independent" when the agency's commissioners or board members are removable by the President only for cause, not at will, and therefore are not supervised or directed by the President. Examples of independent agencies include well-known bodies such as the Federal Trade Commission, the Federal Communications Commission, the Securities and Exchange Commission, the National Labor Relations Board, and the Federal Energy Regulatory Commission.

Those and other independent agencies exercise executive power by bringing enforcement actions against private citizens. Those agencies often promulgate legally binding regulations pursuant to statutes enacted by Congress, and they adjudicate disputes involving private parties. So those agencies exercise executive, quasi-legislative, and quasi-judicial power.

The independent agencies collectively constitute, in effect, a headless fourth branch of the U.S. Government. They hold enormous power over the economic and social life of the United States. Because of their massive power and the absence of Presidential supervision and direction, independent agencies pose a significant threat to individual liberty and to the constitutional system of separation of powers and checks and balances.

To mitigate the risk to individual liberty, the independent agencies historically have been headed by *multiple*

commissioners or board members. In the Supreme Court's words, each independent agency has traditionally been established as a "body of experts appointed by law and informed by experience." *Humphrey's Executor*, 295 U.S. at 624. Multi-member independent agencies do not concentrate all power in one unaccountable individual, but instead divide and disperse power across multiple commissioners or board members. The multi-member structure thereby reduces the risk of arbitrary decisionmaking and abuse of power, and helps protect individual liberty.

In other words, the heads of *executive* agencies are accountable to and checked by the President; and the heads of *independent* agencies, although not accountable to or checked by the President, are at least accountable to and checked by their fellow commissioners or board members. No independent agency exercising substantial executive authority has ever been headed by *a single person*.

Until now.

In the Dodd-Frank Act of 2010, Congress created a new independent agency, the Consumer Financial Protection Bureau. As originally proposed by then-Professor and now-Senator Elizabeth Warren, the CFPB was to be another traditional, multi-member independent agency. The initial Executive Branch proposal from President Obama's Administration likewise envisioned a multi-member independent agency. The House-passed bill sponsored by Congressman Barney Frank and championed by Speaker Nancy Pelosi also contemplated a multi-member independent agency.

But Congress ultimately departed from the Warren and Executive Branch proposals, and from the House bill

sponsored by Congressman Frank. Congress established the CFPB as an independent agency headed not by a multi-member commission but rather by a single Director.

The Director of the CFPB wields enormous power over American businesses, American consumers, and the overall U.S. economy. The Director unilaterally implements and enforces 19 federal consumer protection statutes, covering everything from home finance to student loans to credit cards to banking practices.

The Director *alone* may decide what rules to issue. The Director *alone* may decide how to enforce, when to enforce, and against whom to enforce the law. The Director *alone* may decide whether an individual or entity has violated the law. The Director *alone* may decide what sanctions and penalties to impose on violators of the law.

Because the CFPB is an independent agency headed by a single Director and not by a multi-member commission, the Director of the CFPB possesses more unilateral authority – that is, authority to take action on one's own, subject to no check – than any single commissioner or board member in any other independent agency in the U.S. Government. Indeed, other than the President, the Director enjoys more unilateral authority than any other official in any of the three branches of the U.S. Government.

That combination – power that is massive in scope, concentrated in a single person, and unaccountable to the President – triggers the important constitutional question at issue in this case.

The petitioner here, PHH, is a mortgage lender and was the subject of a CFPB enforcement action that resulted in a $109

million sanction.   In seeking to vacate the CFPB's order, PHH argues that the CFPB's novel structure – an independent agency headed by a single Director – violates Article II of the Constitution.   I agree with PHH.

Three considerations inform my Article II analysis: history, liberty, and Presidential authority.

*First*, history.   In separation of powers cases, the Supreme Court has repeatedly emphasized the significance of historical practice.   *See, e.g.*, *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014); *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010).   The single-Director structure of the CFPB represents a gross departure from settled historical practice.   Never before has an independent agency exercising substantial executive authority been headed by just one person.   That history matters.   In *Free Enterprise Fund*, in invalidating the novel structure of another newly created independent agency, the Public Company Accounting Oversight Board, the Supreme Court stated:   "Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity."   *Id.* at 505.   Here too:   Perhaps the most telling indication of the severe constitutional problem with the CFPB is the lack of historical precedent for this entity.

*Second*, liberty.   The CFPB's concentration of enormous power in a single unaccountable, unchecked Director poses a far greater risk of arbitrary decisionmaking and abuse of power, and a far greater threat to individual liberty, than a multi-member independent agency does.   The overarching constitutional concern with independent agencies is that the agencies exercise executive power but are unchecked by the President, the official who is accountable to the people and who is responsible under Article II for the exercise of executive

power. In lieu of Presidential control, the multi-member structure of independent agencies operates as a critical substitute check on the excesses of any individual independent agency head. This new agency, the CFPB, lacks that critical check, yet still wields vast power over American businesses and consumers. This "wolf comes as a wolf." *Morrison*, 487 U.S. at 699 (Scalia, J., dissenting).

*Third*, Presidential authority. The single-Director CFPB diminishes the President's Article II authority to control the Executive Branch more than traditional multi-member independent agencies do. In comparable multi-member independent agencies such as the Federal Trade Commission (to which the CFPB repeatedly compares itself), the President ordinarily retains power to designate the chairs of the agencies and to remove chairs at will from the chair position. As a result, Presidents can maintain at least some influence over the general direction of the agencies. Soon after a new President enters office, the new President typically designates new chairs. Those independent agencies therefore flip to control by chairs who are aligned with the new President. For example, shortly after he took office on January 20, 2017, President Trump designated new Chairs of the Federal Trade Commission, the Federal Communications Commission, the Securities and Exchange Commission, and the National Labor Relations Board, among others. President Obama did the same within a few weeks of taking office in 2009.

A President possesses far less influence over the single-Director CFPB. The single CFPB Director serves a fixed five-year term and, absent good cause, may not be replaced by the President, even by a newly elected President. The upshot is that a President may be stuck for years with a CFPB Director who was appointed by the prior President and who vehemently opposes the current President's agenda. To illustrate, upon

taking office in January 2017, the President could not appoint a new Director of the CFPB, at least absent good cause for terminating the existing Director. It will get worse in the future. Any new President who is elected in 2020, 2024, or 2028 may spend a majority of his or her term with a CFPB Director who was appointed *by a prior President*. That does not happen with the chairs of the traditional multi-member independent agencies. That dramatic and meaningful difference vividly illustrates that the CFPB's novel single-Director structure diminishes Presidential power more than traditional multi-member independent agencies do.

In sum, because of the consistent historical practice in which independent agencies have been headed by multiple commissioners or board members; because of the serious threat to individual liberty posed by a single-Director independent agency; and because of the diminution of Presidential authority caused by this single-Director independent agency, I conclude that the CFPB violates Article II of the Constitution. Under Article II, an independent agency that exercises substantial executive power may not be headed by a single Director. As to remedy, I agree with the United States as amicus curiae: The Supreme Court's *Free Enterprise Fund* decision and the Court's other severability precedents require that we sever the CFPB's for-cause provision, so that the Director of the CFPB is supervised, directed, and removable at will by the President.

## I.  HISTORY

I begin by describing the history of independent agencies in general and of the CFPB in particular.  That history demonstrates that, in order to comply with Article II, independent agencies exercising substantial executive power must be structured as multi-member agencies.

### A

As the Supreme Court has explained, our Constitution "was adopted to enable the people to govern themselves, through their elected leaders," and the Constitution "requires that a President chosen by the entire Nation oversee the execution of the laws."  *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 499 (2010).  Article II of the Constitution provides quite simply: "The executive Power shall be vested in a President of the United States of America."  U.S. CONST. art. II, § 1.  And Article II assigns the President alone the authority and responsibility to "take Care that the Laws be faithfully executed."  *Id.* § 3.  Article II makes "emphatically clear from start to finish" that the President is "personally responsible for his branch."  AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 197 (2005).

To exercise the executive power, the President must be assisted by subordinates.  The Framers anticipated and provided for executive departments, and for officers (principal and inferior) in those departments who would assist the President. *See* U.S. CONST. art. II, § 2.  In 1789, soon after being sworn in, the First Congress established new executive Departments of Foreign Affairs, War, and Treasury, and created various offices in those new Departments.

In order to control the exercise of executive power and take care that the laws are faithfully executed, the President must be able to supervise and direct those subordinate executive officers. As James Madison stated during the First Congress, "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 ANNALS OF CONGRESS 463 (Madison) (1789) (Joseph Gales ed., 1834); *see also* Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1215 (2014) ("The text and structure of Article II provide the President with the power to control subordinates within the executive branch.").

To supervise and direct executive officers, the President must be able to remove those officers at will. Otherwise, a subordinate could ignore the President's supervision and direction without fear, and the President could do nothing about it. *See Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey.").

The Article II chain of command therefore depends on the President's removal power. As James Madison explained during the First Congress: "If the President should possess alone the power of removal from office, those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." 1 ANNALS OF CONGRESS 499 (Madison).

In 1789, the First Congress confirmed that Presidents may remove executive officers at will. As the Supreme Court has explained: "The removal of executive officers was discussed

extensively in Congress when the first executive departments were created. The view that 'prevailed, as most consonant to the text of the Constitution' and 'to the requisite responsibility and harmony in the Executive Department,' was that the executive power included a power to oversee executive officers through removal." *Free Enterprise Fund*, 561 U.S. at 492 (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), 16 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS 893 (2004)). That Decision of 1789 "soon became the settled and well understood construction of the Constitution." *Free Enterprise Fund*, 561 U.S. at 492.

To summarize: "The Constitution that makes the President accountable to the people for executing the laws also gives him the power to do so. That power includes, as a general matter, the authority to remove those who assist him in carrying out his duties. Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 513-14.

But that bedrock constitutional principle was challenged in the late 1800s and the early 1900s. As part of the Progressive Movement and an emerging belief in expert, apolitical, and scientific answers to certain public policy questions, Congress began creating new agencies that were independent of the President but that exercised combined powers: the executive power of enforcement, the legislative power of issuing binding legal rules, and the judicial power of deciding adjudications and appeals. The heads of those independent agencies were removable by the President only for cause, not at will, and were neither supervised nor directed by the President. Some early examples included the Interstate Commerce Commission (1887) and the Federal Trade Commission (1914). Importantly, the independent agencies were multi-member

bodies: They were designed as non-partisan expert agencies that could neutrally and impartially issue rules, initiate law enforcement actions, and conduct or review administrative adjudications.

The constitutionality of those independent agencies was called into doubt by the Supreme Court in the 1926 *Myers* decision written by Chief Justice and former President Taft. In that case, the Supreme Court ruled that, under Article II, the President must be able to supervise, direct, and remove at will executive officers. The Court stated: When "the grant of the executive power is enforced by the express mandate to take care that the laws be faithfully executed, it emphasizes the necessity for including within the executive power as conferred the exclusive power of removal." *Myers v. United States*, 272 U.S. 52, 122 (1926).

The *Myers* Court's articulation of the President's broad removal power appeared to mean that Congress could no longer create independent agencies. Indeed, Congress itself read *Myers* that way. For several years after *Myers*, Congress therefore did not create any new agencies whose heads were protected by for-cause removal provisions.

In the 1930s, based on his reading of Article II and buoyed by *Myers*, President Franklin Roosevelt vigorously challenged the notion of independent agencies. President Roosevelt did not necessarily object to the *existence* of the agencies; rather, he objected to the President's lack of control over the agencies.

The issue came to a head in President Roosevelt's dispute with William E. Humphrey, a commissioner of the Federal Trade Commission. Commissioner Humphrey was a Republican holdover from the Hoover Administration who, in President Roosevelt's view, was too sympathetic to big

business and too hostile to the Roosevelt Administration's regulatory agenda. Asserting his authority under Article II, President Roosevelt fired Commissioner Humphrey. Humphrey contested the removal (and after Humphrey's death, his representative continued the litigation in order to obtain back pay). Humphrey's representative argued that Humphrey was protected against firing by the statute's for-cause removal provision, and further argued that Congress could create independent agencies without violating Article II. The case reached the Supreme Court in 1935.

At its core, the *Humphrey's Executor* case raised the question whether Article II permitted independent agencies. Representing President Roosevelt, the Solicitor General contended that Congress could not create *independent* agencies. The Solicitor General relied on the text and history of Article II, as well as the Supreme Court's 1926 decision in *Myers*. But notwithstanding Article II and *Myers*, the Supreme Court upheld the constitutionality of independent agencies – an unexpected decision that incensed President Roosevelt and helped trigger his ill-fated court reorganization proposal in 1937. *See Humphrey's Executor v. United States*, 295 U.S. 602, 631-32 (1935).

In allowing independent agencies, the *Humphrey's Executor* Court emphasized that the Federal Trade Commission was intended "to be non-partisan" and "to exercise the trained judgment of a body of experts appointed by law and informed by experience." *Id.* at 624. Those characteristics, among others, led the Court to conclude that Congress could create an independent agency "wholly disconnected from the executive department," except in its selection. *Id.* at 630, 625. According to the Court, Congress could limit the President's power to remove the commissioners of the Federal Trade Commission and, by extension, Congress

could limit the President's power to remove the commissioners and board members of similar independent agencies. *Id.* at 628-30.

Ever since the 1935 *Humphrey's Executor* decision, independent agencies have played a significant role in the U.S. Government. The independent agencies possess extraordinary authority over vast swaths of American economic and social life – from securities to antitrust to telecommunications to labor to energy. The list goes on.

Importantly, however, each of the independent agencies has traditionally operated – and each continues to operate – as a multi-member "body of experts appointed by law and informed by experience." *Id.* at 624. Independent agencies are not headed by single Directors. As Professor Amar has explained, "the Decision of 1789" has remained controlling, at least to the extent that the Decision "established that in all one-headed departments, the department head must be removable at will by the president." AKHIL REED AMAR, AMERICA'S UNWRITTEN CONSTITUTION 323 (2012).

The independent agency at issue here, the CFPB, arose out of an idea originally advanced by then-Professor and now-Senator Elizabeth Warren. In 2007, concerned about balkanized and inconsistent federal law enforcement of consumer protection statutes, Professor Warren encouraged Congress to create a new independent agency, a Financial Product Safety Commission. This new agency would centralize and unify federal law enforcement efforts to protect consumers. *See* Elizabeth Warren, *Unsafe at Any Rate: If It's Good Enough for Microwaves, It's Good Enough for Mortgages. Why We Need a Financial Product Safety Commission*, Democracy, Summer 2007, at 8, 16-18.

The agency proposed by Professor Warren was to operate as a traditional multi-member independent agency. The subsequent Executive Branch proposal by President Obama's Administration likewise contemplated a multi-member independent agency. *See* DEPARTMENT OF THE TREASURY, FINANCIAL REGULATORY REFORM: A NEW FOUNDATION: REBUILDING FINANCIAL SUPERVISION AND REGULATION 58 (2009). The originally passed House bill sponsored by Congressman Barney Frank and supported by Speaker Nancy Pelosi similarly would have created a multi-member independent agency. *See* H.R. 4173, 111th Cong. § 4103 (as passed by House, Dec. 11, 2009).

But Congress ultimately departed from the Warren and Executive Branch proposals, from the House bill, and from historical practice by creating an independent agency with only a single Director. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, Title X § 1011, 124 Stat. 1376, 1964 (codified at 12 U.S.C. § 5491). The single Director of the CFPB is removable only for cause – that is, for "inefficiency, neglect of duty, or malfeasance in office" – during the Director's fixed five-year term. *See* 12 U.S.C. § 5491(c)(3); *cf. Humphrey's Executor*, 295 U.S. at 620.

Congress's choice of a single-Director CFPB was not an especially considered legislative decision. No committee report or substantial legislative history delved into the benefits of single-Director independent agencies versus multi-member independent agencies. No congressional hearings studied the question. Congress apparently stumbled into this single-Director structure as a compromise or landing point between the original Warren multi-member independent agency proposal and a traditional executive agency headed by a single person.

Under the law as enacted, the President may not supervise, direct, or remove at will the CFPB Director. As a result, a Director appointed by a President may continue to serve in office even if the President later wants to remove the Director based on a policy disagreement, for example. More importantly, a Director may continue to serve as Director under a new President (until the Director's statutory five-year tenure has elapsed), even though the new President might strongly disagree with that Director about policy issues or the overall direction of the agency.

Congress insulated the CFPB's Director from Presidential influence, yet also granted the CFPB extraordinarily broad authority to implement and enforce U.S. consumer protection laws. Under the Dodd-Frank Act, the CFPB may "implement[] the Federal consumer financial laws through rules, orders, guidance, interpretations, statements of policy, examinations, and enforcement actions." 12 U.S.C. § 5492(10). The CFPB may "prescribe rules or issue orders or guidelines pursuant to" 19 distinct consumer protection laws. *Id.* § 5581(a)(1)(A); *see also id.* §§ 5481(14), 5512(b). That rulemaking power was previously exercised by seven different government agencies. *See id.* § 5581(b) (transferring to the CFPB certain "consumer financial protection functions" previously exercised by the Federal Reserve, the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Department of Housing and Urban Development, and the Federal Trade Commission).

The CFPB may pursue enforcement actions in federal court, as well as before administrative law judges. The agency may issue subpoenas requesting documents or testimony in connection with those enforcement actions. *See id.* §§ 5562-5564. The CFPB may adjudicate disputes. And the CFPB

may impose a wide range of legal and equitable relief, including restitution, disgorgement, money damages, injunctions, and civil monetary penalties. *Id.* § 5565(a)(2).

All of that massive power is ultimately lodged in one person – the Director of the CFPB – who is not supervised, directed, or removable at will by the President.

Because the Director acts alone and without Presidential supervision or direction, and because the CFPB wields broad authority over the U.S. economy, the Director enjoys significantly more *unilateral* power than any single member of any other independent agency. By "unilateral power," I mean power that is not checked by the President or by other commissioners or board members. Indeed, other than the President, the Director of the CFPB is the single most powerful official in the entire U.S. Government, at least when measured in terms of unilateral power. That is not an overstatement. What about the Speaker of the House? The Speaker can pass legislation only if 218 Members agree. The Senate Majority Leader? The Leader typically needs 60 Senators to invoke cloture, and needs a majority of Senators (usually 51 Senators or 50 plus the Vice President) to approve a law or nomination. The Chief Justice? The Chief Justice must obtain four other Justices' votes in order to prevail. The Chair of the Federal Reserve? The Chair often needs the approval of a majority of the Federal Reserve Board. The Secretary of Defense? The Secretary is supervised and directed and removable at will by the President. On any decision, the Secretary must do as the President says. So too with the Secretary of State, and the Secretary of the Treasury, and the Attorney General.

To be sure, the Dodd-Frank Act requires the Director to establish and consult with a "Consumer Advisory Board." *See id.* § 5494. But the advisory board is just that: advisory. The

Director need not heed the Board's advice. Without the formal authority to block unilateral action by the Director, the Advisory Board does not come close to the kind of check provided by the multi-member structure of traditional independent agencies.

The Act also, in theory, allows a supermajority of the Financial Stability Oversight Council to veto certain regulations of the Director. *See id.* §§ 5513, 5321. But by statute, the veto power may be used only to prevent regulations (not to overturn enforcement actions or adjudications); only when two-thirds of the Council members agree; and only when a particular regulation puts "the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk," a standard unlikely to be met in practice. *Id.* § 5513(c)(3)(B)(ii); *see* S. Rep. No. 111-176, at 166 ("The Committee notes that there was no evidence provided during its hearings that consumer protection regulation would put safety and soundness at risk."); *see also* Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace?*, 81 Geo. Wash. L. Rev. 856, 875 (2013) ("[S]ubstantive checks on the CFPB can be triggered . . . only under the extreme circumstance of a severe threat to the safety and soundness of the American financial system. It is likely that this extreme test will rarely be satisfied in practice."); Recent Legislation, *Dodd-Frank Act Creates the Consumer Financial Protection Bureau*, 124 Harv. L. Rev. 2123, 2129 (2011) ("[T]he high standard for vetoing regulations . . . will be difficult to establish."). In this case, for example, the veto power could not have been used to override the CFPB's statutory interpretation or its enforcement action against PHH.

The Act also technically makes the CFPB part of the Federal Reserve for certain administrative purposes. *See, e.g.*,

12 U.S.C. § 5491(a); *see also id.* § 5493.   But that is irrelevant to the present analysis because the Federal Reserve Board may not supervise, direct, or remove the CFPB Director.

In short, when measured in terms of unilateral power, the Director of the CFPB is the single most powerful official in the entire U.S. Government, other than the President.   Indeed, within his jurisdiction, the Director of the CFPB is even more powerful than the President.   The Director's view of consumer protection law and policy prevails over all others.   In essence, the Director of the CFPB is the President of Consumer Finance.

The concentration of massive, unchecked power in a single Director marks a dramatic departure from settled historical practice and makes the CFPB unique among independent agencies, as I will now explain.

**B**

As a single-Director independent agency exercising substantial executive authority, the CFPB is the first of its kind and an historical anomaly.   Until this point in U.S. history, independent agencies exercising substantial executive authority have all been multi-member commissions or boards. A sample list includes:

- Interstate Commerce Commission (1887)
- Federal Reserve Board (1913)
- Federal Trade Commission (1914)
- U.S. International Trade Commission (1916)
- Federal Deposit Insurance Corporation (1933)
- Federal Communications Commission (1934)
- National Mediation Board (1934)
- Securities and Exchange Commission (1934)
- National Labor Relations Board (1935)

- Federal Maritime Commission (1961)
- National Transportation Safety Board (1967)
- National Credit Union Administration (1970)
- Occupational Safety and Health Review Commission (1970)
- Postal Regulatory Commission (1970)
- Consumer Product Safety Commission (1972)
- Nuclear Regulatory Commission (1974)
- Federal Energy Regulatory Commission (1977)
- Federal Mine Safety and Health Review Commission (1977)
- Federal Labor Relations Authority (1978)
- Merit Systems Protection Board (1978)
- Defense Nuclear Facilities Safety Board (1988)
- National Indian Gaming Commission (1988)
- Chemical Safety and Hazard Investigation Board (1990)
- Surface Transportation Board (1995)
- Independent Payment Advisory Board (2010).[1]

---

[1] In general, an agency without a for-cause removal statute is an executive agency, not an independent agency, because the President may supervise, direct, and remove at will the heads of those agencies. That said, in the period from *Myers* (1926) to *Humphrey's Executor* (1935), Congress created several multi-member agencies that did not include for-cause provisions, apparently because Congress interpreted *Myers* to outlaw independent agencies. Those agencies included the FCC and the SEC. After *Humphrey's Executor*, those multi-member agencies were treated as independent agencies even though the relevant statutes did not include for-cause provisions. *Cf. Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 487 (2010) (deciding case on assumption that SEC is an independent agency). Because those agencies' statutes do not contain express for-cause provisions, some have suggested that those agencies actually are and should be treated as executive

Have there been *any* independent agencies headed by a single person? In an effort to be comprehensive, the three-judge panel in this case issued a pre-argument order asking the CFPB for all historical or current examples it could find of independent agencies headed by a single person. The CFPB found only three examples: the Social Security Administration, the Office of Special Counsel, and the Federal Housing Finance Agency. At the en banc stage, the CFPB cited no additional examples.

None of the three examples, however, has deep historical roots. Indeed, the Federal Housing Finance Agency has existed only since 2008, about as long as the CFPB. The other two are likewise relatively recent. And those other two have been constitutionally contested by the Executive Branch, and they do not exercise the core Article II executive power of bringing law enforcement actions or imposing fines and penalties against private citizens for violation of statutes or agency rules.

For those reasons, as I will explain, the three examples are different in kind from the CFPB. Those examples therefore do not count for much when compared to the deeply rooted historical practice of independent agencies as multi-member agencies. To borrow the words of Justice Breyer in *Noel Canning*, as weighed against the settled historical practice, "these few scattered examples" are "anomalies." *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2567, slip op. at 21 (2014); *see*

---

agencies. *See* Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 834-35 (2013); Note, *The SEC Is Not an Independent Agency*, 126 Harv. L. Rev. 781, 801 (2013). I do not tackle that question in this opinion and do not imply an answer one way or the other about the executive or independent status of the multi-member agencies that lack express for-cause removal provisions.

*also Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 505-06 (2010).

First, the CFPB cited and primarily relied on the example of the Social Security Administration, which is an independent agency headed by a single Social Security Commissioner. *See* 42 U.S.C. §§ 901(a), 902(a). But the current structure of the agency is relatively recent. The Social Security Administration long existed first as a multi-member independent agency and then as a single-Director executive agency within various executive departments, most recently the Department of Health and Human Services. Only in 1994 did Congress change the Social Security Administration to a single-Director independent agency. Importantly, when the agency's structure was altered in 1994, President Clinton issued a signing statement pronouncing that the change in the agency's structure was constitutionally problematic. *See* President William J. Clinton, Statement on Signing the Social Security Independence and Program Improvements Act of 1994, 2 Pub. Papers 1471, 1472 (Aug. 15, 1994). That agency's structure therefore is constitutionally contested. In those circumstances, the historical precedent counts for little because it is not settled. *Cf. Noel Canning*, 134 S. Ct. at 2563-64, 2567, slip op. at 14-15, 20-21 (discounting example of appointments during particular inter-session recess because of Senate Committee's strong opposition to those appointments); *INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983) (discounting prior legislative veto provisions because Presidents had objected to those provisions). If anything, when considered against the "settled practice," the Social Security example only highlights the anomaly of an independent agency headed by a single person. *Noel Canning*, 134 S. Ct. at 2567, slip op. at 21.

Moreover, the Social Security Administration is not a precedent for the CFPB because the Social Security Commissioner does not possess unilateral authority to bring law enforcement actions against private citizens, which is the core of the executive power and the primary threat to individual liberty posed by executive power. *See Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting). The Social Security Administration does not have power to impose fines or penalties on private citizens in Social Security benefits cases. Instead, the bulk of the Social Security Administration's authority involves adjudication of private claims for benefits. Although the agency does possess limited power to seek civil sanctions against those who file improper claims, the Commissioner may initiate such a proceeding "only as authorized by the Attorney General," who is an executive officer accountable to the President. 42 U.S.C. § 1320a-8(b).

Second, the CFPB cited the example of the Office of Special Counsel, an independent agency headed by a single Special Counsel. The Office has a narrow jurisdiction and mainly enforces certain personnel rules against government employers and employees, such as the prohibition against improper political activity by government employees. Like the Social Security Administration, the Office of Special Counsel lacks deep historical roots. It became a single-Director agency in 1978. And like the Social Security Administration, the constitutionality of the Special Counsel has been contested since its creation. Under President Carter, the Department of Justice opined that the Special Counsel "must be removable at will by the President," and the Department opposed a for-cause restriction on removal of the Special Counsel. Memorandum Opinion for the General Counsel, Civil Service Commission, 2 Op. O.L.C. 120, 120 (1978). When Congress passed subsequent legislation regarding the Office of Special Counsel, President Reagan vetoed the bill due

to "serious constitutional concerns" about the Office's status as an independent agency. President Ronald Reagan, Memorandum of Disapproval on a Bill Concerning Whistleblower Protection, 2 Pub. Papers 1391, 1392 (Oct. 26, 1988). The history of the Office of Special Counsel confirms what one former Special Counsel has acknowledged: The agency is "a controversial anomaly in the federal system." K. William O'Connor, *Foreword* to A LEGISLATIVE HISTORY OF THE MERIT SYSTEM PRINCIPLES, PROHIBITED PERSONNEL PRACTICES AND THE OFFICE OF THE SPECIAL COUNSEL, at v (1985). That agency's structure remains constitutionally contested and so is not a meaningful historical precedent for the CFPB.

Moreover, the Office of Special Counsel is not a precedent for the CFPB because the Office of Special Counsel is primarily responsible for enforcing personnel laws against government agencies and government employees. Unlike the CFPB, the Office of Special Counsel may not enforce laws against private citizens or impose fines and penalties on private citizens.[2]

---

[2] Because the Social Security Administration and the Office of Special Counsel do not exercise the core executive power of bringing law enforcement actions and because they have narrow jurisdiction, a holding invalidating the single-Director structure of the CFPB would not necessarily invalidate the single-Director structure of the Social Security Administration and the Office of Special Counsel. That said, if those two agencies are unconstitutionally structured, the remedy would presumably be the same remedy as in *Free Enterprise Fund*: severing the for-cause provision so that the agencies would continue to fully operate, albeit as traditional executive agencies rather than independent agencies. I do not address those agencies in this case.

Third, the CFPB pointed to Congress's 2008 creation of a single-Director Federal Housing Finance Agency. *See* Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, § 1101, 122 Stat. 2654, 2662 (codified at 12 U.S.C. §§ 4511-4512). That agency is a contemporary of the CFPB and merely raises the same question we confront here. An agency created only in 2008 does not constitute an historical precedent for the CFPB. *Cf. NLRB v. SW General, Inc.*, 137 S. Ct. 929, 943, slip op. at 17 (2017) ("'[H]istorical practice' is too grand a title for the Board's evidence. The FVRA was not enacted until 1998 . . . .").

Fourth, although not a regulatory agency precedent and not an example cited by the CFPB as precedent for its single-Director structure (for good reason), there is at least one other modern statute that created an independent entity headed by one person. It is the now-defunct independent counsel law. But the independent counsel was distinct in numerous meaningful ways from the CFPB Director. Unlike the CFPB Director, the independent counsel exercised only executive power, not rulemaking or adjudicative power. Unlike the CFPB Director, the independent counsel had only a limited jurisdiction for particular defined criminal investigations where the Department of Justice had a conflict of interest. Most importantly, unlike the CFPB Director, the independent counsel was an inferior officer, not a principal officer. The independent counsel was an inferior officer, according to the Supreme Court, because the independent counsel could be supervised and directed to some extent by the Attorney General, who is a principal executive officer accountable to the President.

Given those important distinctions, the independent counsel is not an historical precedent for a single *principal* officer as the head of an independent regulatory agency. That

is no doubt why the CFPB has not relied on the independent counsel as an historical precedent for a single-Director CFPB.[3]

So in terms of historical practice, that's all the CFPB has, and that's not much. As Justice Breyer stated for the Supreme Court when the Court faced a similar (actually, a more robust) historical record in *Noel Canning*, the few examples offered by the CFPB are "anomalies." 134 S. Ct. at 2567, slip op. at 21. Or as the Supreme Court put it in *Free Enterprise Fund* when confronting a similar historical record, a "handful of isolated" examples does not count for much when assessed against an otherwise settled historical practice. 561 U.S. at 505.

---

[3] Recall, moreover, that the independent counsel experiment ended with nearly universal consensus that the experiment had been a mistake and that Justice Scalia had been right back in 1988 to view the independent counsel system as an unwise and unconstitutional departure from historical practice and a serious threat to individual liberty. *See Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting) ("this wolf comes as a wolf"); *see also* Stanford Lawyer 4 (Spring 2015) (quoting Justice Kagan's statement that Justice Scalia's dissent in *Morrison* is "one of the greatest dissents ever written and every year it gets better"). The independent counsel experience strongly counsels against single-Director independent agencies. The independent counsel is, of course, distinct from the traditional special counsels who are appointed by the Attorney General for particular matters. Those special counsels ordinarily report to and are removable by the Attorney General or the Deputy Attorney General.

In this section of the opinion, I am addressing the *historical practice* of how independent agencies are structured. A separate question is whether *Morrison v. Olson* constitutes a *judicial precedent* on the question of whether a single-Director independent regulatory agency is constitutional. The answer to that question is also no, for similar reasons. I will address the *Morrison* point more fully in Part IV below.

To be sure, in "all the laws enacted since 1789, it is always possible that Congress" created some other independent agencies that exercised traditional executive functions but were headed by single Directors. *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J., dissenting); *see also Noel Canning*, 134 S. Ct. at 2567, slip op. at 21 ("There may be others of which we are unaware."). But "the research of the parties and the Court has not found such a needle in the haystack." *Free Enterprise Fund*, 537 F.3d at 699 n.8 (Kavanaugh, J., dissenting). "Even if such an example were uncovered," there is no question that a single-Director independent agency "has been rare at best." *Id.*[4]

In considering precedents for the single-Director structure of the CFPB, one may wonder about all of the *executive*

---

[4] Some have suggested that the CFPB Director is similar to the Comptroller of the Currency. But unlike the Director, the Comptroller is not independent. The Comptroller is removable at will by the President. Full stop. *See* 12 U.S.C. § 2 ("The Comptroller of the Currency shall be appointed by the President, by and with the advice and consent of the Senate, and shall hold his office for a term of five years unless sooner removed by the President, upon reasons to be communicated by him to the Senate.").

A predecessor Comptroller of the Treasury, established in 1789, likewise was not independent. In *Free Enterprise Fund*, the Supreme Court definitively explained that the original Comptroller of the Treasury was removable at will by the President. *See* 561 U.S. at 500 n.6. The *Free Enterprise Fund* opinion also addressed the alleged attribution to Madison of "a belief that some executive officers, such as the Comptroller, could be made independent of the President." *Id.* The *Free Enterprise Fund* Court explained that "Madison's actual proposal, consistent with his view of the Constitution, was that the Comptroller hold office for a term of 'years, *unless sooner removed by the President* . . . .'" *Id.* (quoting 1 ANNALS OF CONGRESS 612 (1789)) (emphasis added).

departments and agencies headed by a single person. Why don't they provide a precedent for the CFPB? Consider for example the Department of Justice, the Department of the Treasury, the Department of State, the Department of Defense, and the EPA, all headed by a single person.

The distinction, of course, is that those departments and agencies are *executive* agencies. They operate within the Executive Branch chain of command under the supervision and direction of the President, and those agency heads are removable at will by the President. The President therefore is a check on those agencies. Those agencies are accountable to the President. The President in turn is accountable to the people of the United States for the exercise of executive power in the executive agencies. So a single person at the helm of an executive agency is perfectly constitutional.[5]

By contrast, independent agencies operate free of the President's supervision and direction. Therefore, they traditionally have been headed by multiple commissioners or board members who check one another. An independent agency operates as "a body of experts appointed by law and informed by experience." *Humphrey's Executor v. United States*, 295 U.S. 602, 624 (1935).

That deeply rooted tradition – namely, that independent agencies are headed by multiple commissioners or board members – has been widely recognized by leading judges, congressional committees, and academics who have studied the issue. Consider the following:

---

[5] Congress may of course establish executive agencies that are headed by multiple individuals (although Congress rarely does so), but each agency head must be removable at will by the President in order for the agency to maintain its status as an executive agency.

- Justice Breyer, joined by Justices Stevens, Ginsburg, and Sotomayor: "Agency independence is a function of several different factors . . . includ[ing] . . . composition as a multimember bipartisan board . . . ." *Free Enterprise Fund*, 561 U.S. at 547 (Breyer, J., dissenting).

- A Senate study: "The traditional independent regulatory agency is a commission of multiple members . . . . The size of the commission, the length of the terms, and the fact that they do not all lapse at one time are key elements of the independent structure." Senate Committee on Governmental Affairs, STUDY ON FEDERAL REGULATION, S. Doc. No. 95-91, vol. 5, at 35 (1977).

- The same Senate study: The "relative importance to be attached to group decision-making" is the "[c]hief" factor legislators consider when deciding whether to create an independent rather than an executive agency. *Id.* at 79.

- Professors Breger and Edles: The multi-member agency form has become "synonymous with independence." Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1137 (2000).

- Professor Amar: "Viewed through the prism of practice, the Constitution allows independent agencies to be created when three factors converge: first, when an executive entity is best headed up by a committee rather than by a single officer . . . ." AKHIL REED AMAR, AMERICA'S UNWRITTEN CONSTITUTION 385 (2012).

- Professor Barkow: "multimember design" is one of the "[t]raditional [l]odestars" of agency independence.

Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 26 (2010).

- Professor Davis: Independent agencies should be headed by multiple members "just as we want appellate courts to be made up of plural members, to protect against the idiosyncracies of a single individual." KENNETH CULP DAVIS, ADMINISTRATIVE LAW OF THE SEVENTIES 15 (1976).

- Professor Strauss: Independent regulatory commissions are "governmental agencies headed by multi-member boards acting collegially on the regulatory matters within their jurisdiction." PETER L. STRAUSS, AN INTRODUCTION TO ADMINISTRATIVE JUSTICE IN THE UNITED STATES 15 (1989).

- Professors Bressman and Thompson: Independent agencies, unlike Executive Branch agencies, are "generally run by multi-member commissions or boards." Lisa Schultz Bressman & Robert B. Thompson, *The Future of Agency Independence*, 63 Vand. L. Rev. 599, 610 (2010).

- A *Harvard Law Review* analysis: "Most independent agencies have multimember boards." Recent Legislation, *Dodd-Frank Act Creates the Consumer Financial Protection Bureau*, 124 Harv. L. Rev. 2123, 2128 (2011).

The bottom line is that independent agencies historically have been headed by multiple commissioners or board members. The CFPB's single-Director structure flouts that historical practice. *See Who's Watching the Watchmen? Oversight of the Consumer Financial Protection Bureau: Hearing Before the Subcommittee on TARP, Financial Services and Bailouts of Public and Private Programs of the House Committee on Oversight and Government Reform*,

112th Cong. 77 (2011) (statement of Andrew Pincus) (emphasis added) ("Dodd-Frank sets up for the Bureau an *unprecedented* structure that consolidates more power in the director than in the head of any other agency that regulates private individuals and entities."); *Dodd-Frank Act Creates the Consumer Financial Protection Bureau*, 124 Harv. L. Rev. at 2130 (emphasis added) ("[T]he CFPB's design is troubling because of its *unprecedented* nature."); Note, *Independence, Congressional Weakness, and the Importance of Appointment: The Impact of Combining Budgetary Autonomy with Removal Protection*, 125 Harv. L. Rev. 1822, 1824 n.15 (2012) (emphasis added) (CFPB's lack of a multi-member board is "*atypical* for independent agencies and will amplify the Director's independence"); Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace?* 81 Geo. Wash. L. Rev. 856, 899 (2013) (emphasis added) ("[T]he agency structure Congress chose for the CFPB – a single-director structure, devoid of accountability, and with vast, ill-defined powers – appears to be *unique* in recent American history.").[6]

In short, the CFPB is exceptional in our constitutional structure and unprecedented in our constitutional history.

---

[6] The settled historical practice is further illustrated by the quorum provisions applicable to independent agencies. Those quorum provisions reinforce the accepted understanding that independent agencies must have multiple commissioners or board members. *Cf. New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010); Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1182-83 & app. (2000) (summarizing independent agency quorum requirements).

**C**

The CFPB's departure from historical practice matters in this case because historical practice matters to separation of powers analysis. A long line of Supreme Court precedent commands that we heed history and tradition in separation of powers cases not resolved by the constitutional text alone.[7] As Justice Breyer wrote for the Supreme Court in *Noel Canning*, the "longstanding practice of the government can inform our determination of what the law is." *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560, slip op. at 7 (2014). Justice Breyer quoted James Madison's statement that it was "foreseen at the birth of the Constitution, that difficulties and differences of opinion might occasionally arise in expounding terms & phrases necessarily used in such a charter . . . and that it might require a regular course of practice to liquidate & settle the meaning of some of them." *Id.*, slip op. at 8. Justice Breyer explained, moreover, that the Court "has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Id.*, slip op. at 8.

All of this, Justice Breyer stated, is "neither new nor controversial." *Id.*, slip op. at 7. Consider the following:

- "In separation-of-powers cases this Court has often put significant weight upon historical practice."

---

[7] As a matter of first principles, there would be a strong argument that this case could and should be resolved in PHH's favor by the constitutional text alone – on the ground that independent agencies violate Article II. But *Humphrey's Executor* rejected that broad argument, and we as a lower court are bound by that case. The question for us is whether *Humphrey's Executor* extends to single-Director independent agencies.

*Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2091, slip op. at 20 (2015).

- "We therefore conclude, in light of historical practice, that a recess of more than 3 days but less than 10 days is presumptively too short to fall within the Clause." *Noel Canning*, 134 S. Ct. at 2567, slip op. at 21.

- "Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity." *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 505 (2010).

- This "Court has long made clear that, when we face difficult questions of the Constitution's structural requirements, longstanding customs and practices can make a difference." *Commonwealth of Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1884, slip op. at 13 (2016) (Breyer, J., dissenting).

- "[T]raditional ways of conducting government . . . give meaning to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989).

- "Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring).

- "A legislative practice such as we have here, evidenced not by only occasional instances, but marked by the movement of a steady stream for a century and a half of time, goes a long way in the direction of proving the presence of unassailable ground for the constitutionality of the practice, to be found in the origin and history of the power involved, or in its nature, or in both combined." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 327-28 (1936).

- "Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character." *The Pocket Veto Case*, 279 U.S. 655, 689 (1929).
- "Such long practice under the pardoning power and acquiescence in it strongly sustains the construction it is based on." *Ex parte Grossman*, 267 U.S. 87, 118-19 (1925).
- A "page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921).
- In "determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself – even when the validity of the practice is the subject of investigation." *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915).
- "[W]here there is ambiguity or doubt [in the words of the Constitution], or where two views may well be entertained, contemporaneous and subsequent practical construction are entitled to the greatest weight." *McPherson v. Blacker*, 146 U.S. 1, 27 (1892).
- A "doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice." *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819).

Stated simply, in separation of powers cases not resolved by the constitutional text alone, historical practice helps define the constitutional limits on the Legislative and Executive

Branches.[8]  The Supreme Court's recent decisions in *Free Enterprise Fund* and *Noel Canning* illustrate how the Court relies on historical practice in the separation of powers context.[9]

In *Free Enterprise Fund*, the Supreme Court considered the constitutionality of the new Public Company Accounting Oversight Board created by the 2002 Sarbanes-Oxley Act.

---

[8] The Supreme Court has relied heavily on historical practice not just in separation of powers cases, but also in federalism cases. In several federalism cases over the last 25 years, the Court has invalidated novel congressional statutes that altered the traditional federal-state balance.  *See New York v. United States*, 505 U.S. 144, 177 (1992) ("The take title provision appears to be unique.  No other federal statute has been cited which offers a state government no option other than that of implementing legislation enacted by Congress."); *Printz v. United States*, 521 U.S. 898, 905 (1997) ("[I]f, as petitioners contend, earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist."); *Alden v. Maine*, 527 U.S. 706, 744 (1999) ("The provisions of the FLSA at issue here, which were enacted in the aftermath of *Parden*, are among the first statutory enactments purporting in express terms to subject nonconsenting States to private suits."); *cf. National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 549 (2012) (binding opinion of Roberts, C.J.) ("But Congress has never attempted to rely on that power to compel individuals not engaged in commerce to purchase an unwanted product."); *id.* at 659 (joint dissent of Scalia, Kennedy, Thomas, and Alito, JJ.) ("[T]he relevant history is not that Congress has achieved wide and wonderful results through the proper exercise of its assigned powers in the past, but that it has never before used the Commerce Clause to compel entry into commerce.").

[9] Of course, if the constitutional text is sufficiently clear, then the existence of any historical practice departing from that text is not persuasive.  *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 944-46 (1983); *Powell v. McCormack*, 395 U.S. 486, 546-47 (1969).

Independent agency heads are ordinarily removable for cause by the President. But the new Public Company Accounting Oversight Board's members were removable only for cause by the SEC Commissioners, and the SEC Commissioners in turn were understood to be removable only for cause by the President. In other words, there were *two* levels of for-cause removal between the President and the Accounting Oversight Board.

The Supreme Court drew a line between one level of for-cause removal, which was the structure of traditional independent agencies, and two levels of for-cause removal, the novel structure of the new Accounting Oversight Board. The Court ruled that the latter was unconstitutional. The Court drew that line in part because historical practice had settled on allowing only one level of for-cause removal between the President and independent agency heads. There were at most "only a handful of isolated" precedents for the new Board. *Free Enterprise Fund*, 561 U.S. at 505. That mattered, according to the Court: "Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity." *Id.* And as the Court noted, there was a difference between one level of for-cause removal and two levels of for-cause removal in terms of an agency's insulation from Presidential influence. *See id.* at 495-96. Therefore, the Court invalidated the structure of the new Board.[10]

---

[10] Justice Breyer dissented for four Justices in *Free Enterprise Fund*. But importantly, he dissented not because he disagreed with the Court's point that historical practice matters, but rather primarily because he did not see a meaningful difference – in practical, analytical, or constitutional terms – between one level and two levels of for-cause removal. *See Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 525-26 (2010) (Breyer, J., dissenting).

In *Noel Canning*, the Supreme Court, speaking through Justice Breyer, likewise stressed the importance of history when assessing the constitutionality of a novel practice – in that case, Presidential recess appointments in Senate recesses of fewer than 10 days. The Court said: "Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions regulating the relationship between Congress and the President." *Noel Canning*, 134 S. Ct. at 2559, slip op. at 7. Based on that history, the Supreme Court ruled that a Senate recess of "less than 10 days is presumptively too short" for constitutional purposes. *Id.* at 2567, slip op. at 21.

Why 10 days? After all, the text of the Constitution does not draw any such 10-day line. The Court reasoned that the historical practice between the President and the Senate had established a 10-day line.

Specifically, the *Noel Canning* Court stated that it had "not found a single example of a recess appointment made during an intra-session recess that was shorter than 10 days." *Id.* at 2566, slip op. at 20. Although the Court did find "a few historical examples of recess appointments made during inter-session recesses shorter than 10 days," the Court stated: "But when considered against 200 years of settled practice, we regard these few scattered examples as anomalies." *Id.* at 2567, slip op. at 20-21.

According to the Court, therefore, *allowing* recess appointments in Senate recesses of fewer than 10 days would depart from the settled historical practice and alter the relative powers of the President and Senate over appointments. So, too, *disallowing* recess appointments in Senate recesses of 10 or more days would depart from settled historical practice. In

*Noel Canning*, the Supreme Court relied on that historical practice in defining the constitutional rule.[11]

The history-based analysis of *Free Enterprise Fund* and *Noel Canning* underscores the broader jurisprudential principle long applied by the Supreme Court: In separation of powers cases not resolved by the constitutional text alone, historical practice matters.

\* \* \*

The CFPB's single-Director structure is without meaningful historical precedent. Here, as in *Free Enterprise Fund* and prior cases, the lack of historical precedent matters. To borrow the words of the Supreme Court in *Free Enterprise Fund*: "Perhaps the most telling indication of the severe constitutional problem" with the CFPB "is the lack of historical precedent for this entity." 561 U.S. at 505.

---

[11] Justice Scalia concurred in the judgment for four Justices in *Noel Canning*, arguing as relevant here that the text of the Constitution rendered intra-session recess appointments unconstitutional even in Senate recesses of 10 or more days. But Justice Scalia did not disagree with the Court's claim that historical practice often matters in separation of powers cases involving ambiguous constitutional text, which is the relevant point for our purposes. *See NLRB v. Noel Canning*, 134 S. Ct. 2550, 2594, slip op. at 5 (2014) (Scalia, J., concurring in judgment) ("Of course, where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision."). Rather, Justice Scalia stated that the constitutional text in that case was sufficiently clear and dispositive that resort to historical practice was unnecessary and unwarranted. *See id.* at 2592, slip op. at 2; *see generally* John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 Harv. L. Rev. 1939 (2011).

## II. LIBERTY

The CFPB's single-Director structure not only departs from historical practice. It also threatens individual liberty more than the traditional multi-member structure does.

### A

The historical practice of structuring independent agencies as multi-member commissions or boards is the historical practice for a reason: It reflects a deep and abiding concern for safeguarding the individual liberty protected by the Constitution.

"The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986). The "structural principles secured by the separation of powers protect the individual as well." *Stern v. Marshall*, 564 U.S. 462, 483 (2011). As Justice Scalia stated: "The purpose of the separation and equilibration of powers in general, and of the unitary Executive in particular, was not merely to assure effective government but to preserve individual freedom." *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting).

The basic constitutional concern with independent agencies is that the agencies are unchecked by the President, the official who is accountable to the people and responsible under Article II for the exercise of executive power. Recognizing the broad and unaccountable power wielded by independent agencies, Congress has traditionally required multi-member bodies at the helm of independent agencies. In the absence of Presidential control, the multi-member structure

of independent agencies serves as a critical substitute check on the excesses of any individual independent agency head.

But in this new agency, the CFPB, that critical check is absent. And the lack of that traditional safeguard threatens the individual liberty protected by the Constitution's separation of powers.

How does a single-Director independent agency fare worse than multi-member independent agencies in protecting individual liberty? A single-Director independent agency concentrates enforcement, rulemaking, and adjudicative power in one individual. By contrast, multi-member independent agencies do not concentrate all of that power in one individual. The multi-member structure thereby helps to prevent arbitrary decisionmaking and abuse of power, and to protect individual liberty.

The point is simple but profound. In a multi-member independent agency, no single commissioner or board member can *affirmatively* do much of anything. Before the agency can infringe your liberty in some way – for example, by enforcing a law against you or by issuing a rule that affects your liberty or property – a majority of commissioners must agree. As a former Chair of the Federal Trade Commission has explained, it takes "a consensus decision of at least a majority of commissioners to authorize, or forbear from, action." Edith Ramirez, *The FTC: A Framework for Promoting Competition and Protecting Consumers*, 83 Geo. Wash. L. Rev. 2049, 2053 (2015). That in turn makes it harder for the agency to infringe your liberty.

In addition, unlike single-Director independent agencies, multi-member independent agencies "can foster more deliberative decision making." Kirti Datla & Richard L.

Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 794 (2013). Multi-member independent agencies benefit from diverse perspectives and different points of view among the commissioners and board members.[12] The multiple voices and perspectives make it more likely that the costs and downsides of proposed decisions will be more fully ventilated. *See* Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1113 (2000) (independent agencies "are also multi-member organizations, a fact that tends toward accommodation of diverse or extreme views through the compromise inherent in the process of collegial decisionmaking"); Jacob E. Gersen, *Administrative Law Goes to Wall Street: The New Administrative Process*, 65 Admin. L. Rev. 689, 696 (2013) (A "multimember board allows for a representation of divergent interests in a way that a single decisionmaker simply cannot."); Glen O. Robinson, *On Reorganizing the Independent Regulatory Agencies*, 57 Va. L. Rev. 947, 963 (1971) ("It is not bipartisanship as such that is important; it is rather the safeguards and balanced viewpoint that can be provided by plural membership."); *cf.* Harry T. Edwards, *The Effects of Collegiality on Judicial Decision Making*, 151 U. Pa. L. Rev. 1639, 1645 (2003) ("[C]ollegiality plays an important part in *mitigating* the role of partisan politics and personal ideology by allowing judges of differing perspectives and philosophies to communicate with, listen to, and ultimately influence one another in constructive and law-abiding ways.").

---

[12] By statute, certain independent agencies must include members of both major political parties. *See, e.g.*, 15 U.S.C. § 41 (Federal Trade Commission); 15 U.S.C. § 78d(a) (Securities and Exchange Commission); 15 U.S.C. § 2053(c) (Consumer Product Safety Commission); 42 U.S.C. § 7171(b)(1) (Federal Energy Regulatory Commission). Most others are bipartisan by tradition.

As compared to a single-Director independent agency structure, a multi-member independent agency structure – and its inherent requirement for compromise and consensus – will tend to lead to decisions that are not as extreme, idiosyncratic, or otherwise off the rails. *Cf.* Stephen M. Bainbridge, *Why a Board? Group Decisionmaking in Corporate Governance*, 55 Vand. L. Rev. 1, 12-19 (2002). A multi-member independent agency can go only as far as the middle vote is willing to go. Conversely, under a single-Director structure, an agency's policy goals "will be subject to the whims and idiosyncratic views of a single individual." Joshua D. Wright, *The Antitrust/Consumer Protection Paradox: Two Policies at War with Each Other*, 121 Yale L.J. 2216, 2260 (2012); *cf.* Recent Legislation, *Dodd-Frank Act Creates the Consumer Financial Protection Bureau*, 124 Harv. L. Rev. 2123, 2128 (2011) (multi-member commission structure "reduces the variance of policy and improves accuracy through aggregation"); Michael B. Rappaport, Essay, *Replacing Independent Counsels with Congressional Investigations*, 148 U. Pa. L. Rev. 1595, 1601 n.17 (2000) ("independent agencies tend to be headed by multimember commissions, which function to prevent aberrant actions").

Relatedly, as compared to a single-Director independent agency, a multi-member independent agency (particularly when bipartisan) supplies "a built-in monitoring system for interests on both sides because that type of body is more likely to produce a dissent if the agency goes too far in one direction." Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 41 (2010). A dissent, in turn, can serve "as a 'fire alarm' that alerts Congress and the public at large that the agency's decision might merit closer scrutiny." *Id.*; *see also Dodd-Frank Act Creates the Consumer Financial Protection Bureau*, 124 Harv.

L. Rev. at 2128 (the "presence of dissenters" in agency proceedings "provides new information and forces the proponent to articulate a coherent rationale, thus acting as a constraining force").

Moreover, multi-member independent agencies are better structured than single-Director independent agencies to guard against "capture" of – that is, undue influence over – independent agencies by regulated entities or interest groups, for example. As Elizabeth Warren noted in her original proposal for a multi-member consumer protection agency: "With every agency, the fear of regulatory capture is ever-present." Elizabeth Warren, *Unsafe at Any Rate: If It's Good Enough for Microwaves, It's Good Enough for Mortgages. Why We Need a Financial Product Safety Commission*, Democracy, Summer 2007, at 8, 18. Capture can infringe individual liberty because capture can prevent a neutral, impartial agency assessment of what rules to issue or what enforcement actions to undertake or how to resolve adjudications. In a multi-member agency, however, the capturing parties "must capture a majority of the membership rather than just one individual." Lisa Schultz Bressman & Robert B. Thompson, *The Future of Agency Independence*, 63 Vand. L. Rev. 599, 611 (2010); *see also* ROBERT E. CUSHMAN, THE INDEPENDENT REGULATORY COMMISSIONS 153 (1941) (noting, in reference to Federal Reserve Act of 1913, that it "seemed easier to protect a board from political control than to protect a single appointed official"); Barkow, *Insulating Agencies*, 89 Tex. L. Rev. at 38 ("[O]nly one person at the apex can also mean that the agency is more easily captured."); Robinson, *On Reorganizing the Independent Regulatory Agencies*, 57 Va. L. Rev. at 962 ("[T]he single administrator may be *more* vulnerable" to interest group pressures "because

he provides a sharper focus for the concentration of special interest power and influence.").[13]

In short, when an independent agency is structured as a multi-member agency rather than as a single-Director agency, the agency can better protect individual liberty because it can better prevent arbitrary enforcement actions and unlawful or otherwise unreasonable rules.[14]

---

[13] This case exemplifies the reality of (and not just the potential for) arbitrary decisionmaking by the Director of the CFPB. The Director discarded the Government's longstanding interpretation of the relevant statute, adopted a new interpretation of that statute, applied that new interpretation *retroactively*, and then imposed massive sanctions on PHH for violation of the statute – even though PHH's relevant acts occurred *before* the Director changed his interpretation of the statute. *Cf. Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly."). Notably, the Director *unilaterally* added $103 million to the $6 million in penalties that had been imposed by the administrative law judge.

[14] To be sure, multi-member independent agencies are hardly perfect. For example, some members of multi-member independent agencies may occasionally move in lockstep, thereby diminishing the benefits of multi-member bodies. Moreover, it can be harder to find three or five highly qualified commissioners than just one highly qualified commissioner. And multi-member bodies are often not as efficient as single-headed agencies and can be beset by contentious relations among the members. That said, "[c]onvenience and efficiency are not the primary objectives – or the hallmarks – of democratic government." *Bowsher v. Synar*, 478 U.S. 714, 736 (1986). Indeed, so as to avoid falling back into the kind of tyranny that they had declared independence from, the Framers often made trade-offs against efficiency in the interest of enhancing liberty.

**B**

Notably, the multi-member structure of independent agencies is not an accident. On the contrary, Congress has traditionally designed independent agencies as multi-member bodies in order to protect liberty and prevent arbitrary decisionmaking by a single unaccountable Director.

As Franklin Roosevelt's Administration explained in its comprehensive study of independent agencies, the "popular belief that important rule-making functions ought to be performed by a group rather than by a single officer, by a commission rather than by a department head," was a reason "for the establishment of independent regulatory agencies." THE PRESIDENT'S COMMITTEE ON ADMINISTRATIVE MANAGEMENT, REPORT OF THE COMMITTEE WITH STUDIES OF ADMINISTRATIVE MANAGEMENT IN THE FEDERAL GOVERNMENT 216 (1937). In a leading study of independent commissions, a member of the Roosevelt Administration analyzed the creation of the Federal Trade Commission and explained: "The two ideas, a commission and independence for the commission, *were inextricably bound together*. At no point was it proposed that a commission ought to be set up unless it be independent or that an independent officer should be created rather than a commission." ROBERT E. CUSHMAN, THE INDEPENDENT REGULATORY COMMISSIONS 188 (1941) (emphasis added).

Senator Newlands, the sponsor of the legislation creating the Federal Trade Commission, emphasized the need for a commission rather than a single Director: "If only powers of investigation and publicity are given a single-headed organization, like the Bureau of Corporations, might be the best for the work; but if judgment and discretion are to be exercised, or if we have in contemplation the exercise of any corrective

power hereafter, or if the broad ends above outlined are to be attained, it seems to me that a commission is required." 51 Cong. Rec. 11,092 (1914).

In *Humphrey's Executor*, the Supreme Court recognized that Congress intended independent agencies to be multi-member bodies. The Court repeatedly noted that the Federal Trade Commission is "a body of experts." *Humphrey's Executor v. United States*, 295 U.S. 602, 624 (1935). The Court stated that the nature and functions of the Commission evinced Congress's "*intent to create a body of experts* who shall gain experience by length of service – a body which shall be independent of executive authority, *except in its selection*, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government." *Id.* at 625-26 (first emphasis added).

In short, Congress structured independent agencies as multi-member agencies for good reason – namely, to safeguard individual liberty from the excesses of a single officer's unaccountable decisionmaking.

## C

When examining the relevant history, we can see that the original design, common understanding, and consistent historical practice of independent agencies as multi-member bodies reflect the larger values of the Constitution. The Constitution as a whole embodies the bedrock principle that dividing power among multiple entities and persons helps protect individual liberty. The Framers created a federal system with the national power divided among three branches. The Framers "viewed the principle of separation of powers as the absolutely central guarantee of a just Government."

46

*Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

The principle of checks and balances influenced how the Framers allocated power *within* the three national branches. For example, the Framers divided the Legislative Branch into two houses, each with multiple members. No one person operates as Legislator in Chief. Rather, 535 Members of Congress do so, divided into two Houses. Likewise, the Framers established "one supreme Court" composed of multiple "Judges" rather than a single judge. No one person operates as the Supreme Justice. Rather, the Court consists of one Chief Justice and several Associate Justices, all of whom have equal votes on cases.

Of course, the one exception to the Constitution's division of power among multiple parties within the branches is the President, who is the lone head of the entire Executive Branch. But the President is the exception that proves the rule. For starters, the Framers were concerned that dividing the executive power among multiple individuals would render the Executive Branch too weak as compared to the more formidable Legislative Branch. *See* THE FEDERALIST NO. 48 (Madison) (It is "against the enterprising ambition" of the Legislative Branch "that the people ought to indulge all their jealousy and exhaust all their precautions. The legislative department derives a superiority in our governments . . . ."). The Framers sought "[e]nergy in the executive." THE FEDERALIST NO. 70 (Hamilton).

At the same time, the Framers certainly recognized the risk that a single President could lead to tyranny or arbitrary decisionmaking. To mitigate the risk to liberty from a single President, the Framers ensured that the President had "a due dependence on the people." *Id.* The President is nationally

elected. In choosing the President, "the whole Nation has a part, making him the focus of public hopes and expectations." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring). Presidential candidates are put through the wringer precisely because of the power they may someday wield. In other words, the Framers concentrated executive power in a single President on the condition that the President would be nationally elected and nationally accountable.

The President is therefore the exception to the ordinary constitutional practice of dividing power among multiple entities and persons. Apart from the President, the Constitution reflects the basic commonsense principle that multi-member bodies – the House, the Senate, the Supreme Court – do better than single-member bodies in avoiding arbitrary decisionmaking and abuses of power, and thereby protecting individual liberty.

That background constitutional principle buttresses the conclusion that a single-Director independent agency lies outside the norm and poses a risk to individual liberty. After all, the Director of the CFPB is not elected by the people and is of course not remotely comparable to the President in terms of accountability to the people. And in addition to exercising executive enforcement authority, the Director of the CFPB unilaterally exercises quasi-legislative power, even though that power is ordinarily exercised by multi-member legislative bodies. Moreover, the Director of the CFPB unilaterally exercises appellate quasi-judicial power, even though that power is ordinarily exercised by multi-member bodies.

\* \* \*

Justice Kennedy has stated: "Liberty is always at stake when one or more of the branches seek to transgress the separation of powers." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring). In this case, the CFPB's novel single-Director structure departs from history, transgresses the separation of powers, and threatens individual liberty.

## III. PRESIDENTIAL AUTHORITY

The single-Director structure of the CFPB not only departs from history and threatens individual liberty. It also diminishes the President's power to exercise influence over the CFPB, as compared to the President's power to exercise influence over traditional multi-member independent agencies. That additional diminution of Presidential authority exacerbates the Article II problem posed by the single-Director CFPB.

In traditional multi-member agencies, the President may designate the chair of the agency, and the President may remove a chair at will from the chair position. (Of course, the President may not remove that official from the commission or board altogether, only from the position as chair.) By contrast, the CFPB has only one Director, and the President may not designate a new Director until the former Director leaves office or the Director's term expires. That structure diminishes the President's power to influence the direction of the CFPB, as compared to the President's power to influence the direction of traditional multi-member independent agencies.

That diminution of Presidential power runs afoul of the Article II principle articulated by the Supreme Court in *Free Enterprise Fund*. Indeed, this case involves a greater diminution of Presidential power than occurred in *Free Enterprise Fund*.

**A**

As the Supreme Court stated in *Free Enterprise Fund*, the "landmark case of *Myers v. United States* reaffirmed the principle that Article II confers on the President the general administrative control of those executing the laws." *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 492-93 (2010). In other words, when it comes to the "responsibility to take care that the laws be faithfully executed," Article II of the Constitution means that the "buck stops with the President." *Id.* at 493. At the same time, the *Free Enterprise Fund* Court acknowledged that the general rule of Presidential removal was cabined by the Court's decision in *Humphrey's Executor*.

But as the Supreme Court indicated in *Free Enterprise Fund*, an independent agency's structure violates Article II when it is not historically rooted and when it causes an *additional* diminution of Presidential control beyond that caused by a traditional independent agency. *See id.* at 501 ("We deal with the unusual situation, never before addressed by the Court, of two layers of for-cause tenure. And though it may be criticized as 'elementary arithmetical logic,' two layers are not the same as one.").

The CFPB's single-Director structure contravenes that diminution principle. As a result of the CFPB's novel single-Director structure and the five-year fixed term for the Director, a President may be stuck for years – or even for his or her entire

four-year term – with a single Director who was appointed by a prior President and who has different policy views.

Nothing comparable happens in traditional multi-member independent agencies. Rather, the traditional multi-member structure ordinarily allows the current President to exercise some influence over the agency through Presidential appointment. That is because the President may designate agency chairs and may remove agency chairs at will from their positions as chairs.[15]

The power to designate and remove chairs at will is important because, by statute, the "chairs of multimember agencies have been granted budget, personnel, and agenda control." Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L. Rev. 769, 818 (2013). "In many agencies, the chair has the right to appoint staff directly and is the public voice of the agency. These powers allow the chair to exercise significant control over the agency's agenda." Rachel E. Barkow,

---

[15] For example, the President unilaterally designates (and may unilaterally remove at will from the position as chair) the chairs of the following agencies: the Defense Nuclear Facilities Safety Board, 42 U.S.C. § 2286(c)(1); the Federal Communications Commission, 47 U.S.C. § 154(a); the Federal Energy Regulatory Commission, 42 U.S.C. § 7171(b)(1); the Federal Maritime Commission, 46 U.S.C. § 301(c)(1); the Federal Labor Relations Authority, 5 U.S.C. § 7104(b); the Federal Trade Commission, 15 U.S.C. § 41; the Federal Mine Safety and Health Review Commission, 30 U.S.C. § 823(a); the National Labor Relations Board, 29 U.S.C. § 153(a); the Nuclear Regulatory Commission, 42 U.S.C. § 5841(a); the Occupational Safety and Health Review Commission, 29 U.S.C. § 661(a); the Postal Regulatory Commission, 39 U.S.C. § 502(d); the Securities and Exchange Commission, 15 U.S.C. § 78d note; and the Surface Transportation Board, 49 U.S.C. § 1301(c).

*Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 39 (2010).

Professor Revesz is one of the Nation's leading scholars of the administrative state. He and Kirti Datla have succinctly summarized the President's authority with respect to chairs:

> The chair of a multimember agency usually holds the position of chair – but not as a member of the agency – at the will of the President. After removal of an existing chair, the President can then appoint a new chair with preferences closer to his. *The ability of the President to retain policy influence through the selection of the chair is important* because . . . the chair of a multimember agency is ordinarily its most dominant figure. While there is room for debate, *it is clear that the ability to appoint the head of an independent agency allows the President to retain some control over that agency's activities*. An appointed chair will align with the President for multiple reasons.

Datla & Revesz, *Deconstructing Independent Agencies*, 98 Cornell L. Rev. at 819 (internal quotation marks omitted) (emphases added); *see also* Glen O. Robinson, *Independent Agencies: Form and Substance in Executive Prerogative*, 1988 Duke L.J. 238, 245 n.24 (1988) ("It is important to note that since *Humphrey's Executor* the President generally has been given power to designate agency chairmen. . . . From personal experience I can report that the FCC's chairman and a handful of staff – usually selected by the chair – can and usually do exercise nearly total control over that agency's basic policy agenda.").

To be sure, the chair alone ordinarily may not *affirmatively* issue rules, initiate enforcement actions, or adjudicate disputes. But the chair both controls the agenda and may *prevent* certain

actions from occurring. So the President's ability to designate a chair is valuable, even in circumstances where the agency as a whole continues to be controlled by commissioners or board members who might oppose the President's views.

By exercising their power to appoint chairs of the major multi-member independent agencies, Presidents may gain some control over the direction of those agencies within days of taking office at the start of their first terms. For example, President Trump replaced the chairs of the FTC, FCC, SEC, and NLRB within one week of taking office in January 2017. President Obama did the same by March 2009.

But a President has no such power when it comes to the single Director of the CFPB, who serves a fixed five-year term. Unlike with the FTC, FCC, SEC, and NLRB, for example, the President was *not* able to designate a new Director of the CFPB in January 2017.

That problem will only grow worse for the next few Presidents. The most recent CFPB Director left office in November 2017. Assuming for present purposes that a new Director is appointed in 2018 for a five-year term, that Director may serve until 2023 – several years after the 2020 election. The President who is elected (or re-elected) in 2020 will have no power to remove that Director until 2023, some two or three years into that Presidential term. A new Director then will be appointed in 2023. That Director could serve until 2028 – nearly the entire term of the President elected in 2024. Another new Director may be appointed in 2028. That Director could serve until 2033, meaning for the entirety of the term of the President elected in 2028.

Those very realistic scenarios expose the CFPB's flagrant disregard of constitutional text, history, structure, and

precedent (not to mention, common sense). And those scenarios convincingly demonstrate that the single-Director CFPB, with its fixed five-year Director term, causes a diminution of Presidential power greater than the diminution that occurs in traditional multi-member independent agencies.

There is more. In a multi-member agency, the commissioners or board members other than the chair serve staggered terms and are replaced by the President as their terms expire. A tradition has developed by which some commissioners or board members of the opposite party resign from independent agencies when a new President takes office. *See* Datla & Revesz, *Deconstructing Independent Agencies*, 98 Cornell L. Rev. at 820-21. Even apart from that tradition, the staggered terms mean that a President will have ever-increasing influence (through appointments) over an independent agency during the course of that President's term. That does not occur with the single-Director CFPB. Until the Director's term expires, the new President has zero influence through appointment, and the zero remains zero until the Director's term expires. Although this line of reasoning "may be criticized as elementary arithmetical logic," some influence exceeds zero influence. *Free Enterprise Fund*, 561 U.S. at 501.

This is a much starker case of unconstitutionality than *Free Enterprise Fund*. In *Free Enterprise Fund*, the second for-cause provision did not afford PCAOB members all that much additional insulation from the President. The case therefore involved an important but *marginal* additional diminution of Presidential authority beyond the diminution that occurs in a traditional independent agency.

Here, by contrast, Presidents will be stuck for years at a time with CFPB Directors appointed by prior Presidents. This

case therefore involves a *substantial* additional diminution of Presidential authority beyond the diminution that occurs in a traditional independent agency. The additional diminution exacerbates the Article II problem posed by the single-Director CFPB.

**B**

The CFPB says that a single head of an independent agency might be *more* responsive on an *ongoing* basis to the President than multiple heads of an independent agency are, thereby mitigating the Article II concern with a single-Director independent agency. That argument is wrong, both as a matter of theory and as a matter of fact.

To begin with, whether headed by one, three, or five members, an independent agency's heads are not removable at will by the President. With independent agencies, the President is limited (after designation of the chair and appointment of new members) in essence to indirect cajoling. *Cf.* Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2323 (2001) ("[A] for-cause removal provision would buy little substantive independence if the President, though unable to fire an official, could command or, if necessary, supplant his every decision.").[16] As Justice Scalia

---

[16] The for-cause removal restrictions attached to independent agencies ordinarily prohibit removal except in cases of inefficiency, neglect of duty, or malfeasance. Those restrictions have significant impact both in law and in practice. *See Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 502 (2010) (for-cause restrictions "mean what they say"). *Humphrey's Executor* and *Wiener v. United States* show, for example, that for-cause removal requirements prohibit dismissal by the President due to lack of trust in the administrator, *see Humphrey's Executor v. United States*, 295 U.S. 602, 618-19, 625-26 (1935), differences in

55

once memorably noted, an attempt by the President to supervise, direct, or threaten to remove the head of an independent agency with respect to a particular substantive decision is statutorily impermissible and likely to trigger "an impeachment motion in Congress." Tr. of Oral Arg. at 60, *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010). That is true whether there are one, three, or five heads of the independent agency. The independent status of an independent agency erects a high barrier between the President and the independent agency, regardless of how many people head the independent agency on the other side of the barrier.

Moreover, even assuming that *ongoing* influence of independent agencies can occur in *indirect* ways, it is not plausible to say that a President could have more indirect ongoing influence over (i) a single Director who has policy views contrary to the President's than the President has over (ii) a multi-member independent agency headed by a chair who

---

policy outlook, *id.*, or the mere desire to install administrators of the President's choosing, *Wiener v. United States*, 357 U.S. 349, 356 (1958).

To cabin the effects of *Humphrey's Executor* on the Presidency, some have proposed reading the standard for-cause removal restrictions in the statutes creating independent agencies to allow for Presidential removal of independent agency heads based on policy differences. But as the Supreme Court recently explained, *Humphrey's Executor* refuted the idea that "simple disagreement" with an agency head's "policies or priorities could constitute 'good cause' for its removal." *Free Enterprise Fund*, 561 U.S. at 502. The *Free Enterprise Fund* Court expressly confirmed that *Humphrey's Executor* "rejected a removal premised on a lack of agreement on either the policies or the administering of the Federal Trade Commission." *Id.*

is appointed by the President and shares the same policy views as the President.

In short, given the President's inability to designate a new CFPB Director *at the beginning of the Presidency* – in contrast to the President's ability to appoint chairs of the FTC, FCC, SEC, and NLRB, for example – the single-Director CFPB structure diminishes the President's power more than the traditional multi-member independent agency does.[17]

---

[17] The CFPB says that the Chair of the Federal Reserve Board is not removable at will from the chair position. That is not apparent from the statutory language. *Cf. infra* note 20; *see also* Adrian Vermeule, *Conventions of Agency Independence*, 113 Colum. L. Rev. 1163, 1196 (2013) (While "the members of the Federal Reserve Board enjoy statutory for-cause protection, the Chair and Vice Chairs do not, qua Chairs."). But even assuming the CFPB's assertion is correct, such an exception would simply reflect the unique function of the Federal Reserve Board with respect to monetary policy. The Chair of the Federal Reserve Board would be akin to what Justice Breyer in *Noel Canning* referred to as an historical anomaly – here, an anomaly due to the Federal Reserve's special functions in setting monetary policy and stabilizing the financial markets. The Federal Reserve Board is certainly not a model or precedent for wholesale creation of a vast independent regulatory state run by single-Director independent agencies that oppose a particular President. If the CFPB is right in this case, Congress could create an independent Federal Reserve headed by one Director. The CFPB apparently thinks that would be fine. I disagree. Indeed, that question should not be a close call. Apart from the Federal Reserve Board, there are a few other relatively minor examples where the President arguably may not have the ability to designate and remove chairs at will. But as discussed above, there can be no doubt that the common practice in traditional independent agencies is that the President may designate a chair and remove a chair at will.

The CFPB also says that Congress's creation of the single-Director structure is unlikely to afford Congress any greater influence over the CFPB than Congress has over a multi-member independent agency. Perhaps true, perhaps not. Either way, however, the Supreme Court has stressed that congressional aggrandizement is not a necessary feature of an Article II violation in this context. The Court squarely said as much in *Free Enterprise Fund*. "Even when a branch does not arrogate power to itself, therefore, it must not impair another in the performance of its constitutional duties." 561 U.S. at 500. And to take an obvious example of the point, if Congress enacted legislation converting the Department of Justice into an independent agency, there would be no formal congressional aggrandizement. But there is little doubt that such legislation would violate Article II. *See Morrison v. Olson*, 487 U.S. 654, 695-96 (1988).

In considering the Presidential power point, keep in mind that the CFPB repeatedly compares itself to the FTC. That comparison is wrong as a matter of history and liberty, as discussed above. But the comparison is also wrong as a matter of Presidential authority. When the three-judge panel first heard this case in 2016, some of the threats to Presidential power may have appeared theoretical. In 2017, those threats became much more concrete. In January 2017, the President designated new Chairs of the FTC, FCC, SEC, and NLRB, among other multi-member independent agencies. Meanwhile, the President was legally unable to designate a new CFPB Director. The President's inability to do so led to a variety of episodes throughout 2017 that highlighted the diminution of Presidential power over the CFPB, as compared to the President's power over the traditional multi-member independent agencies. For example, during 2017, the Director of the CFPB took several major actions contrary to the President's policy views.

In the wake of the CFPB's activities over the past year, the question that the Supreme Court asked in *Free Enterprise Fund* is right on point: "where, in all this, is the role for oversight by an elected President?" 561 U.S. at 499. By disabling the President from supervising and directing the Director of the CFPB, the Dodd-Frank Act contravenes the Supreme Court's statement in *Free Enterprise Fund*: "Congress cannot reduce the Chief Magistrate to a cajoler-in-chief." *Id.* at 502.

In sum, the novel single-Director structure of the CFPB diminishes Presidential authority more than the traditional multi-member agencies do. That diminution of Presidential authority exacerbates the Article II problem with the single-Director CFPB.

## C

The CFPB's departure from historical practice, threat to individual liberty, and diminution of Presidential authority combine to make this an overwhelming case of unconstitutionality.

But suppose that there were no additional diminution of Presidential authority caused by the single-Director structure of the CFPB, beyond that which occurs with traditional multi-member independent agencies. Would the single-Director structure still be unconstitutional? The answer is yes.

Neither *Humphrey's Executor* nor any later case has granted Congress a free pass, without boundaries, to create independent agencies that depart from history and threaten individual liberty. *Humphrey's Executor* is not a blank check for Congress. *Humphrey's Executor* does not mean that anything goes. In that respect, keep in mind (in case I have not mentioned it enough already) that the Constitution's

separation of powers is not solely or even primarily concerned with preserving the powers of the branches. The separation of powers is primarily designed to protect individual liberty.

As I have explained, the single-Director CFPB departs from settled historical practice and threatens individual liberty far more than a multi-member independent agency does. The single-Director CFPB therefore poses a constitutional problem even if (counter-factually) it does not occasion any additional diminution of Presidential power beyond that caused by traditional multi-member independent agencies.

## IV. VERTICAL STARE DECISIS AND JUDICIAL DEFERENCE

Notwithstanding all of the above, the CFPB argues that, as a matter of vertical stare decisis, this case is controlled by (i) *Humphrey's Executor*; (ii) *Morrison*; or (iii) general principles of judicial deference. The CFPB is incorrect.

*First*, the CFPB contends that *Humphrey's Executor* controls this case – in other words, that *Humphrey's Executor* by its terms upheld all independent agencies, including single-Director independent agencies. That is wrong. In *Humphrey's Executor*, the Supreme Court did not say (or articulate a principle) that single-Director independent agencies are constitutional. Not even close.

After all, Humphrey's representative argued to the Supreme Court that the "nature" of the Federal Trade Commission justified independence from the President: "With the increasing complexity of human activities many situations arise where governmental control can be secured only by the 'board' or 'commission' form of legislation." Brief for Samuel F. Rathbun, Executor, at 41, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935) (citation and

internal quotation marks omitted). In its opinion, the Court agreed. The Court noted that the Federal Trade Commission "is to be non-partisan" and, like the Interstate Commerce Commission, be composed of members "called upon to exercise the trained judgment of a body of experts." *Humphrey's Executor*, 295 U.S. at 624. The Court stated that the nature and functions of the FTC evinced Congress's "intent to create a body of experts who shall gain experience by length of service – a body which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government." *Id.* at 625-26 (emphasis omitted).

The CFPB responds that the *Humphrey's Executor* Court's multiple references to a "body of experts" were not relevant to the Court's constitutional holding. That is incorrect. The Court repeatedly referenced the Federal Trade Commission's status as a body of experts in concluding that Congress could permissibly insulate the FTC commissioners from Presidential removal. The Court wrote: "The Federal Trade Commission is an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." *Id.* at 628. "Such a body," according to the Court, "cannot in any proper sense be characterized as an arm or an eye of the executive," and thus such a body can be made independent of the President. *Id.*

In short, *Humphrey's Executor* repeatedly emphasized the multi-member structure of the FTC. In doing so, *Humphrey's Executor* drew (at least implicitly) the same distinction between multi-member agencies and single-Director agencies that I am drawing in this case. At best for the CFPB,

*Humphrey's Executor* leaves open the single-Director question. *Humphrey's Executor* does not hold that single-Director independent agencies are constitutional.[18]

---

[18] In its brief, PHH has expressly preserved the argument that *Humphrey's Executor* should be overruled. The reasoning of *Humphrey's Executor* is inconsistent with the reasoning in the Court's prior decision in *Myers*. *See Humphrey's Executor v. United States*, 295 U.S. 602, 626 (1935) ("In so far as" the expressions in *Myers* are "out of harmony with the views here set forth, these expressions are disapproved."). The *Humphrey's Executor* decision subsequently has received significant criticism. *See* Geoffrey P. Miller, *Independent Agencies*, 1986 Sup. Ct. Rev. 41, 93 ("*Humphrey's Executor*, as commentators have noted, is one of the more egregious opinions to be found on pages of the United States Supreme Court Reports."); Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 Colum. L. Rev. 573, 611-12 (1984) ("Remarkably, the Court did not pause to examine how a purpose to create a body 'subject only to the people of the United States' – that is, apparently, beyond control of the constitutionally defined branches of government – could itself be sustained under the Constitution."). Moreover, the reasoning of *Humphrey's Executor* is in tension with the reasoning of the Supreme Court's recent decision in *Free Enterprise Fund*. *See In re Aiken County*, 645 F.3d 428, 444-46 (D.C. Cir. 2011) (Kavanaugh, J., concurring); Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1208 (2014).

For those reasons, among others, PHH preserves the argument that *Humphrey's Executor* should be overruled by the Supreme Court. Overruling *Humphrey's Executor* would not mean the end of the agencies that are now independent. The agencies would instead transform into executive agencies supervised and directed by the President. So the question is not the existence of the agencies; the question is the President's control over the agencies and the resulting accountability of those agencies to the people.

In any event, it is not our job to decide whether to overrule *Humphrey's Executor*. As a lower court, we must follow Supreme

*Second*, the CFPB argues that *Morrison v. Olson* controls this case. That suggestion is even further afield. *Morrison* upheld the independent counsel law. But the independent counsel differed in three critical ways from the ordinary independent agency. The independent counsel had only a narrowly defined jurisdiction in cases where the Department of Justice had a conflict of interest. The independent counsel had only enforcement authority, not rulemaking or adjudicative authority. And the independent counsel was an inferior officer, not a principal officer (a point the Supreme Court emphasized in *Free Enterprise Fund*). The independent counsel was an inferior officer, the *Morrison* Court said, because she could be supervised and directed by the Attorney General. *Morrison* did not hold – or even hint – that a single *principal* officer could be the sole head of an independent regulatory agency with broad enforcement, rulemaking, and adjudication powers.

Moreover, no party in *Morrison* argued that the Office of the Independent Counsel was unconstitutional because a single person headed it. And it is black-letter law that cases are not precedent for issues that were not raised or decided. *See* BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 46, 84, 226-28 (2016). For that reason, too, it is impossible to rely on the result in *Morrison* as a binding precedent on the single-Director question.

The CFPB separately argues that the so-called *Morrison* "test" – as distinct from *Morrison*'s result – dictates a particular conclusion in this case. In *Morrison*, the Court said that

---

Court precedent, including *Humphrey's Executor*. But it is emphatically our job to apply *Humphrey's Executor* in a manner consistent with settled historical practice, the Constitution's protection of individual liberty, and Article II's assignment of executive authority to the President.

removal restrictions could not be "of such a nature that they impede the President's ability to perform his constitutional duty." *Morrison v. Olson*, 487 U.S. 654, 691 (1988). As relevant here, *Morrison* and *Free Enterprise Fund* together mean that Congress may not diminish Presidential control over independent agencies more than the diminution that occurs with traditional multi-member agencies.

As explained above, the single-Director independent agency structure *does* diminish Presidential authority more than traditional multi-member independent agencies do. So the CFPB flunks the *Morrison* and *Free Enterprise Fund* test.

Even if that were not the case, however, the *Morrison* "test" is not the exclusive way that a novel independent agency structure may violate Article II. Neither *Humphrey's Executor* nor any later case gives Congress blanket permission to create independent agencies that depart from history and threaten individual liberty.

In that regard, I repeat what I wrote 10 years ago in *Free Enterprise Fund*:

> [T]he lengthy recitation of text, original understanding, history, and precedent above leads to the following principle: *Humphrey's Executor* and *Morrison* represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power. Therefore, given a choice between drawing the line at the holdings in *Humphrey's Executor* and *Morrison* or extending those cases to authorize novel structures such as the PCAOB that further attenuate the President's control over executive officers, we should opt for the former. We should resolve questions about the scope of those precedents in light of

and in the direction of the constitutional text and constitutional history. . . . In this case, that sensible principle dictates that we hold the line and not allow encroachments on the President's removal power beyond what *Humphrey's Executor* and *Morrison* already permit.

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

*Third*, in addition to invoking *Humphrey's Executor* and *Morrison*, the CFPB and its amici cite various arguments for judicial deference to Congress's choice of a single-Director structure. Those scattershot arguments are all unavailing.

Some speak of the CFPB as a one-off congressional experiment (like the independent counsel law) and suggest that we should let it go as a matter of judicial deference to Congress. But even apart from the fundamental point that our job as judges is to enforce the law, not abdicate to the political branches, *cf. Boumediene v. Bush*, 553 U.S. 723, 765-66 (2008), we cannot think of this as a one-off case because we could not cabin the consequences in any principled manner if we were to uphold the CFPB's single-Director structure. As the Supreme Court has warned: "Slight encroachments create new boundaries from which legions of power can seek new territory to capture." *Stern v. Marshall*, 564 U.S. 462, 503 (2011). Justice Frankfurter captured it well in his opinion in *Youngstown*: "The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594 (1952) (Frankfurter, J., concurring).

That fairly describes what a ruling upholding the CFPB's single-Director structure would mean. As the CFPB acknowledged at oral argument before the three-judge panel, a ruling in its favor would necessarily allow *all* extant independent agencies to be headed by one person. The CFPB's position, if accepted, would give Congress the green light to convert other heads of independent agencies into single Directors rather than multi-member commissions. A single-Director SEC, with the power to unilaterally impose $500 million penalties? A single-Director FCC, with the power to unilaterally mandate or rescind "net neutrality"? A single-Director NLRB, with the power to unilaterally supervise employer-employee relations nationwide? A single-Director Federal Reserve, with the power to unilaterally set monetary policy for the United States? That's what the CFPB's position would usher in.

"In the past, when faced with novel creations of this sort, the Supreme Court has looked down the slippery slope – and has ordinarily refused to take even a few steps down the hill." *Free Enterprise Fund*, 537 F.3d at 700 (Kavanaugh, J., dissenting). We should heed that caution and not start down the hill in this case.

More broadly, some suggest that judges should generally defer to Congress's understanding of the Constitution's separation of powers. But that hands-off attitude would flout a long, long line of Supreme Court precedent. *See Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 508 (2010) (invalidating structure of Public Company Accounting Oversight Board); *Boumediene*, 553 U.S. at 765-66, 792 (invalidating provision of Military Commissions Act); *Clinton v. City of New York*, 524 U.S. 417, 448-49 (1998) (invalidating Line Item Veto Act); *Metropolitan Washington Airports Authority v. Citizens for the Abatement of*

*Aircraft Noise, Inc.*, 501 U.S. 252, 265-77 (1991) (invalidating structure of Metropolitan Washington Airports Authority Board of Review); *Bowsher v. Synar*, 478 U.S. 714, 733-34 (1986) (invalidating Comptroller General's powers under reporting provisions of Balanced Budget and Emergency Deficit Control Act); *INS v. Chadha*, 462 U.S. 919, 942 n.13, 957-59 (1983) (invalidating legislative veto provision of Immigration and Nationality Act); *Buckley v. Valeo*, 424 U.S. 1, 134-35, 140 (1976) (invalidating structure of Federal Election Commission); *Myers v. United States*, 272 U.S. 52 (1926) (invalidating provision requiring Senate consent to President's removal of executive officer).

Citing the fact that President Obama signed the Dodd-Frank Act that created the CFPB, some argue that the Executive Branch has somehow waived any objection to this Article II violation. But President George W. Bush signed the Sarbanes-Oxley Act that created the PCAOB. That fact did not deter the Supreme Court in *Free Enterprise Fund*. The Court firmly declared that "the separation of powers does not depend on the views of individual Presidents, nor on whether the encroached-upon branch approves the encroachment." *Free Enterprise Fund*, 561 U.S. at 497. A President cannot "choose to bind his successors by diminishing their powers." *Id.*

Some argue that the courts need not intervene to address the CFPB's structural flaw because the CFPB is checked by Congress through Congress's oversight power and ultimate control over appropriations. But Congress cannot supervise or direct the Director on an ongoing basis regarding what rules

to issue, what enforcement actions to bring (or decline to bring), or how to resolve adjudications.[19]

In urging judicial deference to the single-Director structure, the CFPB also points out that the CFPB's *decisions* are checked by the courts, so we should not worry too much about the CFPB's single-Director *structure*. But much of what an agency does – determining what rules to issue within a broad statutory authorization and when, how, and against whom to bring enforcement actions to enforce the law – occurs in the twilight of discretion. Those discretionary actions have a critical impact on individual liberty. Yet courts do not review or only deferentially review such exercises of agency

---

[19] Moreover, Congress's ability to check the CFPB is less than its ability to check traditional independent agencies. The CFPB is not subject to the ordinary annual appropriations process. Instead, the Dodd-Frank Act requires the Federal Reserve to transfer "from the combined earnings of the Federal Reserve System" the amount "determined by the Director," not to exceed 12 percent of the "total operating expenses of the Federal Reserve System." 12 U.S.C. § 5497(a)(1)-(2). As those who have labored in Washington well understand, the regular appropriations process brings at least some measure of oversight by Congress. The CFPB is exempt from that check. To be sure, Section 5497 is not an entrenched statute shielded from future congressional alteration, nor could it be. *See, e.g.*, *Manigault v. Springs*, 199 U.S. 473, 487 (1905). But changing that statutory provision would require Congress to enact a new law. In short, the CFPB's current exemption from the ordinary appropriations process arguably enhances the concern in this case about the massive power lodged in a single, unaccountable Director.

That said, the single-Director CFPB would constitute an Article II problem even if the CFPB were subject to the usual appropriations process. The CFPB's exemption from the ordinary appropriations process is at most just "extra icing on" an unconstitutional "cake already frosted." *Yates v. United States*, 135 S. Ct. 1074, 1093, slip op. at 6 (2015) (Kagan, J., dissenting).

discretion. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844-45 (1984); *Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 41-43 (1983); *Heckler v. Chaney*, 470 U.S. 821, 831-33 (1985). The probability of judicial review of some agency action has never excused or mitigated an Article II problem in the structure of the agency. *See, e.g.*, *Free Enterprise Fund*, 561 U.S. 477; *Buckley*, 424 U.S. 1.

* * *

In sum, the CFPB's single-Director structure departs from settled historical practice, threatens individual liberty, and diminishes the President's Article II authority to exercise the executive power. Applying the Supreme Court's separation of powers precedents, I conclude that the CFPB is unconstitutionally structured because it is an independent agency that exercises substantial executive power and is headed by a single Director.

## V. REMEDY

Having concluded that the CFPB is unconstitutionally structured, I reach the question of the appropriate remedy.

In light of this one specific constitutional flaw in the Dodd-Frank Act, must that whole Act be struck down? Or must we strike down at least those statutory provisions creating the CFPB and defining the CFPB's duties and authorities? Or do we more narrowly strike down and sever the for-cause removal provision that is the source of the constitutional problem?

Not surprisingly, PHH wants us, at a minimum, to strike down the CFPB and prevent its continued operation. The

United States as amicus curiae agrees with PHH on the merits, but disagrees on the remedy. According to the United States, the Supreme Court's case law requires us to impose the narrower remedy of simply severing the for-cause removal provision. I agree with the United States' reading of the Supreme Court precedent.

In *Free Enterprise Fund*, the Supreme Court confronted a similar issue with respect to the Public Company Accounting Oversight Board. Having found that Board's structure unconstitutional, would the Court invalidate the agency (or even the whole Sarbanes-Oxley Act) or simply sever the for-cause provision? The Court stated: "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 508 (2010). Applying that principle, the *Free Enterprise Fund* Court severed the second for-cause provision and otherwise left the PCAOB intact.

Severability is appropriate, the *Free Enterprise Fund* Court stated, so long as (i) Congress would have preferred the law with the offending provision severed over no law at all; and (ii) the law with the offending provision severed would remain "fully operative as a law." *Id.* at 509. Both requirements are met here.

*First*, in considering Congress's intent with respect to severability, courts must decide – or often speculate, truth be told – whether Congress would "have preferred what is left of its statute to no statute at all." *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 330 (2006); *see also Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987) (The "unconstitutional provision must be severed unless the statute

created in its absence is legislation that Congress would not have enacted."). Importantly, courts need not speculate and can presume that Congress wanted to retain the constitutional remainder of the statute when "Congress has explicitly provided for severance by including a severability clause in the statute." *Id.* at 686; *see also id.* (The "inclusion of such a clause creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision.").

The statute at issue in *Free Enterprise Fund* had no express severability clause. By contrast, in this case, the Dodd-Frank Act contains an *express* severability clause that instructs: "If any provision" of the Act "is held to be unconstitutional, the remainder of" the Act "shall not be affected thereby." 12 U.S.C. § 5302.

This case therefore presents an even easier case than *Free Enterprise Fund* for severability of the for-cause provision. Through its express severability clause, the Dodd-Frank Act itself all but answers the question of presumed congressional intent. It will be the rare case when a court may ignore a severability provision set forth in the text of the relevant statute. *See Alaska Airlines*, 480 U.S. at 686. I see no justification for tilting at that windmill in this case.

*Second*, we also must look at "the balance of the legislation" to assess whether the statute is capable "of functioning" without the offending provisions "in a manner consistent with the intent of Congress." *Id.* at 684-85 (emphasis omitted). That prong of the analysis in essence turns on whether the truncated statute is "fully operative as a law." *Free Enterprise Fund*, 561 U.S. at 509. To take just one example, in *Marbury v. Madison*, the Court concluded that Section 13 of the Judiciary Act of 1789 was unconstitutional in

part. 5 U.S. 137, 179-80 (1803). But the Court did not disturb the remainder of the Judiciary Act. *Id.* at 179-80.

Here, as in *Free Enterprise Fund*, the Dodd-Frank Act and its CFPB-related provisions will remain "fully operative as a law" without the for-cause removal restriction. *Free Enterprise Fund*, 561 U.S. at 509. Operating without the for-cause removal provision and under the supervision and direction of the President, the CFPB may still "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws," 12 U.S.C. § 5491(a), much as the Public Company Accounting Oversight Board has continued fulfilling its statutorily authorized mission in the wake of the Supreme Court's decision in *Free Enterprise Fund*.[20] Moreover, the CFPB's operation as an executive agency will not in any way prevent the overall Dodd-Frank Act from operating as a law.

To be sure, one might ask whether, instead of severing the for-cause removal provision, which would make the CFPB an

---

[20] The Dodd-Frank Act contains a five-year tenure provision for the Director, *see* 12 U.S.C. § 5491(c)(1), akin to the similar 10-year tenure provision for the Director of the FBI and the 5-year tenure provision for the Commissioner of the IRS. *See* Crime Control Act of 1976, § 203, *reprinted in* 28 U.S.C. § 532 note (FBI Director "may not serve more than one ten-year term"); 26 U.S.C. § 7803(a)(1)(B) (term of the IRS Commissioner "shall be a 5-year term"). But under Supreme Court precedent, those kinds of tenure provisions do not prevent the President from removing at will a Director at any time during the Director's tenure. *See Parsons v. United States*, 167 U.S. 324, 343 (1897). Therefore, I would not invalidate and sever the tenure provision. If such a tenure provision did impair the President's ability to remove the Director at will during the Director's term, then it too would be unconstitutional, and also would have to be invalidated and severed.

executive agency, we should rewrite and add to the Dodd-Frank Act by restructuring the CFPB as a *multi-member independent* agency. But doing so would require us to create a variety of new offices, designate one of the offices as chair, and specify various administrative details of the reconstituted agency. In *Free Enterprise Fund*, the Supreme Court firmly rejected that approach. As the Supreme Court said, all of that "editorial freedom" would take courts far beyond our judicial capacity and proper judicial role. 561 U.S. at 510. In comparable circumstances, no Supreme Court case has adopted such an approach. We therefore may not do so here. Congress of course remains free, if it wishes, to reconstruct the CFPB as a traditional multi-member independent agency.

In similar circumstances, the Supreme Court in *Free Enterprise Fund* severed the unconstitutional for-cause provision but did not otherwise disturb the Sarbanes-Oxley Act or the operation of the new Public Company Accounting Oversight Board created by that Act. *See id.* at 508-10. Similarly, in a recent case involving the Copyright Royalty Board, we severed the for-cause provision that rendered that Board unconstitutional, but did not otherwise disturb the copyright laws or the operation of the Copyright Royalty Board. *See Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332, 1340-41 (D.C. Cir. 2012).

In light of the Dodd-Frank Act's express severability clause, and because the Act and the CFPB may function without the CFPB's for-cause removal provision, we must remedy the constitutional violation by severing the for-cause removal provision from the statute. Under that approach, the CFPB would continue to operate, but would do so as an executive agency. The President of the United States would

have the power to supervise and direct the Director of the CFPB, and to remove the Director at will at any time.

\* \* \*

The CFPB violates Article II of the Constitution because the CFPB is an independent agency that exercises substantial executive power and is headed by a single Director. We should invalidate and sever the for-cause removal provision and hold that the Director of the CFPB may be supervised, directed, and removed at will by the President. I respectfully dissent.

RANDOLPH, *Senior Circuit Judge*, dissenting:

I entirely agree with Judge Kavanaugh's dissenting opinion.[1] I write to identify a separate constitutional issue that provides an additional reason for setting aside not only the order of the Director of the Consumer Financial Protection Bureau, but also all proceedings before the CFPB's Administrative Law Judge, including his Recommended Decision.

After the CFPB's enforcement unit filed a Notice of Charges against PHH, an Administrative Law Judge held a nine-day hearing and issued a recommended decision, concluding that petitioners had violated the Real Estate Settlement Procedures Act of 1974. In PHH's administrative appeal, the Director "affirm[ed]" the ALJ's conclusion that PHH had violated that Act.

I believe the ALJ who presided over the hearing was an "inferior Officer" within the meaning of Article II, section 2, clause 2 of the Constitution. That constitutional provision requires "inferior Officers" to be appointed by the President, the "Courts of Law," or the "Heads of Departments." This ALJ was not so appointed. Pursuant to an agreement between the CFPB and the Securities and Exchange Commission, the SEC's Chief Administrative Law Judge assigned him to the case. In addition to the unconstitutional structure of the CFPB, this violation of

_____

[1] I do not agree that "[i]n practical effect," Judge Griffith's "approach yields a result somewhat similar to Judge Kavanaugh's proposed remedy." Concurring Op. at 22 (Griffith, J.). There are substantial differences between the President's power of removal "for cause" and the President's power to remove an individual who has no such protection. One of the biggest is that non-"for cause" employees are not entitled due process before being removed from office, *see Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 578 (1972), but "for cause" employees are so entitled. Experience under the Civil Service Reform Act of 1978 proves how time-consuming and cumbersome pre-removal due process procedures can be.

the Appointments Clause rendered the proceedings against PHH unconstitutional.

This case is indistinguishable from *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868 (1991). My reasoning is set forth in *Landry v. Federal Deposit Insurance Corp.*, 204 F.3d 1125, 1140-44 (D.C. Cir. 2000) (Randolph, J., concurring in part and concurring in the judgment). There is no need to repeat what I wrote there. The majority opinion in *Landry* disagreed with my position, but PHH has preserved the issue for judicial review. The CFPB has argued that PHH waived the issue because it did not raise it before the CFPB. But the *Freytag* petitioners also raised their constitutional objection to the appointment of the special trial judge for the first time on appeal. *See Freytag*, 501 U.S. at 892-95 (Scalia, J., concurring). There is no difference between this case and *Freytag*, except that in light of the majority opinion in *Landry* it would have been futile for PHH to object, a point that cuts in PHH's favor.

Since the panel decision in this case, several developments have occurred with respect to the Appointments Clause issue. The Tenth Circuit in *Bandimere v. SEC*, 844 F.3d 1168 (10th Cir. 2016), *pet. for cert. pending*, No. 17-475 (filed Sept. 29, 2017), disagreed with the majority opinion in *Landry* and held that the SEC's ALJs are invested with powers that require their appointment as inferior officers under the Appointments Clause. In addition, the Fifth Circuit granted a stay of an FDIC order because the respondent had established a likelihood of success on his claim that the ALJ who presided over his proceeding was an officer who was not properly appointed under the Appointments Clause. *Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017). In so ruling, the Fifth Circuit also expressly disagreed with *Landry*.

In the meantime, our court, sitting *en banc*, split 5 to 5 in *Lucia v. SEC*, a case in which the panel – relying on *Landry* – had reached a conclusion in direct conflict with *Bandimere*. *Raymond J. Lucia Cos. v. SEC*, 868 F.3d 1021 (D.C. Cir. 2017) (en banc). On June 26, 2017, the equally-divided *en banc* court issued a per curiam order denying the petition for review.

On November 29, 2017, the Solicitor General, on behalf of the SEC, filed a response to Lucia's certiorari petition. The Solicitor General confessed error and acquiesced in certiorari. That is, the S.G. agreed that the SEC's ALJs are "inferior officers" within the meaning of the Appointments Clause and, as such, were not properly appointed. Brief for the Respondent at 10-19, *Lucia v. SEC*, No. 17-130 (filed Nov. 29, 2017). On January 12, 2018, the Supreme Court granted certiorari. 2018 WL 386565 (S. Ct. Jan. 12, 2018).

Given this state of affairs, the *en banc* majority should withhold any order remanding this case to the CFPB until the Supreme Court decides *Lucia*. *Cf.* Order, *Timbervest, LLC v. SEC*, No. 15-1416 (D.C. Cir. Aug. 8, 2017); Order, *J.S. Oliver Capital Mgmt. v. SEC*, No. 16-72703 (9th Cir. Oct. 25, 2017). As the Court held in *Freytag*, Appointments Clause violations go "to the validity" of the underlying proceedings. 501 U.S. at 879. Suppose the Supreme Court agrees with the Solicitor General in *Lucia*, which seems entirely probable. Then not only the CFPB Director's order, but also all proceedings before the ALJ, including the ALJ's Recommended Decision, would be invalid.

Nevertheless, the majority – relying on the order granting *en banc* in *PHH* – remands the case to the CFPB without waiting for the Supreme Court to decide *Lucia*. Maj. Op. at 17. The *en banc* order stated: "While *not otherwise limited*, the parties are directed to address" the consequences of a decision

that the ALJ in *Lucia* was an inferior officer.  Order, *PHH Corp. v. CFPB*, No. 15-1177 (D.C. Cir. Feb. 16, 2017) (emphasis added).

Two points about the order are worth noting.  The first is that the order limited neither the issues to be argued nor the issues to be decided.  The second is that the order embodied the *en banc* court's judgment that the proper disposition of this case required consideration of the outcome in *Lucia*.  Of course, the posture has changed.  At the time of the *en banc* order, *Lucia* was pending in this court; now *Lucia* is pending in the Supreme Court.  That difference makes it all the more important that we wait for the Supreme Court's decision.